### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CORSI, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 1:07-cv-02004-ESH |
| | ) |
| EAGLE PUBLISHING, INC. | ) |
| | ) |
| Defendant. | ) |
| | ) |

### <u>MOTION TO DISMISS</u>

COMES NOW Defendant Eagle Publishing, Inc., through the undersigned counsel, and hereby moves this Court for an Order dismissing the action pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(7) and 19, and as grounds therefor refers to the Memorandum of Points and Authorities attached hereto and made a part hereof.

Respectfully submitted,

<u>/s/ Mark I. Bailen</u>
Bruce W. Sanford (356568)
Mark I. Bailen (459623)
Laurie A. Babinski (976505) (admission pending)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue N.W.
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1500
Fax: (202) 861-1783

*Attorneys for Defendant*
*Eagle Publishing, Inc.*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CORSI, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-02004-ESH |
| | ) | |
| EAGLE PUBLISHING, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO DISMISS

Bruce W. Sanford (356568)
Mark I. Bailen (459623)
Laurie A. Babinski (976505) (admission pending)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue N.W.
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1500
Fax: (202) 861-1783

*Attorneys for Defendant*
*Eagle Publishing, Inc.*

## <u>TABLE OF CONTENTS</u>

**PAGE**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.    The Authors' Publishing Contracts With Regnery ............................................. 3

    B.    The Miniter Arbitration ..................................................................................... 4

    C.    The Federal Court Action .................................................................................. 6

ARGUMENT ...................................................................................................................... 7

II.    THE COURT SHOULD DISMISS THE CASE UNDER RULES 12(B)(7) AND
    19 BECAUSE NON-PARTY REGNERY PUBLISHING, INC. IS
    INDISPENSABLE ........................................................................................................ 7

    A.    Regnery Publishing, Inc. Is a "Necessary" Party ............................................. 8

    B.    Regnery Publishing, Inc. Is "Indispensable" .................................................. 10

III.    THE COURT SHOULD DISMISS THE CASE UNDER RULE 12(B)(6)
    BECAUSE THE AUTHORS HAVE FAILED TO STATE A CLAIM UPON
    WHICH RELIEF MAY BE GRANTED ..................................................................... 11

    A.    The Authors Have Failed to State a Claim for Fraud ........................................ 12

    B.    The Authors Have Failed to State a Claim for Inducement to Breach of
        Contract ............................................................................................................ 14

    C.    The Authors Have Failed to State a Claim for Interference with
        Contractual Relations ....................................................................................... 15

    D.    The Authors Have Failed to State a Claim for Interference with
        Prospective Business Advantage ....................................................................... 16

    E.    The Authors Have Failed to State a Claim for Unjust Enrichment .................... 16

    F.    The Authors Have Failed to State a Claim for an Accounting ........................... 17

    G.    The Authors Have Failed to State a Claim for Unfair Trade Practices ............... 18

    H.    The Authors Have Failed to State a Claim for Damage to Commercial
        Reputation ........................................................................................................ 18

CONCLUSION ................................................................................................................. 19

## POINTS AND AUTHORITIES

### CASES

*Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32 (D.D.C. 2005)..............................................................................................................15

* *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................12, 15

*Bloomgarden v. Coyer*, 479 F.2d 201 (D.C. Cir. 1973)............................................16, 17

*Bouley v. Bouley*, 19 A.D.3d 1049 (N.Y. App. Div. 2005)............................................18

*Brown v. Carr*, 503 A.2d 1241 (D.C. 1986)....................................................................16

*Burger King Corp. v. American National Bank & Trust Co. of Chicago*, 119 F.R.D. 672 (N.D. Ill. 1988) .........................................................................................9

*Cadet v. Draper & Goldberg, PLLC*, No. 05-cv-2105, 2007 U.S. Dist. LEXIS 72504 (D.D.C. Sept. 28, 2007) ................................................................................13

*Carnero v. Boston Scientific Corp.*, 433 F.3d 1 (1st Cir. 2006).......................................9

*Carter v. Hahn*, 821 A.2d 890 (D.C. 2003).....................................................................19

*Casco Marina Development, L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77 (D.C. 2003)....................................................................................................16

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ......................................14

*Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489 (D.C. Cir. 1997)..................10

* *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Washington*, 699 F.2d 1274 (D.C. Cir. 1983)...................................................................................8, 11

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ........................................................17

*Daisley v. Riggs Bank*, 372 F. Supp. 2d 61 (D.D.C. 2005)......................................13, 14

*DeKine v. District of Columbia*, 422 A.2d 981 (D.C. 1980)..........................................16

*Equity Group v. Painewebber Inc.*, 839 F. Supp. 930 (D.D.C. 1993) ...........................15

*Fred Ezra Co. v. Pedas*, 682 A.2d 173 (D.C. 1996).......................................................16

*Government Rels. Inc. v. Howe*, No. 05-cv-1081, 2007 U.S. Dist. LEXIS 4952
  (D.D.C. Jan. 24, 2007) .......................................................................................... 14

*Heller v. Fortis Benefits Insurance Co.*, 142 F.3d 487 (D.C. Cir. 1998) ........................ 16

*Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916 (D.C. 1992) ....................... 14

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ...................................................... 3, 14

*In re Kosmadakes*, 444 F.2d 999 (D.C. Cir. 1971) ......................................................... 18

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ................................... 12

*Naartex Consulting Corp. v. Watt*, 542 F. Supp. 1196 (D.D.C. 1982) ............................ 9

*Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322 (D.C. 1999) ......................... 18

*P.V. Properties, Inc. v. Rock Creek Village Assocs. Ltd. P'ship*, 549 A.2d 403,
  409 (Md. App. 1988) ............................................................................................... 17

*Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968) ................ 11

*Rivera Rojas v. Loewen Group Int'l, Inc.*, 178 F.R.D. 356 (D.P.R. 1998) ................. 5, 10

*In re: Sealed Case*, 494 F.3d 139 (D.C. Cir. 2007) ........................................................ 12

*State v. General Electric Co.*, 199 A.D.2d 595 (N.Y. App. Div. 1993) .................... 18-19

*Stephens v. United States*, No. 07-cv-1162, 2007 U.S. Dist. LEXIS 72058
  (D.D.C. Sept. 28, 2007) .......................................................................................... 12

*Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F. Supp. 518 (D. Conn. 1991) .......... 9

*Tuxedo Contractors, Inc. v. Swindell-Dressler Co.*, 613 F.2d 1159 (D.C. Cir.
  1979) .................................................................................................................... 14, 15

*United States ex rel. Joseph v. Cannon*, 642 F.2d 1373 (D.C. Cir. 1981) ..................... 13

*United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251
  (D.C. Cir. 2004) ....................................................................................................... 13

## MISCELLANEOUS

1A C.J.S. Accounting § 6 (2007) ..................................................................................... 17

Consumer Protection Procedures Act, D.C. Code § 28-3901 .......................................... 18

Fed. R. Civ. P. 12(b)(6)........................................................................................... 2

Fed. R. Civ. P. 19(a) ................................................................................................. 8

Fed. R. Civ. P. 19(b) ............................................................................................ 7, 10

William Prosser, *Law of Torts* § 130 (4th ed. 1971)......................................... 16

5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1202
    (3d ed. 2004)..................................................................................................... 12

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §
    1359 (3d ed. 2004) ............................................................................................ 5

## INTRODUCTION

Plaintiffs are five authors (collectively, the "Authors") whose books have been published by non-party Regnery Publishing, Inc. ("Regnery"), a leading publisher with an enviable track record of creating successful bestsellers. As expected, the Authors have written contracts with Regnery and the contracts each contain arbitration provisions for dispute resolution. The Authors complain about Regnery's marketing and distribution strategies, alleging that the strategies deprive them of potential royalty income. While the Authors' claims are meritless – Regnery's activities are clearly described in the Authors' contracts and are standard practices used by publishers throughout the publishing industry – this case is ripe for dismissal at the preliminary motion stage because the Authors have asserted their claims not against Regnery, but its parent corporation, Eagle Publishing, Inc. ("Eagle").

The Authors maintain no relationship with Eagle – contractual, fiduciary, or otherwise. While they may have sued Eagle in an attempt to avoid the mandatory arbitration provision in their contracts with Regnery, their failure to join Regnery creates at least two grounds for dismissal under Rule 12(b), Federal Rules of Civil Procedure. First, each of the eight causes of action in the Complaint implicates rights in the publishing contracts between the Authors and Regnery. It is well settled that where rights under a contract are construed, all parties to the contract are considered necessary parties under Rule 19. Because Regnery is necessary to the adjudication of the Authors' claims and because it cannot be joined in this federal action due to the mandatory arbitration provision in the contracts, this case must be dismissed under Rules 12(b)(7) and 19.

Indeed, these very same issues are being adjudicated in a pending arbitration between Regnery and one of the Authors, Richard Miniter. That arbitration was initiated by Regnery, after Mr. Miniter failed to provide Regnery the manuscript for a book as required under his

publishing contract with Regnery. Instead, Mr. Miniter signed a new contract with another publisher, and then refused to honor a buy-out deal brokered by his agent, forcing Regnery to seek recovery in arbitration. In that proceeding, Mr. Miniter asserted claims nearly identical to those alleged here. He also attempted to join the other authors in that proceeding. The arbitrator precluded him from doing so finding that each of the Authors' claims concern separate and distinct contracts which should be arbitrated separately. Instead of pursuing Regnery in arbitration as required under the contracts, however, the Authors have apparently attempted to avoid their contractual obligations by filing this federal court action against Eagle.

Secondly, the Complaint fails to state a claim against Eagle upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The thrust of the Authors' claims (that Regnery's marketing and distribution shortchanges them on royalties) is directly contradicted by the explicit language in the Authors' contracts that grants Regnery the *exclusive* right to market and distribute their books. Not only does Regnery have the right to use marketing strategies such as book club listings and premiums for subscriptions, but, in fact, these are effective tools that help drive retail sales. Because the Complaint avoids allegations describing how Regnery actually breached any contract – which is a required element to state a valid claim for either inducement to breach of contract (Count II) or intentional interference with contract (Count III) – the Authors cannot state a claim upon which relief may be granted.

The remaining counts in the Complaint similarly fail. Specifically, the Authors have failed to state claims for fraud and "unfair trade practices" (Counts I and VII) because they have failed to identify a single misrepresentation or omission by Eagle (or Regnery) that can form the basis for such claims. The allegations for interference with prospective business advantage (Count IV) fail to state a claim because the Authors have not identified any specific

- 2 -

advantageous business transactions with which Eagle interfered.  The Authors cannot state a claim for unjust enrichment (Count V) because the Authors acknowledge that they produced their manuscripts to Regnery – not Eagle – and thus they did not perform any services for Eagle that would render it "unjustly enriched."  Their claim for an accounting (Count VI) fails because they have not alleged (nor can they) any contractual, statutory or fiduciary duty owed by Eagle to the Authors.  Finally, the claim for damage to commercial reputation (Count VIII) fails because the Authors have not alleged any false statements made by Eagle.

The case, therefore, should also be dismissed under Rule 12(b)(6).

## BACKGROUND

A.    The Authors' Publishing Contracts With Regnery

Plaintiffs entered separate publishing contracts with Regnery whereby they granted and assigned to Regnery "the exclusive right, title and interest to print, publish and market" a book (or books) by the author.  Compl.  ¶ 19; *see* publishing contracts attached hereto as Exhibits 1-8 (collectively, the "Publishing Contracts") at ¶ 1.[1]

Each of the contracts contains an arbitration provision, which states:

> Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

---

[1] Plaintiff Corsi entered a publishing contract with Regnery on or around June 7, 2004.  Ex. 1. Plaintiff Gertz entered publishing contracts with Regnery on or about July 31, 1998, January 31, 2000 and in or around November 2001.  Exs. 2, 3, and 4.  Plaintiff Patterson entered a publishing contract with Regnery in or around May 2002.  Ex. 5.  Plaintiff Mowbray entered a publishing contract with Regnery on or around February 10, 2003.  Ex. 6.  Plaintiff Miniter entered contracts with Regnery in or around April 2003 and on or around February 14, 2005.  Exs. 7 and 8.  The Court may review the terms of a contract when considering a motion to dismiss under Rule 12(b)(6).  *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

Corsi contract ¶ 14, attached as Ex. 1.[2]

The Publishing Contracts grant Regnery wide latitude in how it chooses to print, publish and market the books. Other than requirements that Regnery publish the book within 12 months after final acceptance of the manuscript (subject to certain exceptions), affix a copyright notice to the book in the Author's name, provide a set amount of free copies to the author, and pay the author royalties as prescribed by the terms of the contract, Regnery is virtually free to publish and distribute the book in its sole discretion. *See*, *e.g.*, Ex. 1 at ¶¶ 2, 7.

The Publishing Contracts' royalty provisions contemplate that Regnery may sell books to the book trade (i.e. retail markets), to the book trade at discounts, and to "additional markets outside regular bookstores or outside the regular book trade." Compl. ¶¶ 19-21; *see*, *e.g.*, Ex. 1 at ¶ 2. The Publishing Contracts explicitly envision sales to "additional markets":

> Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the book trade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to book clubs Publisher shall pay Author ten percent (10%) of the amount received by the Publisher in excess of its manufacturing costs, returns, and agent commissions.

Mowbray contract ¶ 2(g) attached as Ex. 6; Compl. ¶ 20.

The Publishing Contracts do not contain any representations by Eagle or any obligations of Eagle. The contracts are exclusively between Regnery and the Authors.

B.    The Miniter Arbitration

In April 2007, Regnery initiated an arbitration proceeding against Miniter with the American Arbitration Association. *See* Demand for Arbitration, *Regnery Publ'g, Inc. v. Richard*

---

[2] *See also* Gertz (1998) contract ¶ 15, Gertz (2000) contract ¶ 14, and Gertz (2001) contract ¶ 14 attached as Exs. 2-4; Patterson contract ¶ 14 attached as Ex. 5; Mowbray contract ¶ 13 attached as Ex. 6; Miniter (2003) contract ¶ 14 and Miniter (2005) contract ¶ 14 attached as Exs. 7-8.

*Miniter*, Case No. 16 143 00290 07, attached as Ex. 9.[3]  Regnery claimed that Miniter breached his publishing contract with Regnery entered on or about February 14, 2005 by failing to produce a manuscript of a second book for publication as required under the contract.  Ex. 9 at ¶ 4.  On or about September 14, 2007, Miniter filed counterclaims against Regnery in the arbitration, asserting that Regnery breached the contract by allegedly failing to make royalty payments and by "its improper diversion of books from retail sales and to affiliate and/or subsidiary organizations for no charge, or for a substantially reduced charge, in order to avoid royalty payments."  *See* First Amended Counterclaims and Demand for Arbitration, attached as Ex. 10.[4]  Miniter also sought an order directing Regnery to provide an accounting.  *Id.*  He asserted claims based on both his February 2005 and April 2003 publishing contracts with Regnery.

In September 2007, Miniter moved to join plaintiffs Corsi, Gertz, Mowbray, and Patterson as parties to the arbitration, on the grounds that they would be asserting "identical" claims against Regnery.  *See* Respondent's Motion for Leave to Join Parties and Claims, attached as Ex. 11.  On October 1, 2007, the arbitrator denied without prejudice Miniter's motion to join, finding joinder to be improper at such a late stage in the arbitration where each of the authors' contracts involved separate and distinct facts.  The arbitrator specifically noted that the other authors were not precluded from filing their own arbitration proceeding.  *See* Procedure Order No. 4 attached as Ex. 12.  The arbitrator denied Miniter's efforts to assert claims relating to his 2003 contract, but permitted the claims arising under the 2005 contract to go forward.  *Id.*

The Miniter arbitration hearing is scheduled for January 14 and 15, 2008.

---

[3]  For purposes of a motion under Rule 12(b)(7), the court may consider matters outside of the pleadings.  *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1359 (3d ed. 2004); *Rivera Rojas v. Loewen Group Int'l, Inc.,* 178 F.R.D. 356, 360-61 (D.P.R. 1998).

[4]  The American Arbitration Association initially dismissed the counterclaims because Miniter failed to make payment of the filing fee.  Later, Miniter was granted leave to re-file.

C.    The Federal Court Action

On November 6, 2007, the Authors filed the instant action alleging that Eagle "orchestrates and participates" in a "scheme to divert book sales away from retail outlets and to wholly owned subsidiary organizations within the Eagle conglomerate." Compl. at p. 2 (Nature of the Case). The Authors have asserted causes of action for 1) fraud; 2) inducement to breach of contract; 3) interference with contractual relations; 4) interference with prospective business advantage; 5) unjust enrichment; 6) accounting; 7) unfair trade practices; and 8) damage to commercial reputation.

The Authors allege that "Regnery's publications are marketed and sold by sister companies within the Eagle conglomerate." Compl. ¶ 11. They claim that an Eagle subsidiary operates the Conservative Book Club ("CBC") and that Regnery sells first edition books to CBC "at, below, or only marginally above, its own cost of publication." *Id.* They allege that "the Eagle conglomerate realizes greater profits from the sale of Regnery's books by CBC than it does from sales in retail bookstores" and this is "antithetical" to the interests of Regnery's authors and "contrary to the clear intent of the parties to Regnery's publishing contracts." *Id.* ¶¶ 13-14. The Complaint does not cite any provision in the Publishing Contracts identifying the allegedly contrary intent of the parties.

The Authors allege that Eagle distributes Regnery's books by direct mail and over the Internet and the Authors expected royalties are "substantially reduced." Compl. ¶ 15. According to the Complaint, books are also offered as free gifts to new subscribers of Eagle's periodicals and Eagle also controls and directs donations of Regnery books to nonprofit entities. *Id.* ¶¶ 16-17. The Authors acknowledge that these sales by direct mail, over the Internet, to book clubs and otherwise are "treated as sales to 'additional markets,'" and royalty payments to authors for

- 6 -

sales to "additional markets" are "treated under a separate clause in the Publishing Contracts."
*Id*. ¶ 19.

Notwithstanding the reference to sales to additional markets in the Publishing Contracts,
the Authors allege that "Eagle and its agents" deliberately conceal diversion of books away from
the retail trade.  Compl. ¶ 23.  They further allege that Regnery acts at "Eagle's direction" to
minimize sales through traditional channels in the book trade, even though they do not cite any
provision in the Publishing Contracts which this alleged activity violates, nor do they specify any
facts supporting the allegation that Regnery is acting against the Authors' best interest at Eagle's
direction.  *Id*. ¶ 24.

The Authors acknowledge that Regnery is a wholly-owned subsidiary of Eagle but they
do not challenge the separate corporate identity of Regnery.  Compl. ¶ 10.

## **ARGUMENT**

### I.    **THE COURT SHOULD DISMISS THE CASE UNDER RULES 12(b)(7) AND 19 BECAUSE NON-PARTY REGNERY PUBLISHING, INC. IS INDISPENSABLE**

A Rule 12(b)(7) motion should be granted where a party fails to join an indispensable
party pursuant to Rule 19.  Under Rule 19(a), the Court must first determine whether an absent
party is necessary to the litigation.  If so, the Court must consider under Rule 19(b) "whether in
equity and good conscience the action should proceed among the parties before it," or whether it
should be dismissed, "the absent person being thus regarded as indispensable."  Fed. R. Civ. P.
19(b).

For the reasons set forth below, Regnery is both a necessary and indispensable party and
this action should not proceed without it.  Because each of the Authors previously agreed to
arbitrate any claims against Regnery (concerning their books), Regnery cannot be joined to this
action.  The case should be dismissed.

A.    Regnery Publishing, Inc. Is a "Necessary" Party

A party is deemed "necessary" under Rule 19(a) if without it (1) "complete relief cannot be accorded among those already parties," or (2) the absent party "claims an interest relating to the subject of the action and is so situated that the disposition of the action in [that party's] absence may" either "(i) as a practical matter impair [that] person's ability to protect that interest or (ii) leave [the remaining] parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed. R. Civ. P. 19(a); *see Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Washington*, 699 F.2d 1274, 1278-79 (D.C. Cir. 1983) (affirming dismissal under Rule 19 and noting that "[a]ll three Rule 19(a) concerns are implicated when the person whose obligation is centrally at issue is missing from the action").

The allegations in the Complaint make clear that the ability of Regnery to protect its interests will be impaired by the disposition of the action. It is undisputed that the Authors have a contractual relationship only with Regnery (Compl. ¶ 19) and each of their claims implicates Regnery and the Publishing Contracts. For example:

- The alleged "scheme" to defraud the Authors involves "diverting Regnery book sales away from retail outlets," but the Publishing Contracts make specific reference to sales to "additional markets outside regular bookstores or outside the booktrade."[5] Moreover, the Authors allege that Eagle ratified "false statements and concealments of its subsidiaries" but the only statements by any subsidiary of Eagle identified in the Complaint are the representations by Regnery in the Publishing Contracts.[6]

- The Authors' claim for inducement to breach of contract is explicitly premised on Regnery's alleged violation of the terms of the Publishing Contracts. Compl. ¶ 32.

---

[5] *See, e.g.*, Corsi contract at ¶ 2(c), attached as Exhibit 1.
[6] For the same reasons, the claim for unfair trade practices (Count 7) necessarily implicates Regnery and the Publishing Contracts.

- Similarly, the claim for interference with contractual relations, on its face, is based on the Publishing Contracts between the Authors and Regnery. *Id.* ¶¶ 35-36.

- The claim for interference with prospective business advantage also hinges on whether Regnery acted consistent with its obligations under the Publishing Contracts.

- The claim for unjust enrichment requires examination of whether the Publishing Contracts with Regnery created a relationship between Eagle and the Authors.

- The demand for an accounting necessarily implicates Regnery because it is Regnery that accounts for where and how books are sold and which royalties are due. *See, e.g.,* Corsi contract at ¶ 4(b) ("The statement shall include an accounting of all copies of the Work sold by Publisher . . .").

- The claim for damage to the Authors' reputation is based on representations made about book sales, representations that undoubtedly involve Regnery as Regnery is obligated under the Publishing Contracts to make the accounting.

Findings of fact and legal determinations involving the Publishing Contracts in this case will necessarily affect Regnery. Courts in similar situations have deemed the absent, contracting party, such as Regnery, to be a necessary party. *See*, *e.g.*, *Carnero v. Boston Scientific Corp.,* 433 F.3d 1, 18-19 (1st Cir. 2006) (holding that subsidiary was indispensable because, among other reasons, it was a signatory to the agreement, it made payments to the plaintiff, and it was alleged that the subsidiary breached the agreement); *Burger King Corp. v. American Nat'l Bank & Trust Co. of Chicago*, 119 F.R.D. 672, 676 (N.D. Ill. 1988) (holding that if the "absent party has a legally protected interest *in* the subject matter of the action – i.e., he is a party to a contract at issue – he falls squarely within the terms of Rule 19(a)(2)" (emphasis in original)). Indeed, "the precedent supports the proposition that a contracting party is the paradigm of an indispensable party." *Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F. Supp. 518, 527 (D. Conn. 1991) (citing cases); *see also Naartex Consulting Corp. v. Watt*, 542 F. Supp. 1196 (D.D.C. 1982) (granting motion to dismiss for failure to join an indispensable party because non-

parties who held interest in mineral lease were persons claiming an interest relating to subject matter of the action).

In *Rivera Rojas v. Loewen Group Int'l, Inc.,* 178 F.R.D. 356, 362-63 (D.P.R. 1998), the court determined that a non-party subsidiary of one of the defendants was a necessary and indispensable party based on similar facts. The plaintiffs, sellers of a funeral home business to the defendants, alleged that the defendants "engaged in a scheme of misrepresentation and noncompliance" and that they "concealed information regarding unspecified moneys that were owed to Plaintiffs," among other charges. *Id.* at 360. The defendants formed a subsidiary corporation for purposes of their purchase of the funeral home business, but the plaintiffs did not join this corporation as a defendant to maintain diversity jurisdiction. *Id.* They allege, however, that the parent company used the subsidiary to breach contracts with the plaintiffs and to otherwise harm the plaintiffs. *Id.* at 363. Because the subsidiary "has an interest in the litigation of these issues which pertain to contracts to which [the subsidiary] is a party . . . [i]t should be afforded the opportunity to defend against these allegations." *Id.* at 362. The *Rivera Rojas* court determined that the subsidiary was a necessary party and dismissed the action because its joinder was not feasible. *Id.* at 362-63.

B.    Regnery Publishing, Inc. Is "Indispensable"

Once a party is deemed necessary, the Court must consider under Rule 19(b) "whether in equity and good conscience the action should proceed among the parties before it," or whether it should be dismissed, "the absent person being thus regarded as indispensable." Fed. R. Civ. P. 19(b); *see Cherokee Nation of Oklahoma v. Babbitt,* 117 F.3d 1489, 1496 (D.C. Cir. 1997). The factors to be considered in making this determination are 1) "to what extent judgment rendered in the person's absence might be prejudicial to the person or those already parties"; 2) "the extent

to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided"; 3) "whether a judgment rendered in the person's absence will be adequate"; and 4) "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."  Fed. R. Civ. P. 19(b).  This is a fact-specific inquiry that "can only be determined in the context of particular litigation."  *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 118 (1968).

First, Regnery will certainly be prejudiced if this action proceeds without it.  The parties will be litigating over Regnery's conduct in Regnery's absence and any determinations regarding Regnery's conduct could adversely affect it in the current arbitration proceeding (or future ones).  Courts in similar instances have dismissed the federal court action.  *See Cloverleaf Standardbred Owners Ass'n,* 699 F.2d at 1279-80 (affirming dismissal pursuant to Rule 19 and noting that absent the missing party's participation, its interests could be detrimentally affected).

Second, the prejudice to Regnery cannot be avoided or lessened as each and every claim in the Complaint implicates Regnery in some way.  Third, any judgment would require the daunting task of determining to what extent any alleged injuries suffered by the Authors were caused by Eagle as opposed to Regnery, which, according to the Authors, allegedly breached its contracts with the Authors.  Finally, the plaintiffs have an adequate remedy if this action is dismissed.  They can proceed in arbitration against Regnery, just as plaintiff Minter already has done.

## II.    THE COURT SHOULD DISMISS THE CASE UNDER RULE 12(b)(6) BECAUSE THE AUTHORS HAVE FAILED TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

In considering a Rule 12(b)(6) motion, this Court must accept all well-pled allegations as true and construe the facts and reasonable inferences derived therfrom in the light most

favorable to the plaintiff.  *Stephens v. United States*, No. 07-cv-1162, 2007 U.S. Dist. LEXIS 72058, *5 (D.D.C. Sept. 28, 2007) (Huvelle, J.) (*citing Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).  However, this Court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint," nor must it "accept legal conclusions cast in the form of factual allegations."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

The Supreme Court recently addressed the pleading necessary to survive a Rule 12(b)(6) motion in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  The Supreme Court made clear that Rule 8(a) "does not authorize a pleader's 'bare averment that he wants relief and is entitled to it'" but rather "'contemplates the statement of circumstances, occurrences, and events in support of the claim presented.'"  *Id.* at 1965 n.3 (*quoting* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1202 (3d ed. 2004)); *see also In re: Sealed Case*, 494 F.3d 139, 145 (D.C. Cir. 2007); *Stephens*, 2007 U.S. Dist. LEXIS 72058, at *5-6.  Thus, Rule 8(a) requires a plaintiff to furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 127 S. Ct. at 1964-65.  To survive a motion to dismiss under *Twombly*, this Court must find that the Complaint contains "enough facts to state a claim to relief that is *plausible* on its face."  *Id.* at 1974 (emphasis added).  The Court should dismiss any claim wherein the pleaded facts fail to "raise a right to relief above the speculative level."  *Id.* at 1965.

For the reasons set forth below, plaintiffs have failed to allege facts sufficient to state a claim for any of the eight causes of action.

A.    <u>The Authors Have Failed to State a Claim for Fraud</u>

Any claim for fraud is subject to a heightened pleading requirement under Rule 9(b),

which requires that in "all averments of fraud or mistake, the circumstances constituting fraud or

mistake shall be stated with particularity." In the District of Columbia Circuit, the pleader must

"state the time, place and content of the false misrepresentations, the fact misrepresented and

what was obtained or given up as a consequence of the fraud." *United States ex rel. Joseph v.*

*Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981); *see also United States ex rel. Williams v. Martin-*

*Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1258 (D.C. Cir. 2004) (affirming dismissal of a

complaint under Rule 9(b) because it "allege[d] no start date, name[d] a laundry list of

individuals without specifying their relation to the fraudulent scheme . . . allege[d] a place only

twice . . . and set[] forth no facts that exemplify the purportedly fraudulent scheme").

 The purpose of Rule 9(b) is to give defendants "adequate notice" of the specifics of a

fraud claim against them so that they may "provide a meaningful response." *Daisley v. Riggs*

*Bank*, 372 F. Supp. 2d 61, 78-79 (D.D.C. 2005). Where the fraud claim "revolves around

nondisclosure rather than affirmative misrepresentation . . . plaintiffs must necessarily allege

when and what they believe should have been disclosed by the defendant[]." *Cadet v. Draper &*

*Goldberg, PLLC*, No. 05-cv-2105, 2007 U.S. Dist. LEXIS 72504, *15 (D.D.C. Sept. 28, 2007).

 The Authors have alleged no specific misrepresentations or omissions by Eagle (or

anyone else). For example, the Authors allege that Eagle "ratified false statements and

concealments of its subsidiaries" (Compl. ¶ 29), but offer no further facts identifying the

allegedly "false statements and concealments." For this reason alone their claim fails under Rule

9(b) for pleading with a lack of particularity.

 Moreover, the Authors have not alleged requisite facts establishing the elements for a

fraud claim. In the District of Columbia, a plaintiff must show that a defendant has made: (1) a

false representation 2) in reference to material fact, 3) with knowledge of its falsity, 4) with the

intent to deceive, and 5) action is taken in reliance upon the representation. *Daisley*, 372 F.

Supp. 2d at 78. In cases involving commercial contracts negotiated at arm's length, there is an

additional requirement that the allegedly defrauded party's reliance be reasonable. *See Hercules*

*& Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992).

The Authors have failed to allege that Eagle made a false representation in reference to a

material fact, that Eagle made such representation with knowledge of its falsity and with the

intent to deceive, or that any of the Authors took action relying upon Eagle's representation. For

these reasons, the Authors have not sufficiently stated a claim for fraud.

B.    The Authors Have Failed to State a Claim for Inducement to Breach of Contract

To make out a prima facie case of wrongful inducement of a breach of contract, the

plaintiff must show: 1) a contract; 2) knowledge of the contract; 3) intentional procurement of its

breach by the defendant; and 4) damages resulting from the breach. *Tuxedo Contractors, Inc. v.*

*Swindell-Dressler Co.*, 613 F.2d 1159, 1162 (D.C. Cir. 1979). The Authors have not pointed to

any provision of their contracts with Regnery that has been breached and therefore have failed to

allege the third element of this cause of action that a *breach* was procured by the defendant. In

fact, the Complaint cites the provision in each of the Authors' Publishing Contracts that

specifically contemplates that Regnery would distribute books to "additional markets." Compl. ¶

19. The mere fact that some of those "additional markets" may have included entities owned by

Eagle does not amount to a breach of the Publishing Contracts.[7]

Moreover, the Authors have not alleged facts sufficient to establish that Eagle

---

[7]  The Court may review the terms of a contract when considering a motion to dismiss under
Rule 12(b)(6) without converting the motion into one for summary judgment. *See Kaempe v.*
*Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *see also Chambers v. Time Warner, Inc.*, 282 F.3d
147, 152-54 (2d Cir. 2002) (finding district court's consideration of contracts in deciding a
motion to dismiss proper because they were "integral" to the Complaint").

intentionally procured breach of any contract.  A plaintiff must support such a conclusion with facts establishing that defendant's actions "substantially contributed" to the contracting party's decision to "dishonor" its contract with the plaintiff.  *Tuxedo*, 613 F.2d at 1162.  Intentionally procuring a breach of contract requires "a strong showing of intent" that must involve "egregious conduct such as libel, slander, physical coercion, fraud, misrepresentation, or disparagement."  *Gov't Rels. Inc. v. Howe*, No. 05-cv-1081, 2007 U.S. Dist. LEXIS 4952, *30 (D.D.C. Jan. 24, 2007) (internal quotations omitted).  Here, the Authors make only conclusory allegations that Eagle "induced, forced, and required . . . Regnery to violate the terms of the Authors' Publishing Contracts."  Compl. ¶ 32.  The Complaint does not identify any specific "terms" in the contracts that allegedly have been breached nor does it specify how Eagle "induced, forced and required" Regnery allegedly to breach the contract.  The Authors have failed to allege "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 127 S. Ct. at 1974.

C.    The Authors Have Failed to State a Claim for Interference with Contractual Relations

To establish a *prima facie* case for interference with contractual relations, "a plaintiff must show: 1) that a legal contract existed; 2) that defendant had knowledge of the contract; 3) that defendant intentionally interfered with the contract without justification; and 4) that damages resulted from defendant's actions."  *Equity Group v. Painewebber Inc.*, 839 F. Supp. 930, 934 (D.D.C. 1993).  A plaintiff must also show that the defendant's interference resulted in a breach of the contract in question.  *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 43 (D.D.C. 2005).

As noted above, the Authors have not made sufficient allegations to establish that Regnery breached any of the Publishing Contracts.  Because there has been no breach of contract, Eagle cannot have intentionally interfered with the contracts.

- 15 -

D.     The Authors Have Failed to State a Claim for Interference with Prospective Business Advantage

Intentional interference with a prospective business advantage runs parallel to that for interference with existing contracts. *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986) (*citing* William Prosser, *Law of Torts* § 130 (4th ed. 1971)); *see also DeKine v. District of Columbia*, 422 A.2d 981, 988 (D.C. 1980) (tort falls under same rubric as interference with contractual relations) (citation omitted).  A plaintiff must allege the existence of a "prospective advantageous business transaction" to succeed on this claim. *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003).  The Authors have not alleged any specific prospective, advantageous business transactions, but instead make general, vague allegations that they have been damaged in their "professional reputations" and that alleged reduction in their book sales has been "interfering with prospective business relationships with other publishers."  Compl. ¶ 39.  Without specifying a specific prospective advantageous business transaction, the Authors have failed to state a claim.

E.     The Authors Have Failed to State a Claim for Unjust Enrichment

To state a claim for the remedy of unjust enrichment, a plaintiff must show that: 1) he had a reasonable expectation of payment; 2) the defendant should reasonably have expected to pay; or 3) society's reasonable expectations of person and property would be defeated by nonpayment. *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 495 (D.C. Cir. 1998).  Thus, the plaintiff essentially "must show that [the defendant] was unjustly enriched at his expense and that the circumstances were such that in good conscience [the defendant] should make restitution." *Fred Ezra Co. v. Pedas*, 682 A.2d 173, 175 (D.C. 1996) (citation omitted); *see also Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1973).

It is clear that there is "no general responsibility in quasi-contract law to pay for services

*irrespective* of the circumstances in which they are carried out." *Bloomgarden*, 479 F.2d at 211 (emphasis in original). The circumstances must include a "basis for a claim for compensation" that shows that compensation from the defendant was "originally intended or expected." *Id.* at 212. As a result, where no relationship exists between the plaintiffs and the defendant, and the Complaint does not provide any legitimate ground beyond the "chagrin, disappointment, vexation, or supposed ingratitude" why payment is due, the complaint does not state any circumstances under which compensation could reasonably have been expected. *Id.*

Here, the Authors cannot reasonably have expected to have been compensated by Eagle. Their contracts were exclusively with Regnery and it was Regnery, not Eagle, that provided each of the Authors advances against future royalties. *See* Exs. 1-8 at ¶ 2. It was never contemplated, and the Authors do not so allege, that Eagle would ever compensate the Authors for any reason. Because the Authors cannot allege that any compensation was "originally intended or expected" from Eagle, they have failed to state a claim.

F.    The Authors Have Failed to State a Claim for an Accounting

It is well established that "[a]n accounting implies that one is responsible to another for money or property, as a result either of a contract or some fiduciary relation." 1A C.J.S. Accounting § 6 (2007). In other words, "[a]n accounting may be had where one party is under an obligation to pay money to another based upon facts and records which are known and kept exclusively by the party to whom the obligation is owed, or where there is a confidential or fiduciary relation between the parties, and a duty rests upon the defendant to render an account." *P.V. Properties, Inc. v. Rock Creek Village Assocs. Ltd. P'ship*, 549 A.2d 403, 409 (Md. App. 1988); *see also Cobell v. Norton*, 240 F.3d 1081, 1102-06 (D.C. Cir. 2001) (rev'd on other grounds). Where no fiduciary, statutory, contractual, or other duty exists, a claim for accounting

must be dismissed. *See*, *e.g.*, *Bouley v. Bouley*, 19 A.D.3d 1049, 1051 (N.Y. App. Div. 2005) ("The basis for an equitable action for [an] accounting is the existence of a fiduciary or trust relationship," and where "[p]laintiff fails to allege . . . that defendant holds money or property with respect to which he owes a duty of accounting to plaintiff," a cause of action for accounting must be dismissed. (quotations omitted)); *c.f.*, *In re Kosmadakes*, 444 F.2d 999, 1001, 1004 (D.C. Cir. 1971) (addressing findings of accounting by conservator who had both fiduciary and statutory duties to plaintiff).

Here, the Authors have not alleged, nor can they, any duties owed by Eagle to the Authors. Regnery, not Eagle, may have certain contractual obligations to the Authors but that cannot provide the basis for any requirement that Eagle provide an accounting to the Authors.

G.    The Authors Have Failed to State a Claim for Unfair Trade Practices

The Authors allegedly seek relief for unfair trade practices under D.C. Code § 28-3901, the Consumer Protection Procedures Act ("CPPA"). The CPPA protects consumers from "unlawful trade practices" enumerated in § 28-3904, as well as practices prohibited by other statutes and common law. *Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322, 325 (D.C. 1999). While the allegations in the Complaint do not specify which provisions of the CPPA that Eagle has violated, the Authors' claims cannot stand under any part of the statute because the Complaint does not identify any intentional misrepresentations or omissions by Eagle. *Id.* at 325-26 (plaintiff must show an intentional misrepresentation under the CPPA by clear and convincing evidence).

H.    The Authors Have Failed to State a Claim for Damage to Commercial Reputation

Damage to reputation, commercial or otherwise, is generally manifested not as a separate cause of action, but rather through other tort claims such as libel or slander. *See*, *e.g.*, *State v.*

- 18 -

*General Elec. Co.*, 199 A.D.2d 595, 596-97 (N.Y. App. Div. 1993) (noting that a claim for

"damage to reputation" is "compensated through a specific action like libel, slander or malicious

prosecution . . . there is no independent action for 'damage to reputation'").  To recover for libel

in the District of Columbia, a plaintiff must allege: "1) that the defendant made a false and

defamatory statement concerning the plaintiff; 2) that the defendant published the statement

without privilege to a third party; 3) that the defendant's fault in publishing the statement

amounted to at least negligence [for a private figure]; and 4) either that the statement was

actionable as a matter of law irrespective of special harm or that its publication caused the

plaintiff special harm."  *Carter v. Hahn*, 821 A.2d 890, 893 (D.C. 2003).  Because the Authors

have not identified any statements by Eagle or anyone else that are defamatory, they have failed

to state a claim for reputational damage.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the case pursuant to Rule 12(b)(6),

Rule 12(b)(7), and Rule 19.

Respectfully submitted,

*/s/ Mark I. Bailen*
Bruce W. Sanford (356568)
Mark I. Bailen (459623)
Laurie A. Babinski (976505) (admission pending)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue N.W.
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
Email: *mbailen@baklerlaw.com*

*Attorneys for Defendant*

# MOTION TO DISMISS
# EXHIBIT 1

**REGNERY PUBLISHING, INC.**

*An Eagle Publishing Company • Since 1947*

## PUBLISHING CONTRACT

AGREEMENT made this 7th day of June, 2004, between John E. O'Neill, 1000 Louisiana Ave., suite 1800, Houston, TX 77002 and Jerome Corsi, 41 Copeland Road, Denville, NJ 07834 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.    Grant of Rights.

    Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest to print, publish and market ('publish") and license subsidiary rights, throughout the world in book form (hardcover and softcover) and electronic form a book to be written by Author and tentatively entitled, *Unfit for Command* ("the Work").

2.    Publication and Royalties.

    a.    Publisher hereby agrees to publish the Work within twelve (12) months after its acceptance of the final manuscript of the Work, except that such twelve (12) month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

    b.    On all hardcover books sold to the book trade after returns and for which Publisher has been paid, Publisher shall pay Author a royalty of 10% (ten percent) of Publisher's catalog retail price for the first 5,000 books sold, 12-1/2% (twelve and one-half percent) for the second 5,000 copies, and 15% (fifteen percent) thereafter. For all trade paperback books sold by Publisher after returns and for which Publisher has been paid, Publisher shall pay Author a royalty of 7.5% (seven and one-half percent) of Publisher's catalog retail price.

    c.    In the event that Publisher sells copies of the Work at a discount of 44% or more to the book trade, Publisher shall reduce Author's royalty that would otherwise be paid for such sale by one half of one percentage point (.5%) for each one percentage point that the discount exceeds 44%, (so that if the royalty were otherwise 15% and books were sold at a discount of 46%, the royalty paid would be 14% for that sale). Provided, however, that in no case shall

2

O'Neill/Corsi Publishing Contract
Page 2

Author's royalty for any given sale be reduced by more than one-half of what would otherwise be paid.

    d.    On all copies of the Work, complete or abridged, published and sold by other than Publisher, such as book club editions, paperback editions, abridged editions, and on the sale of all rights to the Work, including but not limited to foreign language, British, paperback, first and second serial rights, audio and video, electronic rights now known or to be developed in the future, and movie and dramatic rights, Publisher and Author shall divide the net proceeds, less agents commissions, equally.

    e.    Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author five (5%) percent of the amount received by the Publisher, less returns and agent commissions.

3.    Manuscript.

    a.    Author shall deliver to the Publisher no later than June 30, 2004 a complete copy of the Work, in hard copy and on computer disk, in content and form satisfactory to the Publisher, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense.  Author agrees to supply with the manuscript and suitable for reproduction all photographs, illustrations, drawings, charts and other material necessary to complete the Work and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any sums payable to Author.

    b.    Should Author fail to deliver the complete and satisfactory manuscript of the Work to the Publisher on the above date (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have thirty (30) days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said thirty (30) day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

    c.    If the manuscript delivered by Author is not, in Publisher's sole judgment, acceptable to it in content and form, Publisher may terminate this agreement by written notice and upon such notice this agreement shall terminate, without further obligation or liability between the parties, except that Author shall repay to the Publisher all sums paid Author hereunder within six months after termination.

    d.    If Publisher elects to submit the manuscript of the Work to its legal counsel for review, then the Work shall not be deemed complete and satisfactory unless and until all changes

O'Neill/Corsi Publishing Contract
Page 3

which may be required by legal counsel have been made by Author. Nothing contained in the preceding sentence shall alter or vary any of the rights of Publisher under this agreement.

c.   The Publisher may make the manuscript conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and may edit the manuscript in a manner acceptable to both parties.

f.   All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms of sale, distribution, advertising, and promotion of the Work shall be within the Publisher's sole discretion.

4.   Statements of Accounts.

a.   Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Work to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Work.

b.   The statement shall include an accounting of all copies of the Work sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c.   Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Work; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

5.   Author's Warranties.

Author hereby represents and warrants:

a.   That he owns all right, title and interest to the Work.

b.   That the Work is original and does not include, and is not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

O'Neill/Corsi Publishing Contract
Page 4

    c.     That the Work has not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Work in the United States or elsewhere.

    d.     That the Work contains no libelous, obscene, or other unlawful matter.

    e.     That the Work does not infringe upon any statutory or common law copyright or trademark, and that any recipe, formula, medication or instruction included in the Work is not injurious to the users' health.

    f.     The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

6.    Author's Undertakings.

    a.     Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Work contains matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter. Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein.

    b.     Author shall, upon receipt, promptly review, correct, and return to Publisher all page proofs of the Work. Once Author has returned said page proofs with his corrections and changes, Publisher will not be required to make any subsequent changes to manuscript, unless it deems it necessary in its sole discretion. The Author will not see printer's bluelines, or be involved in any way in the printing and production process. Publisher and Author will confer after the completed manuscript has been submitted whether an index is required; if so, such index shall be provided at Author's expense, charged to his royalty account.

    c.     Author shall cooperate with Publisher in promotion of the Work and shall be available for interviews and other promotional activities as requested by Publisher.

O'Neill/Corsi Publishing Contract
Page 5

    d.     The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

7.    Publisher's Undertakings.

    a.     Publisher shall affix to all copies of the Work a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Work with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Work when selling or licensing any rights in connection therewith.

    b.     Publisher shall give each Author ten (10) copies of the Work without charge and shall sell any additional copies to Author at a discount of fifty percent (50%).  Author shall not be entitled to royalties on account of such books.

8.    Copyright Infringement.

    Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Work.  If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally.  If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear all expenses of the proceeding and shall be entitled to all recovery therefrom.  If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

9.    Right to Cancel.

    a.     If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

    b.     If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author.  If Author has not cured the breach as set forth by Publisher within thirty (30) days of such notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

    c.     If Publisher does not publish the Work on or before the date provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Work.  If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

    d.     If the Publisher's stock of the Work falls below fifty (50) copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days after the receipt of

O'Neill/Corsi Publishing Contract
Page 6

such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the work within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

    c.    In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

10.    Force Majeure.

    Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires government restrictions, sickness, or other circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

11.    Remainders.

    If the Publisher at any time has unsold or returned copies of the Work on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will first offer Author said copies at forty percent (40%) of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Work to such buyers and upon such terms as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

12.    Assignment.

    a.    Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

    b.    Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

    c.    In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Work shall revert to Author; and any

O'Neill/Corsi Publishing Contract
Page 7

monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

13.    Option.

As part of the consideration paid to Author by Publisher hereunder, Publisher shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form, and of acquiring the same rights in the same manner and on the same terms and conditions as are herein granted. If, Publisher decides not to exercise its option, then Author shall be at liberty to enter into an agreement with any other publisher for its publication. Publisher shall not be required to exercise this option until six (6) months after the publication of the Work.

14.    Arbitration.

Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

15.    Competing Work.

Author shall not, for a period of two (2) years following publication of Work, contract to publish or furnish to a publisher, or authorize the publication of, a book that is likely to compete with the sales of this book or frustrate the value of any of the rights granted under this contract without the written permission of the Publisher.

16.    Entire Agreement.

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

O'Neill/Corsi Publishing Contract
Page 8

Agreed:

_____
John O'Neill                    REDACTED

_____
Social Security Number

Regnery Publishing, Inc.

by _____
Marjory G. Ross
President

_____
Jerome Corsi                    REDACTED

_____
Social Security Number

# MOTION TO DISMISS
# EXHIBIT 2

Gertz 1

7/31/98



**REGNERY**
**PUBLISHING, INC.**
*An Eagle Publishing Company • Since 1947*

### PUBLISHING CONTRACT

AGREEMENT made this 31 day of July 1998, between Willam D. Gertz, 2916 Tapered Lane, Bowie, MD 20715 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.  **Grant of Rights.**

    Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest to print, publish and market ("publish") and license subsidiary rights, throughout the world in book form (hardcover and softcover) and electronic form a book which is to be written by Author and is entitled <u>Deadly Dealing: The Inside Story of Arms Deals and Coverups in the 1990's</u>(working title).

2.  **Publication and Royalties.**

    a. Publisher hereby agrees to publish the Work within 12 months after its acceptance of the final manuscript of the Work, except that such 12 month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

    b. Publisher shall pay Author an advance against all royalty income in the amount of $20,000, one half of which will be paid upon the signing of this agreement, and the balance upon third upon Publisher's final acceptance of the manuscript.

    c. On all books sold to the book trade, Publisher shall pay Author a royalty of 10% (ten percent) of Publisher's catalog retail price for the first 5,000 books sold and for which Publisher has been paid, and 12 1/2% (twelve and one-half percent) for the second 5,000 copies, and 15% (fifteen percent) thereafter, in each case after returns, for hardback books; and 10% (ten percent) of such retail price for all trade paperback books sold by Publisher after returns and for which Publisher has been paid; and 6% (six percent) of such retail price for all mass market paperback books sold by Publisher and for which Publisher has been paid, after returns.

    d. In the event that Publisher sells copies of the Work at a discount of 44% or more to the book trade, Publisher shall reduce Author's royalty that would otherwise be paid for such sale by one half of one percentage point (.5%) for each one percentage point that the discount exceeds 44%, (so that if the royalty were otherwise 15% and books were sold at a discount of 46%, the royalty paid would be 14% for that sale). Provided, however, that in no case shall Author's royalty for any given sale be reduced by more than one half of what would otherwise be paid.

    e. On all copies of the Work, complete or abridged, published and sold by other than Publisher, such as book club editions, paperback editions, abridged editions, and on the sale

Publishing Contract
Page 2

of all rights to the Work, including but not limited to foreign language, British, paperback, first and second serial rights, audio and video, electronic rights now known or to be developed in the future, and movie and dramatic rights, Publisher and Author shall divide the net proceeds, less agents commissions, equally.

f. Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten (10%) percent of the amount received by the Publisher in excess of its manufacturing costs, returns, and agents commissions.

3.   Manuscript

a. Author shall deliver to the Publisher no later than December 31, 1998 a complete copy of the Work in content and form satisfactory to the Publisher, in hard copy and on computer disc, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense. Author agrees to supply with the manuscript and suitable for reproduction all photographs, illustrations, drawings, charts and other material necessary to complete the Work and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any sums payable to Author.

b. Should Author fail to deliver the complete and satisfactory manuscript of the Work to the Publisher on the above date (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have 30 days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said 30 day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

c. If the manuscript delivered by Author is not, in Publisher's sole judgment, acceptable to it in content and form, Publisher may terminate this agreement by written notice and upon such notice this agreement shall terminate, without further obligation or liability between the parties, except that Author shall repay to the Publisher all sums paid Author hereunder within six months after termination.

d. If Publisher elects to submit the manuscript of the Work to its legal counsel for review, then the Work shall not be deemed complete and satisfactory unless and until all changes which may be required by legal counsel have been made by Author. Nothing contained in the preceding sentence shall alter or vary any of the rights of Publisher under this agreement.

e. The Publisher may make the manuscript conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and may edit the manuscript in a manner acceptable to both parties.

4.   All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms of sale, distribution, advertising, and promotion of the Work shall be within the Publisher's sole discretion.

Publishing Contract
Page 3

5. Statements of Accounts.

a. Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Work to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Work.

b. The statement shall include an accounting of all copies of the Work sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c. Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Work; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

6. Author's Warranties.

Author hereby represents and warrants:

a. That he owns all right, title and interest to the Work.

b. That the Work is original and does not include, and is not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

c. That the Work has not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Work in the United States or elsewhere.

d. That the Work contains no libelous, obscene, or other unlawful matter.

e. The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

7. Author's Undertakings.

a. Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Work contains matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes

Publishing Contract
Page 4

any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter. Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein.

b. Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Work. Publisher and Author will confer after the completed manuscript has been submitted whether an index is required; if so, such index shall be provided at Author's expense. The costs of any changes (but not corrections) in proof copy requested by Author shall be charged to Author's account to the extent that they exceed ten (10%) percent of the costs of the proofs without such changes.

c. Author shall cooperate with Publisher in promotion of the Work and shall be available for interviews and other promotional activities as requested by Publisher.

d. The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

8.    Publisher's Undertakings.

a. Publisher shall affix to all copies of the Work a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Work with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Work when selling or licensing any rights in connection therewith.

b. Publisher shall give Author ten (20) copies of the Work without charge and shall sell any additional copies to Author at a discount of 50%. Author shall not be entitled to royalties on account of such books.

9.    Copyright Infringement.

Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Work. If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally. If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear all expenses of the proceeding and shall be entitled to all recovery therefrom. If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

10.   Right to Cancel.

a. If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

b. If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author. If Author has not cured the breach as set forth by Publisher within 30 days of such

Publishing Contract
Page 5

notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

c. If Publisher does not publish the Work on or before the date provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Work. If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

d. If the Publisher's stock of the Work falls below 50 copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days after the receipt of such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the work within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

e. In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

11.    Force Majeure.

Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires government restrictions, sickness, or other circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

12.    Remainders

If the Publisher at any time has unsold or returned copies of the Work on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will first offer Author said copies at forty (40%) percent of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Work to such buyers and upon such terms as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

13.    Assignment.

a. Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

b. Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned

Publishing Contract
Page 6

without permission in the connection of a sale of all or substantially all of the Publisher's assets.

c. In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Work shall revert to Author; and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

14.    Option.

The Publisher shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form and of acquiring the same rights in the same manner as are herein granted. If, six weeks after such work has been submitted to the Publisher, no terms have been agreed upon for its publication, then Author shall be at liberty to enter into an agreement with any other publisher for its publication, provided, however, that Author may not subsequently contract for the publication of such work on terms less favorable to Author than those terms last presented to Publisher without again offering the work to publisher as aforesaid, but on such new terms. Publisher shall not be required to exercise this option until two months after the publication of the Work.

15.    Arbitration.

Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

16.    Competing Work.

Author shall not during the term of this agreement, contract to publish or furnish to a publisher, or authorize the publication of a book that is likely to compete with the sales of this book or frustrate the value of any of the rights granted under this contract without the written permission of the Publisher.

17.    Entire Agreement

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of

Publishing Contract
Page 7

the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Agreed:

REDACTED

_____

Social Security Number

Regnery Publishing, Inc.

by: _____

# MOTION TO DISMISS
# EXHIBIT 3



**REGNERY PUBLISHING, INC.**
*An Eagle Publishing Company • Since 1947*

## PUBLISHING CONTRACT

AGREEMENT made this 30 day of January, 2000, between William D. Gertz, c/o Janklow & Nesbitt Associates, 598 Madison Ave, New York, New York 10022-1614 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.      Grant of Rights.

    Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest to print, publish and market ("publish") and license subsidiary rights as hereinafter set forth, throughout the world in book form (hardcover and softcover) and electronic form a book which is to be written by Author and is entitled <u>The Long March: The Inside Story of the China Threat</u> (working title).

2.      Publication and Royalties.

    a. Publisher hereby agrees to publish the Work within 12 months after its acceptance of the final manuscript of the Work, except that such 12 month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

    b. Publisher shall pay Author an advance against all royalty income in the amount of $75,000, one third of which will be paid upon the signing of this agreement, one third upon Publisher's final acceptance of the manuscript, and the balance upon publication of the Work, but in no case later than twelve months following acceptance of the manuscript.

    c. On all books sold to the book trade, Publisher shall pay Author a royalty of 10% (ten percent) of Publisher's catalog retail price for the first 5,000 books sold and for which Publisher has been paid, and 12 1/2% (twelve and one-half percent) for the second 5,000 copies, and 15% (fifteen percent) thereafter, in each case after returns, for hardback books; and 10% (ten percent) of such retail price for all trade paperback books sold by Publisher after returns and for which Publisher has been paid.

    d. Publisher shall pay author an additional advance against all royalty income of $5000 for each week that the Work is listed on the printed New York Times Bestseller list (any of the top 15 positions), provided, however, that no more than $25,000 shall be paid in such additional advances pursuant to this paragraph.

    e. In the event that Publisher sells copies of the Work at a discount of 48% or more to the book trade, Publisher shall reduce Author's royalty that would otherwise be paid for such sale by one half of one percentage point (.5%) for each one percentage point that the discount exceeds 48%, (so that if the royalty were otherwise 15% and books were sold at a discount of 50%, the royalty paid would be 14% for that sale). Provided, however, that in no case shall Author's royalty for any given sale be reduced by more than one half of what would otherwise be paid.

    f. On all book club editions, paperback editions and abridged editions of the Work published and sold by other than Publisher, Publisher and Author shall divide the net proceeds equally. The term "net proceeds" as used herein means the total proceeds less any commissions paid to agents, such commissions not to exceed

William Gertz Publishing Contract
Page 2

15%. The Author shall have the right to editorially approve all abridgements and/or condensations of the Work.

  g. On the sale of all rights to the Work granted to the Publisher hereunder, Publisher and Author shall divide the net proceeds as follows:

| | Author | Publisher |
|---|---|---|
| i. foreign language | 75% | 25% |
| ii. British | 80% | 20% |
| iii. paperback | 50% | 50% |
| iv. first serial | 90% | 10% |
| v. second serial | 50% | 50% |
| vi. audio | 75% | 25% |
| vii. electronic rights (which | 50% | 50% |

  will be limited to the right
  to reproduce the verbatim text
  of the Work in non-dramatic
  visual form for reading, without
  the addition of sounds, images
  or graphics.

  viii. all rights not explicitly granted to the Publisher hereunder, including but not limited to video, multi media , and movie and dramatic rights are retained by Author,

    h. Author (through his agent) shall approve all subsidiary rights sales, which approval shall not be unreasonably withheld.

    i. Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use; and on the sale of books to bookclubs Publisher shall pay Author ten (10%) percent of the amount received by the Publisher in excess of its manufacturing costs, returns, and agents commissions. Author shall have the right to approve any premium or promotional sale, which approval shall not be unreasonably withheld.

3.  Manuscript

    a.  Author shall deliver to the Publisher no later than June 30, 2000 a complete copy of the Work in content and form satisfactory to the Publisher, in hard copy and on computer disc, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense. Author agrees to supply with the manuscript and suitable for reproduction all photographs, illustrations, drawings, charts and other material necessary to complete the Work and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any sums payable to Author.

    b.  Should Author fail to deliver the complete and satisfactory manuscript of the Work to the Publisher on the above date (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have 30 days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said 30 day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

William Gertz Publishing Contract
Page 3

c. If the manuscript delivered by Author is not, in Publisher's sole judgment, acceptable to it in content and form, Publisher may terminate this agreement by written notice and upon such notice this agreement shall terminate, without further obligation or liability between the parties, except that Author shall repay to the Publisher all sums earned on the publication of the Work by another publisher up to the amount previously paid Author hereunder.

d. If Publisher elects to submit the manuscript of the Work to its legal counsel for review, then the Work shall not be deemed complete and satisfactory unless and until all changes which may be required by legal counsel have been made by Author. Nothing contained in the preceding sentence shall alter or vary any of the rights of Publisher under this agreement.

e. The Publisher may make the manuscript conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and shall make no other changes in the manuscript without the Author's prior approval.

f. All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms of sale, distribution, advertising, and promotion of the Work shall be within the Publisher's sole discretion, provided, however that Publisher shall consult with Author concerning jacket design and copy. Neither Publisher nor any licensee of the Publisher shall make any changes in the text or title of the Work without the Author's prior approval.

4. Statements of Accounts.

a. Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Work to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Work.

b. The statement shall include an accounting of all copies of the Work sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c. Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Work; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

d. In the event that Author has earned back his advance, and after Publisher has taken a reasonable reserve against returns, Publisher shall make estimated royalty payments to Author ninety days into a royalty period (i.e. on or about December 31 and June 30) for the three month periods ending, respectively, on September 30 and March 31. Said payments need not be accompanied by a complete royalty statement but merely by a letter from Publisher explaining how it arrived at the payment made.

5. Author's Warranties.

Author hereby represents and warrants:

a. That he owns all right, title and interest to the Work.

William Gertz Publishing Contract
Page 4

b. That the Work is original and does not include, and is not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

c. That the Work has not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Work in the United States or elsewhere.

d. That the Work contains no libelous, obscene, or other unlawful matter.

e. The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

6.    Author's Undertakings.

a. Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Work contains matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter.  Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein.

b. Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Work.  Publisher and Author will mutually determine after the completed manuscript has been submitted whether an index is required; if so, such index shall be provided at Author's expense.  The costs of any changes (but not corrections) in proof copy requested by Author shall be charged to Author's account to the extent that they exceed ten (10%) percent of the costs of the proofs without such changes.

c. Author shall cooperate with Publisher in promotion of the Work and shall be available for interviews and other promotional activities as requested by Publisher, and Publisher shall pay any costs incurred by Author in connection with promotional activities, subject to prior approval by Publisher.

d. The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

7.    Publisher's Undertakings.

a. Publisher shall affix to all copies of the Work a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Work with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Work when selling or licensing any rights in connection therewith.

William Gertz Publishing Contract
Page 6

percent of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Work to such buyers and upon such terms as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

12.    Assignment.

    a. Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

    b. Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

    c. In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Work shall revert to Author; and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

13.    Option.

    As part of the consideration paid Author herein, Author agrees to submit to the Publisher a proposal for his next book-length work, and shall give Publisher the first opportunity to read and consider for publication such proposal and, if Publisher expresses interest, to negotiate with Publisher in good faith for the purpose of arriving at appropriate terms of publication. If, thirty (30) days after such proposal has been submitted to Publisher, new terms have not been agreed upon for its publication, Author shall be at liberty to enter into an agreement with any other publisher for its publication with no further obligation to Publisher. Publisher shall not be required to exercise this option prior to thirty days following acceptance of the manuscript of the Work which is the subject of this Agreement.

14.    Arbitration.

    Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

15.    Competing Work.

    Author shall not during the term of this agreement, contract to publish or furnish to a publisher, or authorize the publication of a book that is likely to compete directly with the sales of this book or frustrate the value of any of the rights granted under this contract without the written permission of the Publisher.

16.    Entire Agreement

    This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such

William Gertz Publishing Contract
Page 7

amendment, modification or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

17.    Author's Agent.

All sums of money due under the terms of this Agreement shall be paid to Author's agent, Janklow & Nesbit Associates, 598 Madison Avenue, New York, New York 10022, attention: Anne Sibbald, who are hereby authorized by Author to collect and receive such money, and Author declares that the receipt of Janklow & Nesbit Associates shall be a good and valid discharge in respect thereof, and Janklow & Nesbit Associates are hereby empowered by Author to act on his behalf on all matters arising out of this Agreement. Author hereby irrevocably assigns to Janklow & Nesbit Associates, as an agency coupled with an interest, fifteen percent (15%) of any and all amounts due or to become due to Author pursuant to this Agreement. In the event the Author, by written notice to Publisher, instructs Publisher to change the payment arrangements provided in this Agreement, Publisher and Author agree that Publisher shall thereafter pay directly to Janklow & Nesbit Associates fifteen percent (15%) of all advances and royalties that shall become due to Author pursuant to this Agreement. The remaining eighty-five percent (85%) of all advances and royalties that shall become due pursuant to this Agreement shall be paid in accordance with the written instructions of Author. Publisher shall also continue to send copies of all royalty agreements in respect of the Work as well as copies of all subsidiary rights agreements regarding the Work where the Author's share exceeds $500 to Janklow & Nesbit Associates even if Publisher has been instructed to change payment arrangements.

Agreed:

REDACTED

_____
Social Security Number

Regnery Publishing, Inc.

by: _____

# MOTION TO DISMISS
# EXHIBIT 4

**REGNERY PUBLISHING, INC.**

*An Eagle Publishing Company • Since 1947*

### PUBLISHING CONTRACT

AGREEMENT made this  day of November, 2001, between William D. Gertz,  8111 Overfield Ct. Bowie, MD 20715 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.      Grant of Rights.

   Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest to print, publish and market ("publish") and license subsidiary rights as hereinafter set forth, throughout the world in book form (hardcover and softcover) and electronic form an untitled book which is to be written by Author concerning US intelligence failures leading to the September, 2001 terrorist attacks on New York and Washington.

2.      Publication and Royalties.

   a. Publisher hereby agrees to publish the Work within 12 months after its acceptance of the final manuscript of the Work, except that such 12 month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

   b. Publisher shall pay Author an advance against all royalty income in the amount of $75,000, one third of which will be paid upon the signing of this agreement, one third upon Publisher's final acceptance of the manuscript, and the balance upon publication of the Work, but in no case later than twelve months following acceptance of the manuscript.

   c. On all books sold to the book trade, Publisher shall pay Author a royalty of 10% (ten percent) of Publisher's catalog retail price for the first 5,000 books sold and for which Publisher has been paid, and 12 1/2% (twelve and one-half percent) for the second 5,000 copies, and 15% (fifteen percent) thereafter, in each case after returns, for hardback books; and 10% (ten percent) of such retail price for all trade paperback books sold by Publisher after returns and for which Publisher has been paid.

   d. Publisher shall pay author an additional advance against all royalty income of $5000 for each week that the Work is listed on the printed New York Times Bestseller list (any of the top 15 positions), provided, however, that no more than $25,000 shall be paid in such additional advances pursuant to this paragraph.

   e. In the event that Publisher sells copies of the Work at a discount of 48% or more to the book trade, Publisher shall reduce Author's royalty that would otherwise be paid for such sale by one half of one percentage point (.5%) for each one percentage point that the discount exceeds 48%, (so that if the royalty were otherwise 15% and books were sold at a discount of 50%, the royalty paid would be 14% for that sale); provided, however, that in no case shall Author's royalty for any given sale be reduced by more than one half of what would otherwise be paid.

   f. On all book club editions, paperback editions and abridged editions of the Work published and sold by other than Publisher, Publisher and Author shall divide the net proceeds equally. The term "net proceeds" as used herein

ONE MASSACHUSETTS AVENUE, N.W. • WASHINGTON, D.C. 20001 • 202-216-0600 • 202-216-0612 FAX

William Gertz Publishing Contract
Page 2

means the total proceeds less any commissions paid to agents, such commissions not to exceed 15%. The Author shall have the right to editorially approve all abridgements and/or condensations of the Work.

g. On the sale of all rights to the Work granted to the Publisher hereunder, Publisher and Author shall divide the net proceeds as follows:

|  | Author | Publisher |
|---|---|---|
| i. foreign language | 75% | 25% |
| ii. British | 80% | 20% |
| iii. paperback | 50% | 50% |
| iv. first serial | 90% | 10% |
| v. second serial | 50% | 50% |
| vi. audio | 75% | 25% |
| vii. electronic rights (which will be limited to the right to reproduce the verbatim text of the Work in non-dramatic visual form for reading, without the addition of sounds, images or graphics. | 50% | 50% |

viii. all rights not explicitly granted to the Publisher hereunder, including but not limited to video, multi media , and movie and dramatic rights are retained by Author,

b. Author shall approve all subsidiary rights sales, which approval shall not be unreasonably withheld.

i. Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten (10%) percent of the amount received by the Publisher in excess of its manufacturing costs, returns, and agents commissions.  Author shall have the right to approve any premium or promotional sale, which approval shall not be unreasonably withheld.

3.  Manuscript

a.  Author shall deliver to the Publisher no later than April 30, 2002 a complete copy of the Work in content and form satisfactory to the Publisher, in hard copy and on computer disc, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense.  Author agrees to supply, with the manuscript and suitable for reproduction all photographs, illustrations, drawings, charts and other material necessary to complete the Work and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any sums payable to Author.

b.  Should Author fail to deliver the complete and satisfactory manuscript of the Work to the Publisher on the above date unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have 30 days in which to supply the manuscript to publisher, if Author fails to deliver the manuscript in said 30 day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

c.  If the manuscript delivered by Author is not, in Publisher's sole judgment, acceptable to it in content and form, Publisher may terminate this agreement by written notice and upon such notice this agreement shall terminate,

William Gertz Publishing Contract
Page 3

without further obligation or liability between the parties, except that Author shall repay to the Publisher all sums earned on the publication of the Work by another publisher up to the amount previously paid Author hereunder.

d.  If Publisher elects to submit the manuscript of the Work to its legal counsel for review, then the Work shall not be deemed complete and satisfactory unless and until all changes which may be required by legal counsel have been made by Author.  Nothing contained in the preceding sentence shall alter or vary any of the rights of Publisher under this agreement.

e.  The Publisher may make the manuscript conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and shall make no other changes in the manuscript without the Author's prior approval.

f.  All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms of sale, distribution, advertising, and promotion of the Work shall be within the Publisher's sole discretion, provided, however that Publisher shall consult with Author concerning jacket design and copy.  Neither Publisher nor any licensee of the Publisher shall make any changes in the text or title of the Work without the Author's prior approval.

4.  Statements of Accounts.

a.  Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Work to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Work.

b.  The statement shall include an accounting of all copies of the Work sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c.  Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Work, such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

d.  In the event that Author has earned back his advance, and after Publisher has taken a reasonable reserve against returns, Publisher shall make estimated royalty payments to Author ninety days into royalty period (i.e. on or about December 31 and June 30) for the three month periods ending, respectively, on September 30 and March 31. Said payments need not be accompanied by a complete royalty statement but merely by a letter from Publisher explaining how it arrived at the payment made.

5.     Author's Warranties.

Author hereby represents and warrants:

a.  That he owns all right, title and interest to the Work

b.  That the Work is original and does not include, and is not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true

c.  That the Work has not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Work in the United States or elsewhere.

William Gertz Publishing Contract
Page 4

d. That the Work contains no libelous, obscene, or other unlawful matter.

e. The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

6.    Author's Undertakings.

a. Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Work contains matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter. Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein.

b. Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Work. Publisher and Author will mutually determine after the completed manuscript has been submitted whether an index is required; if so, such index shall be provided at Author's expense. The costs of any changes (but not corrections) in proof copy requested by Author shall be charged to Author's account to the extent that they exceed ten (10%) percent of the costs of the proofs without such changes.

c. Author shall cooperate with Publisher in promotion of the Work and shall be available for interviews and other promotional activities as requested by Publisher, and Publisher shall pay any costs incurred by Author in connection with promotional activities, subject to prior approval by Publisher.

d. The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

7.    Publisher's Undertakings.

a. Publisher shall affix to all copies of the Work a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Work with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Work when selling or licensing any rights in connection therewith.

b. Publisher shall give Author ten (20) copies of the Work without charge and shall sell any additional copies to Author at a discount of 50%. Author shall not be entitled to royalties on account of such books.

William Gertz Publishing Contract
Page 5

8.    Copyright Infringement.

Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Work. If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally. If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear all expenses of the proceeding and recovery shall first be applied to reimburse such party for its expenses and the balance of the recovery shall be shared equally. If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

9.    Right to Cancel.

a. If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

b. If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author. If Author has not cured the breach as set forth by Publisher within 30 days of such notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

c. If Publisher does not publish the Work on or before the date provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Work. If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

d. If the Publisher's stock of the Work falls below 50 copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days after the receipt of such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the work within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

e. In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

10.    Force Majeure.

Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires, government restrictions, sickness, or other circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

11.    Remainders.

If the Publisher at any time has unsold or returned copies of the Work on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will offer to Author said copies at forty (40%) percent of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Work to such buyers and upon such terms as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five

William Gertz Publishing Contract
Page 6

(5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

12.    Assignment.

a. Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

b. Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

c. In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Work shall revert to Author; and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

13.    Option.

As part of the consideration paid Author herein, Author agrees to submit to the Publisher a proposal for his next book-length work, and shall give Publisher the first opportunity to read and consider for publication such proposal and, if Publisher expresses interest, to negotiate with Publisher in good faith for the purpose of arriving at appropriate terms of publication. If, thirty (30) days after such proposal has been submitted to Publisher, new terms have not been agreed upon for its publication, Author shall be at liberty to enter into an agreement with any other publisher for its publication with no further obligation to Publisher. Publisher shall not be required to exercise this option prior to thirty days following acceptance of the manuscript of the Work which is the subject of this Agreement.

14    Arbitration.

Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

15.    Competing Work.

Author shall not during the term of this agreement, contract to publish or furnish to a publisher, or authorize the publication of a book that is likely to compete directly with the sales of this book or frustrate the value of any of the rights granted under this contract without the written permission of the Publisher.

16.    Entire Agreement

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement is not binding on the

William Gertz Publishing Contract
Page 7

Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Agreed:

REDACTED

_____
Social Security Number

Regnery Publishing, Inc.

by: _____

# MOTION TO DISMISS
# EXHIBIT 5

**REGNERY PUBLISHING, INC.**

*An Eagle Publishing Company • Since 1947*

PUBLISHING CONTRACT

AGREEMENT made this    day of May, 2002, between Robert B. Patterson, Jr. 120 Oakdale Ave., Peachtree City, Georgia 30269 and Al Santoli, 10117 Ebenshire Court, Oakton, Va 22124 (hereinafter collectively "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.    Grant of Rights.

    Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest to print, publish and market ("publish") and license subsidiary rights throughout the world in book form (hardcover and softcover) and electronic form a book to be written by Author and entitled, *Carrying the Football: Life as a Military Officer Inside the Clinton White House* (working title)   ("the Work").

2.    Publication and Royalties.

    a. Publisher hereby agrees to publish the Work within 12 months after its acceptance of the final manuscript of the Work, except that such 12 month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

    b. Publisher shall pay Author Patterson an advance against all royalty income in the amount of $40,000, one third of which will be paid upon the signing of this agreement, one third upon Publisher's final acceptance of the manuscript, and one third when the Work is published, and shall pay to author Santoli an advance of $15,000, one third of which will be paid upon the signing of this agreement, one third upon Publisher's final acceptance of the manuscript, and one third when the Work is published.  Thereafter, Patterson shall earn 85% of all royalty income, and Santoli 15% of all royalty income.

    c. On all books sold to the book trade, Publisher shall pay Author a royalty of 10% (ten percent) of Publisher's catalog retail price for the first 5,000 books sold and for which Publisher has been paid,  and 12 1/2% (twelve and one-half percent) for the second 5,000 copies, and 15% (fifteen percent) thereafter, in each case after returns, for hardback books; and 10% (ten percent) of such retail price for all trade paperback books sold by Publisher after returns and for which Publisher has been paid after returns.

    d. In the event that Publisher sells copies of the Work at a discount of 44% or more to the book trade, Publisher shall reduce Author's royalty that would otherwise be paid for such sale by one half of one percentage point (.5%) for each one percentage point that the discount exceeds 44%, so that if the royalty were otherwise 15% and books were sold at a discount of 46%, the royalty paid would be 14% for that sale).  Provided, however, that in no case shall Author's royalty for any given sale be reduced by more than one half of what would otherwise be paid.

    e. On all copies of the Work, complete or abridged, published and sold by other than Publisher, such as book club editions, paperback editions, abridged editions, and on the sale of all rights to the Work, including but not limited to foreign language, British, paperback, first and second serial rights, audio and video, electronic rights now known or to be developed in the future, and movie and dramatic rights; Publisher and Author shall divide the net proceeds, less agents commissions, equally.

Patterson and Santoli Publishing Contract
Page 2

1. Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten (10%) percent of the amount received by the Publisher in excess of its manufacturing costs, returns, and agents commissions.

3.     Manuscript.

a. Author shall deliver to the Publisher no later than November 1, 2002 a complete copy of the Work, in hard copy and on computer disk, in content and form satisfactory to the Publisher, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense. Author agrees to supply with the manuscript and suitable for reproduction all photographs, illustrations, drawings, charts and other material necessary to complete the Work and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any sums payable to Author.

b. Should Author fail to deliver the complete and satisfactory manuscript of the Work to the Publisher on the above date (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have 30 days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said 30 day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

c. If the manuscript delivered by Author is not, in Publisher's sole judgment, acceptable to it in content and form, Publisher may terminate this agreement by written notice and upon such notice this agreement shall terminate, without further obligation or liability between the parties, except that Author shall repay to the Publisher all sums paid Author hereunder within six months after termination.

d. If Publisher elects to submit the manuscript of the Work to its legal counsel for review, then the Work shall not be deemed complete and satisfactory unless and until all changes which may be required by legal counsel have been made by Author. Nothing contained in the preceding sentence shall alter or vary any of the rights of Publisher under this agreement.

e. The Publisher may make the manuscript conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and may edit the manuscript in a manner acceptable to both parties.

f. All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms of sale, distribution, advertising, and promotion of the Work shall be within the Publisher's sole discretion.

4.     Statements of Accounts.

a. Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Work to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Work.

b. The statement shall include an accounting of all copies of the Work sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c. Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Work; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period

Patterson and Santoli Publishing Contract
Page 3

examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

5. Author's Warranties.

Author hereby represents and warrants:

a. That he owns all right, title and interest to the Work.

b. That the Work is original and does not include, and is not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

c. That the Work has not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Work in the United States or elsewhere.

d. That the Work contains no libelous, obscene, or other unlawful matter.

e. That the Work does not infringe upon any statutory or common law copyright or trademark, and that any recipe, formula, medication or instruction included in the Work is not injurious to the users' health.

f. The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

6. Author's Undertakings.

a. Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Work contains matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally, provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter. Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein.

b. Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Work. Publisher and Author will confer after the completed manuscript has been submitted whether an index is required; if so, such index shall be provided at Author's expense. The costs of any changes (but not corrections) in proof copy requested by Author shall be charged to Author's account to the extent that they exceed ten (10%) percent of the costs of the proofs without such changes.

c. Author shall cooperate with Publisher in promotion of the Work and shall be available for interviews and other promotional activities as requested by Publisher.

Patters on and Santoli Publishing Contract
Page 4

d. The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

7.    Publisher's Undertakings.

a. Publisher shall affix to all copies of the Work a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Work with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Work when selling or licensing any rights in connection therewith.

b. Publisher shall give Author ten (10) copies of the Work without charge and shall sell any additional copies to Author at a discount of 40%. Author shall not be entitled to royalties on account of such books.

8.    Copyright Infringement

Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Work. If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally. If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear all expenses of the proceeding and shall be entitled to all recovery therefrom. If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

9.    Right to Cancel.

a. If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

b. If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author. If Author has not cured the breach as set forth by Publisher within 30 days of such notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

c. If Publisher does not publish the Work on or before the date provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Work. If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

d. If the Publisher's stock of the Work falls below 50 copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days after the receipt of such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the work within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

e. In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

10.    Force Majeure.

Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires government restrictions, sickness, or other

Patterson and Santoli Publishing Contract
Page 5

circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

11.     Remainders.

If the Publisher at any time has unsold or returned copies of the Work on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will first offer Author said copies at forty (40%) percent of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Work to such buyers and upon such terms as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

12.     Assignment.

a. Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher which consent shall not be unreasonably withheld.

b. Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

c. In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Work shall revert to Author; and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

13.     Option.

As part of the consideration paid to Author by Publisher hereunder, Publisher shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form, and of acquiring the same rights in the same manner and on the same terms and conditions as are herein granted. If, six weeks after such work has been submitted to the Publisher, no terms have been agreed upon for its publication, then Author shall be at liberty to enter into an agreement with any other publisher for its publication, provided, however, that Author may not subsequently contract for the publication of such work on terms less favorable to Author than those terms last presented to Publisher without again offering the work to publisher as aforesaid, but on such new terms. Publisher shall not be required to exercise this option until two months after the publication of the Work. This paragraph pertains only to Author Patterson, and not to Santoli.

14.     Arbitration.

Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

Patterson and Santoli Publishing Contract
Page 6

15.     Competing Work.

Author shall not during the term of this agreement, contract to publish or furnish to a publisher, or authorize the publication of a book that is likely to compete with the sales of this book or frustrate the value of any of the rights granted under this contract without the written permission of the Publisher.

16.     Entire Agreement

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Agreed

_____     Regnery Publishing, Inc.

_____     by: _____
Social Security Number

**MOTION TO DISMISS
EXHIBIT 6**



**REGNERY
PUBLISHING, INC.**

*An Eagle Publishing Company • Since 1947*

PUBLISHING CONTRACT

AGREEMENT made this   day of October, 2002, between Joel Mowbray, c/o David Limbaugh , 2027 Broadway, Cape Giradeaux, Mo. 63782 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1        Grant of Rights.

   Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest to print, publish and market ("publish") and license subsidiary rights, throughout the world as hereinafter set forth, in book form (hardcover and softcover) and electronic form a book to be written by Author and entitled, *Dangerous Diplomacy* (Working title) ( Hereinafter "the Work").

2        Publication and Royalties.

   a. Publisher hereby agrees to publish the Work within 12 months after its acceptance of the final manuscript of the Work, except that such 12 month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

   b. Publisher shall pay Author an advance against all royalty income in the amount of $25,000, one half of which will be paid upon the signing of this agreement, and the balance when the work is  published.

   c. Publisher shall pay author an additional advance against all royalty income of  $5,000 for each week that the Work is listed on the printed New York Times Bestseller list in any of the top fifteen positions, provided, however, that no more than $25,000 shall be paid in such additional advances pursuant to this paragraph.

   d. On all books sold to the book trade, Publisher shall pay Author a royalty of 10% (ten percent) of Publisher's catalog retail price for the first 5,000 books sold and for which Publisher has been paid,  and 12 1/2% (twelve and one-half percent) for the second 5,000 copies, and 15% (fifteen percent) thereafter, in each case after returns, for hardback books; and 7.5% (seven and one half percent) of such retail price for all trade paperback books sold by Publisher after returns and for which Publisher has been paid.

   e. In the event that Publisher sells copies of the Work at a discount of 44% or more to the book trade, Publisher shall reduce Author's royalty that would otherwise be paid for such sale by one half of one percentage point (.5%) for each one percentage point that the discount exceeds 44% (so that if the royalty were otherwise 15% and books were sold at a discount of 46%, the royalty paid would be 14% for that sale).  Provided, however, that in no case shall Author's royalty for any given sale be reduced by more than one half of what would otherwise be paid.

   f. On all copies of the Work, complete or abridged, published and sold by other than Publisher, such as book club editions, paperback editions, abridged editions, and on the sale of all rights to the Work, including but not limited to paperback, first and second serial rights, audio and video, electronic rights now known or to be developed in the

future, and movie and dramatic rights, Publisher and Author shall divide the net proceeds, less agents commissions.

Joel Mowbray  Publishing Contract
Page 2

equally, with the exception of first serial rights, which shall be divided 90% to Author and 10% to Publisher.  Author retains British and all foreign language rights, but the net proceeds of all such sales shall be divided 85% to Author and 15% to Publisher.

       g. Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten (10%) percent of the amount received by the Publisher in excess of its manufacturing costs, returns, and agents commissions.

2.      Manuscript.

       a.  Author shall deliver to the Publisher no later than ~~March 31~~, *Apr. 30* 2003 a complete copy of the Work, in hard copy and on computer disk,  in content and form satisfactory to the Publisher, together with all permissions necessary for  the reproduction of copyrighted material therein secured at Author's expense.  Author agrees to supply with the manuscript and suitable for reproduction all photographs, illustrations, drawings, charts and other material necessary to complete the Work and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any sums payable to Author.

       b.  Should Author fail to deliver the complete and satisfactory manuscript of the Work to the Publisher on the above date (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have 30 days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said 30 day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

       c.  If the manuscript delivered by Author is not, in Publisher's sole judgment, acceptable to it in content and form, Publisher may terminate this agreement by written notice and upon such notice this agreement shall terminate, without further obligation or liability between the parties, except that Author shall repay to the Publisher all sums paid Author hereunder within six months after termination.

       d.  If Publisher elects to submit the manuscript of the Work to its legal counsel for review, then the Work shall not be deemed complete and satisfactory unless and until all changes which may be required by legal counsel have been made by Author.  Nothing contained in the preceding sentence shall alter or vary any of the rights of Publisher under this agreement.

       e.  The Publisher may make the manuscript conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and may edit the manuscript in a manner acceptable to both parties.

       f.  All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms of sale, distribution, advertising, and promotion of the Work shall be within the Publisher's sole discretion.

3.      Statements of Accounts.

       a.  Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Work to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Work.

Joel Mowbray  Publishing Contract
Page 3

b. The statement shall include an accounting of all copies of the Work sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c. Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Work; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

4.      Author's Warranties.

Author hereby represents and warrants:

a. That he owns all right, title and interest to the Work.

b. That the Work is original and does not include, and is not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

c. That the Work has not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Work in the United States or elsewhere.

d. That the Work contains no libelous, obscene, or other unlawful matter.

e. That the Work does not infringe upon any statutory or common law copyright or trademark, and that any recipe, formula, medication or instruction included in the Work is not injurious to the users' health.

f. The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

5.      Author's Undertakings.

a. Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Work contains matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement.  If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter.  Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein.

b. Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Work. Publisher and Author will confer after the completed manuscript has been submitted whether an index is required; if so, such index shall be provided at Author's expense. The costs of any changes (but not corrections) in proof copy

Joel Mowbray  Publishing Contract
Page 4

requested by Author shall be charged to Author's account to the extent that they exceed ten (10%) percent of the costs of the proofs without such changes.

c. Author shall cooperate with Publisher in promotion of the Work and shall be available for interviews and other promotional activities as requested by Publisher.

d. The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

6.    Publisher's Undertakings.

a. Publisher shall affix to all copies of the Work a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Work with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Work when selling or licensing any rights in connection therewith.

b. Publisher shall give Author ten (10) copies of the Work without charge and shall sell any additional copies to Author at a discount of 40%. Author shall not be entitled to royalties on account of such books.

7    Copyright Infringement.

Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Work. If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally. If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear all expenses of the proceeding and shall be entitled to all recovery therefrom. If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

8.    Right to Cancel.

a. If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

b. If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author. If Author has not cured the breach as set forth by Publisher within 30 days of such notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

c. If Publisher does not publish the Work on or before the date provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Work. If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

d. If the Publisher's stock of the Work falls below 50 copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days after the receipt of such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the work within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

Joel Mowbray  Publishing Contract
Page 5

e. In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

9    Force Majeure.

Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires government restrictions, sickness, or other circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

10.    Remainders.

If the Publisher at any time has unsold or returned copies of the Work on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will first offer Author said copies at forty (40%) percent of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Work to such buyers and upon such terms as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

1 .    Assignment.

a. Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

b. Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

c. In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Work shall revert to Author; and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

12.    Option.

As part of the consideration paid to Author by Publisher hereunder, Publisher shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form, and of acquiring the same rights in the same manner and on the same terms and conditions as are herein granted, but for an advance of $50,000 or for an advance of one third of the amount that Author has earned in royalty income from all sources for the Work as of the date that the contract for said new work is submitted to Author, whichever is more. If, six weeks after such work has been submitted to the Publisher, no terms have been agreed upon for its publication, then Author shall be at liberty to enter into an agreement with any other publisher for its publication,

Joel Mowbray  Publishing Contract
Page 6

provided, however, that Author may not subsequently contract for the publication of such work on terms less favorable to Author than those terms last presented to Publisher without again offering the work to publisher as aforesaid, but on such new terms.  Publisher shall not be required to exercise this option until two months after the publication of the Work.

1. Arbitration.

Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association.  Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

1. Competing Work.

Author shall not during the term of this agreement, contract to publish or furnish to a publisher, or authorize the publication of a book that is likely to compete with the sales of this book or frustrate the value of any of the rights granted under this contract without the written permission of the Publisher.

1. Entire Agreement

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced.  Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination.  This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Agreed:                                    2/10/03

                                Regnery Publishing, Inc.

/Social Security Number

REDACTED

Joel Mowbray  Publishing Contract
Page 6

provided, however, that Author may not subsequently contract for the publication of such work on terms less favorable to Author than those terms last presented to Publisher without again offering the work to publisher as aforesaid, but on such new terms.  Publisher shall not be required to exercise this option until two months after the publication of the Work.

13.     Arbitration.

Any controversy or claim arising out of or relating to this agreement,  the interpretation, implementation,  breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association.  Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

14.     Competing Work.

Author shall not during the term of this agreement, contract to publish or furnish to a publisher, or authorize the publication of a book that is likely to compete with the sales of this book or frustrate the value of any of the rights granted under this contract without the written permission of the Publisher.

15.     Entire Agreement

This  Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced.  Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination.  This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Agreed:

_____                    2/10/03

                                                      Regnery Publishing, Inc.

_____                    By: _____

Social Security Number

2714 S. Inge St.
Arlington, VA 22202

# MOTION TO DISMISS
# EXHIBIT 7



**REGNERY PUBLISHING, INC.**
*An Eagle Publishing Company • Since 1947*

## PUBLISHING CONTRACT

AGREEMENT made this ___ day of April, 2003, between Richard Miniter, c/o William Morris Agency, 1325 Avenue of the Americas, New York, NY 10019 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.      Grant of Rights.

Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest in the English language to print, publish and market ("publish") and license subsidiary rights throughout the World, in book form (hardcover and softcover) and electronic form two books, which have been or will be written by Author; the first book is tentatively entitled, *A.W.O.L.* and the second will be a book written about terrorism ("the Works").

2.      Publication and Royalties.

a.      Publisher hereby agrees to publish each Work within twelve (12) months after the acceptance of the final manuscript of each Work, except that such twelve (12) month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

b.      Publisher shall pay Author an advance against all royalty income in the amount of $150,000; $35,000 of which will be paid upon the signing of this agreement; $35,000 upon Publisher's final acceptance of the manuscript for the first book; $30,000 when the first book is published (but in no event later than 12 months after final acceptance); $25,000 upon Publisher's final acceptance of the manuscript for the second book, and $25,000 when the second book is published (but in no event later than 12 months after final acceptance).

c.      Publisher shall pay Author an additional advance against all royalty income of five thousand dollars ($5,000) for each week that each Work is listed on the printed New York Times Best Seller List (any of the top 15 positions), provided, however, that no more than $25,000 shall be paid for each book in such additional advances pursuant to this paragraph. Such payment to be made no later than thirty (30) days after the relevant list appears in print.

d.      On all books sold to the book trade, Publisher shall pay Author a royalty of fifteen percent (15%) of Publisher's catalog retail price for all books sold and for which Publisher has been paid after returns, for hardback books; and seven and one-half percent (7.5%) of such retail price for all trade paperback books in each case after returns.

Publishing Contract
Page 2

     e.     On all copies of the Works, complete or abridged, published and sold by other than Publisher, such as book club editions, paperback editions, abridged editions, and on the sale of all rights to the Works, including but not limited to paperback, second serial rights, electronic rights now known or to be developed in the future, of the verbatim text, without adaptation, the result of which serves as a substitute for sales of the Works in book form, Publisher and Author shall divide the gross proceeds equally, without deduction of any agent commissions, provided, however, as regards second serialization, the periodical and cut shall be subject to the Author's approval, not to be unreasonably withheld or delayed, and further provided, that prior to Publisher's use or disposition of electronic rights granted herein, Author and Publisher shall agree upon the royalties.  Author shall retain first serial rights.  Author retains foreign language rights to the Works.

     f.     Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten percent (10%) of the amount received by the Publisher in excess of its manufacturing costs and returns.  Such sales shall be subject to Author approval, such approval not to be unreasonably withheld.

3.     Manuscript.

     a.     Author shall deliver to the Publisher no later than June 15, 2003, a complete copy of the first Work, and on June 15, 2004, a complete copy of the second Work; in each case, in hard copy and on computer disk, in content and form satisfactory to the Publisher, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense. Author agrees to supply with the manuscripts and suitable for reproduction all mutually agreed upon photographs, illustrations, drawings, charts and other material necessary to complete the Works and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any royalty sums payable to Author.

     b.     Should Author fail to deliver the complete and satisfactory manuscript of the Works to the Publisher on the above dates (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have thirty (30) days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said thirty (30) day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

     c.     The Publisher may make the manuscripts conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and may edit the manuscripts in a manner subject to Author's approval.

     d.     All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms

12/05/2003 02:26PM

Publishing Contract
Page 3

of sale, distribution, advertising, and promotion of the Works shall be within the Publisher's sole discretion, provided, however, Author shall have approval of flap copy and cover design. The initial publications shall be in hardcover.

4.      Statements of Accounts.

        a.      Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Works to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Works.

        b.      The statement shall include an accounting of all copies of the Works sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

        c.      Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Works; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

        d.      If as of any particular accounting rendered under Paragraph 4 hereof the amounts credited to the Author's account under the terms of this Agreement exceed the advances actually paid to the Author as of such accounting the Publisher shall pay with such accounting the amount of such excess. However, the Publisher's obligation to pay advances under Paragraph 2(b) shall be reduced by the amount of payments made in this manner. Such reductions shall be applied in chronological order to the advance installments remaining to be paid as of the date on which any such payment is made.

5.      Author's Warranties.

        Author hereby represents and warrants:

        a.      That he owns all right, title and interest to the Works.

        b.      That the Works are original and do not include, and are not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

        c.      That the Works have not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Works in the United States or elsewhere.

Publishing Contract
Page 4

    d.    That the Works contain no libelous, obscene, or other unlawful matter.

    e.    That the Works do not infringe upon any statutory or common law copyright or trademark, and that any recipe, formula, medication or instruction included in the Works is not injurious to the users' health.

    f.    The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

6.    Author's Undertakings.

    a.    Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Works contain matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter. Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein, provided, however, in the event no legal proceedings have been instituted within one (1) year from the date of receipt of any claim or demand, Publisher shall promptly pay to the Author all withheld sums.

    b.    Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Works. Publisher and Author will agree after each completed manuscript has been submitted whether an index is required; if so, such index shall be charged to Author's royalty account. The costs of any changes (but not corrections) in proof copy requested by Author shall be charged to Author's account to the extent that they exceed five percent (5%) of the costs of the proofs without such changes.

    c.    Author shall cooperate with Publisher in promotion of the Works and shall be available for interviews and other promotional activities as requested by Publisher at mutually agreed upon times and places at Publisher's sole cost and expense. It is understood that Author will use his own residence and transportation while in the Washington, DC area, and the Publisher will not incur any housing or local transportation expenses related to such stays.

12/05/2003 · 02:26PM

Publishing Contract
Page 5

     d.     The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

7.     Publisher's Undertakings.

     a.     Publisher shall affix to all copies of the Works a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Works with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Works when selling or licensing any rights in connection therewith.

     b.     Publisher shall give Author fifty (50) copies of each Work without charge and shall sell any additional copies to Author at a discount of fifty percent (50%). Author shall not be entitled to royalties on account of such books.

8.     Copyright Infringement.

     Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Works. If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally. If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear and recoup all expenses of the proceeding and shall share equally all recovery therefrom. If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

9.     Right to Cancel.

     a.     If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

     b.     If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author. If Author has not cured the breach as set forth by Publisher within thirty (30) days of such notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

     c.     If Publisher does not publish the Works on or before the dates provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Works. If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

     d.     If the Publisher's stock of either Work falls below two hundred and fifty (250) copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days

Publishing Contract
Page 6

after the receipt of such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the Work in question within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

It is also understood that if for two (2) consecutive accounting periods neither the Publisher, nor a licensee of the Publisher has in its inventory printed copies of either Work available for sale in the United States but copies of such work are available for sale by means of on-demand printing or electronic transmission or reproduction, and within these two (2) accounting periods, the Publisher or its licensee(s) collectively have sold less than two hundred and fifty (250) copies of such Work, such Work shall be deemed out-of-print. Each of the two Works shall be treated individually for the purpose of out-of-print.

e.    In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

10.    Force Majeure.

Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires, government restrictions, sickness, or other circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

11.    Remainders.

If the Publisher at any time has unsold or returned copies of the Works on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will first offer Author said copies at forty percent (40%) of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Works to such buyers and upon such terms as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

12/05/2003 02:26PM

Publishing Contract
Page 7

12.    Assignment.

    a.    Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

    b.    Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

    c.    In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Works shall revert to Author, and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

13.    Option.

    As part of the consideration paid to Author by Publisher hereunder, Publisher shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form, and of acquiring the same rights on mutually agreed upon terms and conditions. If, four (4) weeks after such Work has been submitted to the Publisher, no terms have been agreed upon for its publication, then Author shall be at liberty to enter into an agreement with any other publisher for its publication. .

14.    Arbitration.

    Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

    Agency Clause

    All payments due hereunder shall be made payable to and in the name of William Morris Agency, 1325 Avenue of the Americas, New York, NY 10019 as agents for Richard Miniter.

15.    Competing Work.

    Author shall not within one (1) year after publication of ~~the second Work~~ each of the Works authorize the publication of a book on a similar subject or without the written permission of the Publisher. not to be unreasonably withheld. 

16.    Entire Agreement

Publishing Contract
Page 8

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Works, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Interactive electronic multimedia rights to the text of the Works with non-textual elements such as sound, musicals, visuals, graphics or other multimedia features are reserved to the Author for the Author's sole use and disposition.

Advertisements may not be inserted or printed in any edition of the Works, whether issued by the Publisher or its license(s) without the Author's prior written consent.

All rights not specifically granted hereunder are reserved to the Author for his own use and disposition. Reserved rights include, but are not limited to, the right to publish or cause to be published in any form, excerpts, summaries, novelizations or dramatizations, of television and/or motion pictures of the Work, thereof not to exceed seventy-five hundred (7,500) words in length to be used for advertising and exploitation of television and/or motion pictures based upon the Works.

Agreed:

_____

Regnery Publishing, Inc.

by: _____

Social Security Number

12/05/2003 17 44 FAX 11:50 AM REGNERY PUBLISHING          FAX NO. 2022180812          P. 08

Publishing Contract
Page 8

effectiveness of any notice of termination. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Interactive electronic multimedia rights to the text of the Work with non-textual elements such as sound, musicals, visuals, graphics or other multimedia features are reserved to the Author for the Author's sole use and disposition.

Advertisements may not be inserted or printed in any edition of the Work, whether issued by the Publisher or its license(s) without the Author's prior written consent.

All rights not specifically granted hereunder are reserved to the Author for his own use and disposition. Reserved rights include, but are not limited to, the right to publish or cause to be published in any form, excerpts, summaries, novelizations or dramatizations, of television and/or motion pictures of the Work, thereof not to exceed seventy-five hundred (7,500) words in length to be used for advertising and exploitation of television and/or motion pictures based upon the Work.

Agreed:

_____

Regnery Publishing, Inc.

by: _____

_____
Social Security Number                    REDACTED

# MOTION TO DISMISS
# EXHIBIT 8



**REGNERY PUBLISHING, INC.**

*An Eagle Publishing Company • Since 1947*

## PUBLISHING CONTRACT

AGREEMENT made this 14th day of February 2005, between Richard Miniter, c/o William Morris Agency, 1325 Avenue of the Americas, New York, NY 10019 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.    Grant of Rights.

Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest in the English language to print, publish and market ("publish") and license subsidiary rights throughout the World, in book form (hardcover and softcover) and electronic form two books, which have been or will be written by Author ("the Works"); the first book is tentatively entitled, *Propaganda*.

2.    Publication and Royalties.

a.    Publisher hereby agrees to publish each Work within twelve (12) months after the acceptance of the final manuscript of each Work, except that such twelve (12) month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

b.    Publisher shall pay Author an advance against all royalty income in the amount of $355,000; $121,666 of which will be paid upon the signing of this agreement; $116,667 upon Publisher's final acceptance of the manuscript for the first book; and $166,667 upon Publisher's final acceptance of the manuscript for the second book. For purposes of royalty payments it will be assumed that $180,000 of the total advance will be assigned to the first book, and $175,000 will be assigned to the second book.

c.    Publisher shall pay Author an additional advance against all royalty income of five thousand dollars ($5,000) for each week that each Work is listed on the printed New York Times Best Seller List (any of the top 15 positions), provided, however, that no more than $50,000 shall be paid for each book in such additional advances pursuant to this paragraph. Such payment to be made no later than thirty (30) days after the relevant list appears in print.

d.    On all books sold to the book trade, Publisher shall pay Author a royalty of fifteen percent (15%) of Publisher's catalog retail price for all books sold and for which Publisher has been paid after returns, for hardback books; and seven and one-half percent (7.5%) of such retail price for all trade paperback books in each case after returns.

Miniter Publishing Contract
Page 2

e.    On all copies of the Works, complete or abridged, published and sold by other than Publisher, such as book club editions, paperback editions, abridged editions, and on the sale of all rights to the Works, including but not limited to paperback, second serial rights, electronic rights now known or to be developed in the future, of the verbatim text, without adaptation, the result of which serves as a substitute for sales of the Works in book form, Publisher and Author shall divide the gross proceeds equally, without deduction of any agent commissions, provided, however, as regards second serialization, the periodical and cut shall be subject to the Author's approval, not to be unreasonably withheld or delayed, and further provided, that prior to Publisher's use or disposition of electronic rights granted herein, Author and Publisher shall agree upon the royalties.   Author shall retain first serial rights.  Author retains foreign language rights to the Works.

f.    Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten percent (10%) of the amount received by the Publisher in excess of its manufacturing costs and returns.  Such sales shall be subject to Author approval, such approval not to be unreasonably withheld.

3.    Manuscript.

a.    Author shall deliver to the Publisher no later than June 15, 2005, a complete copy of the first Work, and on June 15, 2006, a complete copy of the second Work; in each case, in hard copy and on computer disk, in content and form satisfactory to the Publisher, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense. Author agrees to supply with the manuscripts and suitable for reproduction all mutually agreed upon photographs, illustrations, drawings, charts and other material necessary to complete the Works and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any royalty sums payable to Author.

b.    Should Author fail to deliver the complete and satisfactory manuscript of the Works to the Publisher on the above dates (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have thirty (30) days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said thirty (30) day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

c.    The Publisher may make the manuscripts conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and may edit the manuscripts in a manner subject to Author's approval.

d.    All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms

Miniter Publishing Contract
Page 3

of sale, distribution, advertising, and promotion of the Works shall be within the Publisher's sole discretion, provided, however, Author shall have approval of flap copy and cover design, such approval not to be unreasonably withheld. The initial publications shall be in hardcover.

4.      Statements of Accounts.

a.      Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Works to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Works.

b.      The statement shall include an accounting of all copies of the Works sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c.      Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Works; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

d.      If as of any particular accounting rendered under Paragraph 4 hereof the amounts credited to the Author's account under the terms of this Agreement exceed the advances actually paid to the Author as of such accounting the Publisher shall pay with such accounting the amount of such excess. However, the Publisher's obligation to pay advances under Paragraph 2(b) shall be reduced by the amount of payments made in this manner. Such reductions shall be applied in chronological order to the advance installments remaining to be paid as of the date on which any such payment is made.

5.      Author's Warranties.

Author hereby represents and warrants:

a.      That he owns all right, title and interest to the Works.

b.      That the Works are original and do not include, and are not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

c.      That the Works have not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Works in the United States or elsewhere.

Miniter Publishing Contract
Page 4

    d.    That the Works contain no libelous, obscene, or other unlawful matter.

    e.    That the Works do not infringe upon any statutory or common law copyright or trademark, and that any recipe, formula, medication or instruction included in the Works is not injurious to the users' health.

    f.    The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

6.    Author's Undertakings.

    a.    Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Works contain matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter. Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein, provided, however, in the event no legal proceedings have been instituted within one (1) year from the date of receipt of any claim or demand, Publisher shall promptly pay to the Author all withheld sums.

    b.    Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Works. Publisher and Author will agree after each completed manuscript has been submitted whether an index is required; if so, such index shall be charged to Author's royalty account. The costs of any changes (but not corrections) in proof copy requested by Author shall be charged to Author's account to the extent that they exceed five percent (5%) of the costs of the proofs without such changes.

    c.    Author shall cooperate with Publisher in promotion of the Works and shall be available for interviews and other promotional activities as requested by Publisher at mutually agreed upon times and places at Publisher's sole cost and expense. It is understood that Author will use his own residence and transportation while in the Washington, DC area, and the Publisher will not incur any housing or local transportation expenses related to such stays.

Miniter Publishing Contract
Page 5

d.    The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

7.    Publisher's Undertakings.

a.    Publisher shall affix to all copies of the Works a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Works with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Works when selling or licensing any rights in connection therewith.

b.    Publisher shall give Author fifty (50) copies of each Work without charge and hall sell any additional copies to Author at a discount of fifty percent (50%). Author shall not be entitled to royalties on account of such books.

c.    Publisher shall provide to Author a written marketing plan for each book two months prior to each book's launch, provided Author has met with Publisher in advance to discuss marketing ideas and opportunities.

d.    Publisher shall provide to Author weekly Bookscan sales reports, provided such reports are available to Publisher from Bookscan, and Publisher shall provide to Author monthly returns reports on or about the 15th of the subsequent month.

8.    Copyright Infringement.

Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Works. If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally. If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear and recoup all expenses of the proceeding and shall share equally all recovery therefrom. If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

9.    Right to Cancel.

a.    If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

b.    If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author. If Author has not cured the breach as set forth by Publisher within thirty (30) days of such notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

Miniter Publishing Contract
Page 6

      c.     If Publisher does not publish the Works on or before the dates provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Works. If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

      d.     If the Publisher's stock of either Work falls below two hundred and fifty (250) copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days after the receipt of such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the Work in question within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

      It is also understood that if for two (2) consecutive accounting periods neither the Publisher, nor a licensee of the Publisher has in its inventory printed copies of either Work available for sale in the United States but copies of such work are available for sale by means of on-demand printing or electronic transmission or reproduction, and within these two (2) accounting periods, the Publisher or its licensee(s) collectively have sold less than two hundred and fifty (250) copies of such Work, such Work shall be deemed out-of-print. Each of the two Works shall be treated individually for the purpose of out-of-print.

      e.     In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

10.    Force Majeure.

      Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires government restrictions, sickness, or other circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

11.    Remainders.

      If the Publisher at any time has unsold or returned copies of the Works on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will first offer Author said copies at forty percent (40%) of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Works to such buyers and upon such terms

Miniter Publishing Contract
Page 7

as the Publisher may decide.  If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales.  If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost.  Publisher may destroy or otherwise dispose of all copies not remaindered.

12.     Assignment.

        a.      Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

        b.      Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

        c.      In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Works shall revert to Author; and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

13.     Option.

        As part of the consideration paid to Author by Publisher hereunder, Publisher shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form, and of acquiring the same rights on mutually agreed upon terms and conditions.  If, four (4) weeks after such Work has been submitted to the Publisher, no terms have been agreed upon for its publication, then Author shall be at liberty to enter into an agreement with any other publisher for its publication.

14.     Arbitration.

        Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association.  Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

        Agency Clause

        All payments due hereunder shall be made payable to and in the name of William Morris Agency, 1325 Avenue of the Americas, New York, NY 10019 as agents for Richard Miniter.

Miniter Publishing Contract
Page 8

15.    Competing Work.

Author shall not within one (1) year after publication of the second Work authorize the publication of a book on a similar subject or without the written permission of the Publisher.

16.    Entire Agreement

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced.  Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination.  This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Works, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Interactive electronic multimedia rights to the text of the Works with non-textual elements such as sound, musicals, visuals, graphics or other multimedia features are reserved to the Author for the Author's sole use and disposition.

Advertisements may not be inserted or printed in any edition of the Works, whether issued by the Publisher or its license(s) without the Author's prior written consent.

All rights not specifically granted hereunder are reserved to the Author for his own use and disposition. Reserved rights include, but are not limited to, the right to publish or cause to be published in any form, excerpts, summaries, novelizations or dramatizations, of television and/or motion pictures of the Work, thereof not to exceed seventy-five hundred (7,500) words in length to be used for advertising and exploitation of television and/or motion pictures based upon the Works.

Agreed:

_____

_____
Social Security Number

Regnery Publishing, Inc.

by: _____

REDACTED

# MOTION TO DISMISS
# EXHIBIT 9

AMERICAN ARBITRATION ASSOCIATION
Washington, D.C.

REGNERY PUBLISHING, INC.,      )
                                             )

      Claimant,                )

                                             )

v.                                     )      Claim No. _____

                                           )

RICHARD MINITER,           )

                                           )

      Respondent.         )

## DEMAND FOR ARBITRATION

## STATEMENT OF CLAIM

Regnery Publishing, Inc. files this Demand for Arbitration and states as follows:

1.      The Demand is made under the American Arbitration Association's Commercial Arbitration Rules.

### Parties

2.      Claimant Regnery Publishing, Inc. ("Regnery"), is a book publisher located at One Massachusetts Avenue NW, Washington, DC 20001.

3.      Respondent Richard Miniter, 2420 S. Queen Street, Arlington, Virginia, is an author whose books have been published by Regnery, among other publishers.

### Nature of Claim

4.      This is a claim for breach of contract and unjust enrichment arising out Miniter's failure to adhere to a publishing contract entered into between the parties on February 14, 2005 (the "Contract"). A copy of the Contract is attached hereto as Exhibit A.

5.      Regnery seeks damages and restitution from Miniter amounting to $239,730.

6.      This case shall proceed in accordance with Rules R-1 through R-54 of the Commercial Arbitration Rules of the American Arbitration Association.

<u>Arbitration Clause and Choice of Law Rules</u>

7.    The Contract between the parties contains the following provision relating to

Arbitration and choice of law:

> Any controversy or claim arising out of or relating to this agreement, the
> interpretation, implementation, breach or subject matter thereof, shall be settled
> by arbitration in the District of Columbia, in accordance with the laws of the
> District of Columbia and the rules of the American Arbitration Association.
> Judgment upon the award made by the arbitrators may be entered in any Court
> having jurisdiction thereof.

Contract, Ex. A at ¶ 14.

8.    In accordance with this provision, Regnery requests an arbitration hearing

in Washington, D.C.

<u>Background</u>

9.    On February 14, 2005, the parties entered a publishing contract whereby Miniter

granted Regnery the exclusive right, title and interest to print, publish and market two books

which had been or were to be written by Miniter. <u>See</u> Contract, Ex. A at ¶ 1.

10.    Under the parties' agreement, Miniter was to deliver to Regnery a complete copy

of the manuscript for the first book by June 15, 2005, and a complete copy of the manuscript for

the second book by June 15, 2006. The Contract requires Miniter to produce manuscripts "in

content and form satisfactory to the Publisher." <u>Id.</u> ¶ 3(a).

11.    The Contract further provided that:

> Publisher shall pay Author an advance against all royalty income in the amount of
> $355,000; $121,666 of which will be paid upon the signing of this agreement;
> $116,667 upon Publisher's final acceptance of the manuscript of the first book;
> and $116,667 upon Publisher's final acceptance of the manuscript for the Second
> Book. For purpose of royalty payments it will be assumed that $180,000 of the
> total advance will be assigned to the first book, and $175,000 will be assigned to
> the second book.

<u>Id.</u> ¶ 2(b).

12.    On or about February 14, 2005, Regnery paid Miniter $121,666 representing the first installment of the advance for the two books in the Contract.

13.    Although Miniter failed to deliver the manuscript for the first book (which was tentatively entitled <u>Propaganda</u>, and whose title was later changed to <u>Disinformation</u>) by June 15, 2005, he delivered an acceptable manuscript to Regnery in August 2005.  Regnery paid Miniter $116,667 representing the second installment of the advance.

14.    On or about June 21, 2005, in connection with Miniter's preparation of the manuscript of <u>Disinformation</u>, the parties entered into a side agreement regarding expenses to be incurred by Miniter during a trip to Afghanistan. <u>See</u> "Regnery Publishing, Inc. Publicity Expense Agreement," updated June 21, 2005 (hereafter the "June 21, 2005 Agreement"), attached hereto as Exhibit B.

15.    In light of Miniter's representation that CBS' <u>60 Minutes</u> was interested in reporting a news story regarding Miniter and his book in Afghanistan, Regnery agreed to allocate $25,000 of its marketing budget for publicity to partially fund Miniter's trip to Afghanistan. <u>Id.</u> ¶ 2. The agreement stated:

> Both parties agree that if 60 minutes does not air any story related to Miniter's trip to Afghanistan, then this $25,000 shall be recoverable as if it were an additional advance against royalties earned.  If, however, CBS does air a segment related to Miniter's trip to Afghanistan, this $25,000 shall not be recoverable as an advance, but shall be treated as an expense of the publisher.

<u>Id.</u> ¶ 2 (handwritten addendum).

16.    The agreement further provided that attorneys' fees shall be recoverable by the prevailing party in an action at law or other proceeding. <u>Id.</u> ¶ 13.

17.    On or about June 21, 2005, Regnery paid Miniter $25,000 in accordance with the June 21, 2005 Agreement.

18.    CBS never aired a <u>60 Minutes</u> program concerning Miniter, the book, and a trip to Afghanistan. Accordingly, the $25,000 paid to Miniter is to be considered part of his advance under the Contract. <u>Id.</u> ¶ 2.

19.    On or about January 24, 2006, Miniter met with Regnery's Acquisitions Committee to present possible subject matters for the second book under the Contract. Miniter proposed a book regarding terrorist Abu-Musab al-Zarqawi. <u>See</u> Letter from Marjory G. Ross to Mel Berger, March 30, 2006, attached hereto as Exhibit C.

20.    Shortly after the January 24 meeting, Marjory Ross, the President and Publisher of Regnery, telephoned Mel Berger, Miniter's literary agent at the William Morris Agency, to inform him that Regnery would accept the proposal for the book regarding Zarqawi. <u>Id.</u>

21.    On January 31, 2006, Miniter again met with Regnery and assured Regnery that he would meet his deadlines, fulfill his promises of the book proposal, and fulfill his publicity obligations, among other things. <u>Id.</u>

22.    Thereafter, Miniter demanded additional payments, not envisioned by the Contract, to complete the <u>Zarqawi</u> book. Specifically, Miniter requested that Regnery pay him an additional $97,707 to complete the book. Regnery refused to increase any advances to Miniter as the Contract already provided for payment of $355,000 for the two books, plus the additional $25,000 that Regnery paid in accordance with the June 21, 2005 Agreement.

23.    On or about February 13, 2006, Regnery offered to release Miniter from the Contract for the second book provided that Miniter arranged for another publisher to buy out the advance. In the spirit of compromise, Regnery calculated this figure to be $83,333. <u>See</u> March 30, 2006 letter, attached as Exhibit C and Letter from Jeffrey Carneal to Mel Berger, April 21, 2006, attached hereto as Exhibit D.

24.    Acting on behalf of, and as agent for Miniter, Berger agreed that the new publisher of Miniter's book would direct $83,333 in payments to Regnery. <u>See</u> Email from Mel Berger to Jeff Carneal, May 8, 2006 with letter attached, attached hereto as Exhibit E.

25.    Berger stated in an email:

Take a look at this letter we put together which reflects the Miniter repayments to you <u>on the schedule we agreed to</u>. If this works for you, send it back to me on your letterhead and I'll be able to get it back to you with the S&S [Simon & Schuster] agreement to pay you directly when the contract comes in.

Exhibit E (emphasis added).

26.    Despite the representations from Miniter and Berger, Miniter never executed the buy-out agreement with Regnery and never directed Simon & Schuster or any other publisher to pay Regnery for the return of the advances owed by Miniter.

27.    Miniter has earned $93,603 in royalties through June 30, 2006 on the book <u>Disinfomation</u>.

28.    Despite the fact that Miniter owed Regnery the second book of his two-book agreement, upon information and belief, Simon & Schuster will be publishing a book by Miniter in August 2007.

29.    Miniter's failure to produce a second book as required under the Contract has damaged Regnery, including lost profits that Regnery would have received from the sales of the second book. Assuming the second book would have performed comparably to <u>Disinformation</u>, Regnery has suffered lost profits of at least $70,000.

COUNT I<br><u>BREACH OF CONTRACT (February 14, 2005 Contract)</u>

30.    Regnery realleges the allegations in paragraphs 1 through 29 above.

31.    Miniter is bound by his obligations under the Contract.

32.     Regnery fully performed its obligations under the Contract, including paying Miniter an advance of royalties of $263,333 and accepting Miniter's proposal for a second book.

33.     Miniter has breached the Contract by failing to produce a second manuscript for publication by June 15, 2006, as required under the Contract.

34.     Regnery has been damaged because Miniter's first book has earned only $93,603 in royalties through June 30, 2006 and Miniter has deprived Regnery the opportunity to receive any revenue from the second book.  Regnery, therefore, seeks damages in the amount of $239,730, representing the $263,333 advance to Miniter, minus the $93,603 in royalties earned thus far, plus $70,000 in lost profits due to Miniter's failure to produce the second book.

WHEREFORE, Regnery seeks judgment in the amount of $239,730, plus interest, costs, attorneys' fees and all other relief to which it is entitled.

## COUNT II
## UNJUST ENRICHMENT

35.     Regnery realleges the allegations in paragraphs 1 through 34 above.

36.     Miniter's acceptance and retention of $263,333 in advances for royalties on two books when, in fact, he completed only one book make it inequitable for Miniter to retain any amount beyond the $93,603 in royalties earned for the completed book.

WHEREFORE, Regnery seeks restitution in the amount of $169,730, plus interest, costs, attorneys' fees and all other relief to which it is entitled.

## COUNT III
## BREACH OF CONTRACT (The Buy-Out Agreement)

37.     Regnery realleges the allegations in paragraphs 1 through 36 above.

38.    On or about May 8, 2006, Miniter, acting through his agent Mel Berger, agreed to Regnery's proposed buy out of the Contract for $83,333, to be funded as an allocation from Miniter's advance from Simon & Schuster pursuant to a mutually agreed-upon schedule.

39.    Because neither Miniter nor Simon & Schuster at his direction made the payments as agreed in the proposed buy-out, Miniter thereby breached the buy-out agreement.

WHEREFORE, Regnery seeks judgment in an amount to be determined, plus interest, costs, attorneys' fees and all other relief to which it is entitled.

Dated:  April 6, 2007

Respectfully submitted.

Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Avenue NW
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1500
Fax: (202) 861-1783

*Attorneys for Claimant*
*Regnery Publishing, Inc.*

- 7 -



**REGNERY PUBLISHING, INC.**

*An Eagle Publishing Company • Since 1947*

## PUBLISHING CONTRACT

AGREEMENT made this 14ᵗʰ day of February 2005, between Richard Miniter, c/o William Morris Agency, 1325 Avenue of the Americas, New York, NY 10019 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.    Grant of Rights.

    Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest in the English language to print, publish and market ("publish") and license subsidiary rights throughout the World, in book form (hardcover and softcover) and electronic form two books, which have been or will be written by Author ("the Works"); the first book is tentatively entitled, *Propaganda*.

2.    Publication and Royalties.

    a.    Publisher hereby agrees to publish each Work within twelve (12) months after the acceptance of the final manuscript of each Work, except that such twelve (12) month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

    b.    Publisher shall pay Author an advance against all royalty income in the amount of $355,000; $121,666 of which will be paid upon the signing of this agreement; $116,667 upon Publisher's final acceptance of the manuscript for the first book; and $166,667 upon Publisher's final acceptance of the manuscript for the second book. For purposes of royalty payments it will be assumed that $180,000 of the total advance will be assigned to the first book, and $175,000 will be assigned to the second book.

    c.    Publisher shall pay Author an additional advance against all royalty income of five thousand dollars ($5,000) for each week that each Work is listed on the printed New York Times Best Seller List (any of the top 15 positions), provided, however, that no more than $50,000 shall be paid for each book in such additional advances pursuant to this paragraph. Such payment to be made no later than thirty (30) days after the relevant list appears in print.

    d.    On all books sold to the book trade, Publisher shall pay Author a royalty of fifteen percent (15%) of Publisher's catalog retail price for all books sold and for which Publisher has been paid after returns, for hardback books; and seven and one-half percent (7.5%) of such retail price for all trade paperback books in each case after returns.

Miniter Publishing Contract
Page 2

e.    On all copies of the Works, complete or abridged, published and sold by other than Publisher, such as book club editions, paperback editions, abridged editions, and on the sale of all rights to the Works, including but not limited to paperback, second serial rights, electronic rights now known or to be developed in the future, of the verbatim text, without adaptation, the result of which serves as a substitute for sales of the Works in book form, Publisher and Author shall divide the gross proceeds equally, without deduction of any agent commissions, provided, however, as regards second serialization, the periodical and cut shall be subject to the Author's approval, not to be unreasonably withheld or delayed, and further provided, that prior to Publisher's use or disposition of electronic rights granted herein, Author and Publisher shall agree upon the royalties.   Author shall retain first serial rights.  Author retains foreign language rights to the Works.

f.    Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten percent (10%) of the amount received by the Publisher in excess of its manufacturing costs and returns.  Such sales shall be subject to Author approval, such approval not to be unreasonably withheld.

3.    Manuscript.

a.    Author shall deliver to the Publisher no later than June 15, 2005, a complete copy of the first Work, and on June 15, 2006, a complete copy of the second Work; in each case, in hard copy and on computer disk, in content and form satisfactory to the Publisher, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense. Author agrees to supply with the manuscripts and suitable for reproduction all mutually agreed upon photographs, illustrations, drawings, charts and other material necessary to complete the Works and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any royalty sums payable to Author.

b.    Should Author fail to deliver the complete and satisfactory manuscript of the Works to the Publisher on the above dates (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have thirty (30) days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said thirty (30) day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

c.    The Publisher may make the manuscripts conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and may edit the manuscripts in a manner subject to Author's approval.

d.    All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms

Miniter Publishing Contract
Page 3

of sale, distribution, advertising, and promotion of the Works shall be within the Publisher's sole discretion, provided, however, Author shall have approval of flap copy and cover design, such approval not to be unreasonably withheld. The initial publications shall be in hardcover.

4.    Statements of Accounts.

a.    Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Works to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Works.

b.    The statement shall include an accounting of all copies of the Works sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c.    Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Works; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

d.    If as of any particular accounting rendered under Paragraph 4 hereof the amounts credited to the Author's account under the terms of this Agreement exceed the advances actually paid to the Author as of such accounting the Publisher shall pay with such accounting the amount of such excess. However, the Publisher's obligation to pay advances under Paragraph 2(b) shall be reduced by the amount of payments made in this manner. Such reductions shall be applied in chronological order to the advance installments remaining to be paid as of the date on which any such payment is made.

5.    Author's Warranties.

Author hereby represents and warrants:

a.    That he owns all right, title and interest to the Works.

b.    That the Works are original and do not include, and are not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

c.    That the Works have not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Works in the United States or elsewhere.

Miniter Publishing Contract
Page 4

    d.     That the Works contain no libelous, obscene, or other unlawful matter.

    e.     That the Works do not infringe upon any statutory or common law copyright or trademark, and that any recipe, formula, medication or instruction included in the Works is not injurious to the users' health.

    f.     The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

6.    Author's Undertakings.

    a.     Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Works contain matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit, without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter. Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein, provided, however, in the event no legal proceedings have been instituted within one (1) year from the date of receipt of any claim or demand, Publisher shall promptly pay to the Author all withheld sums.

    b.     Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Works. Publisher and Author will agree after each completed manuscript has been submitted whether an index is required; if so, such index shall be charged to Author's royalty account. The costs of any changes (but not corrections) in proof copy requested by Author shall be charged to Author's account to the extent that they exceed five percent (5%) of the costs of the proofs without such changes.

    c.     Author shall cooperate with Publisher in promotion of the Works and shall be available for interviews and other promotional activities as requested by Publisher at mutually agreed upon times and places at Publisher's sole cost and expense. It is understood that Author will use his own residence and transportation while in the Washington, DC area, and the Publisher will not incur any housing or local transportation expenses related to such stays.

Miniter Publishing Contract
Page 5

d.    The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

7.    Publisher's Undertakings.

a.    Publisher shall affix to all copies of the Works a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Works with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Works when selling or licensing any rights in connection therewith.

b.    Publisher shall give Author fifty (50) copies of each Work without charge and hall sell any additional copies to Author at a discount of fifty percent (50%). Author shall not be entitled to royalties on account of such books.

c.    Publisher shall provide to Author a written marketing plan for each book two months prior to each book's launch, provided Author has met with Publisher in advance to discuss marketing ideas and opportunities.

d.    Publisher shall provide to Author weekly Bookscan sales reports, provided such reports are available to Publisher from Bookscan, and Publisher shall provide to Author monthly returns reports on or about the 15th of the subsequent month.

8.    Copyright Infringement.

Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Works. If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally. If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear and recoup all expenses of the proceeding and shall share equally all recovery therefrom. If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

9.    Right to Cancel.

a.    If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

b.    If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author. If Author has not cured the breach as set forth by Publisher within thirty (30) days of such notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

Miniter Publishing Contract
Page 6

c.    If Publisher does not publish the Works on or before the dates provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Works. If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

d.    If the Publisher's stock of either Work falls below two hundred and fifty (250) copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days after the receipt of such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the Work in question within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

It is also understood that if for two (2) consecutive accounting periods neither the Publisher, nor a licensee of the Publisher has in its inventory printed copies of either Work available for sale in the United States but copies of such work are available for sale by means of on-demand printing or electronic transmission or reproduction, and within these two (2) accounting periods, the Publisher or its licensee(s) collectively have sold less than two hundred and fifty (250) copies of such Work, such Work shall be deemed out-of-print. Each of the two Works shall be treated individually for the purpose of out-of-print.

e.    In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

10.    Force Majeure.

Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires government restrictions, sickness, or other circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

11.    Remainders.

If the Publisher at any time has unsold or returned copies of the Works on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will first offer Author said copies at forty percent (40%) of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Works to such buyers and upon such terms

Miniter Publishing Contract
Page 7

as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

12.    Assignment.

a.    Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

b.    Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

c.    In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Works shall revert to Author; and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

13.    Option.

As part of the consideration paid to Author by Publisher hereunder, Publisher shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form, and of acquiring the same rights on mutually agreed upon terms and conditions. If, four (4) weeks after such Work has been submitted to the Publisher, no terms have been agreed upon for its publication, then Author shall be at liberty to enter into an agreement with any other publisher for its publication.

14.    Arbitration.

Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

Agency Clause

All payments due hereunder shall be made payable to and in the name of William Morris Agency, 1325 Avenue of the Americas, New York, NY 10019 as agents for Richard Miniter.

Miniter Publishing Contract
Page 8

15.    Competing Work.

Author shall not within one (1) year after publication of the second Work authorize the publication of a book on a similar subject or without the written permission of the Publisher.

16.    Entire Agreement

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced.  Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination.  This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Works, unless and until this Agreement is executed by the President of the Publisher.  This agreement shall be binding in the event it is signed in counterparts.

Interactive electronic multimedia rights to the text of the Works with non-textual elements such as sound, musicals, visuals, graphics or other multimedia features are reserved to the Author for the Author's sole use and disposition.

Advertisements may not be inserted or printed in any edition of the Works, whether issued by the Publisher or its license(s) without the Author's prior written consent.

All rights not specifically granted hereunder are reserved to the Author for his own use and disposition. Reserved rights include, but are not limited to, the right to publish or cause to be published in any form, excerpts, summaries, novelizations or dramatizations, of television and/or motion pictures of the Work, thereof not to exceed seventy-five hundred (7,500) words in length to be used for advertising and exploitation of television and/or motion pictures based upon the Works.

Agreed:

_____


_____
Social Security Number

REDACTED

Regnery Publishing, Inc.

by: _____

*Updated 6/21/05*

# REGNERY PUBLISHING, INC.
## PUBLICITY EXPENSE AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into on this _____ day of _____, 2005 by and between Richard Miniter ("Author"), and Regnery Publishing, Inc. (the "Company"). For purposes of this Agreement, the "Company" shall include Regnery Publishing, Inc. and/or any division, subsidiary, parent, affiliate, partnership, or successor.

This Agreement shall be effective as of the date signed by the Author.

### RECITALS

WHEREAS, the Author and the Company have agreed to certain publishing arrangements, as described in the Publishing Contract signed by Author on February 14/1005; and

WHEREAS, the Author intends to travel to Afghanistan to work on material for a book he is writing subject to the Publishing Contract;

WHEREAS, in consideration of the Company's advancement of the Author's royalties earned for the book, the Company requires that the Author execute this Agreement in favor of the Company.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration as specified herein, Author and the Company, intending to be legally bound, agree as follows:

1.    Scope of Engagement.  Author is independently choosing to go to Afghanistan to work on material for a book that he is writing subject to the Publishing Contract.

2.    Publicity.  The Company will allocate funds from its marketing budget on publicity for Author's efforts to develop the book he is writing pursuant to the Publishing Contract.  In light of a potential 60 Minutes story concerning Author, the book and a trip to Afghanistan, $25,000.00 (Twenty Five Thousand and 00/100 Dollars) of these funds shall be used to partially fund Author's trip to Afghanistan. *Both parties agree*

3.    Independent Status.  Author acknowledges and agrees that he is not an agent or employee of the Company and is not authorized to act on behalf of the Company.  Neither this Agreement nor any dealings between the Company and the Author shall give rise to any employment relationship.  The parties hereto acknowledge and agree, without waiving or limiting any rights under the Publishing Contract, that the

*that if 60 minutes does not air any story related to Miniter's trip to Afghanistan, then this $25,000 shall be ← conrenble*



as if it were an additional advance
against royalties earned. If, however,
CBS does air a segment related to
Miniter's trip to Afghanistan, this
$25,000 shall not be recoverable
as an advance, but shall be treated
as an expense by the Publisher.

Publicity Expense Agreement – Richard Miniter

Company shall have no right to control the manner, means or method by which Author writes the book. Author hereby acknowledges and agrees that Author is not and shall not be entitled to any benefits under the Company's or any of the Company's health, retirement, pension, stock option, benefit or welfare plans.

    4.    <u>Taxes and Indemnification</u>. Author and the Company agree that the Company will not treat Author as an employee for tax purposes, and that Author will file all tax information returns and forms and pay all applicable taxes. Author hereby agrees to indemnify and hold the Company, its contractors, employees, officers, directors, agents, and representatives harmless of and from any and all costs, liabilities, damages and/or penalties arising out of any failure by Author or the Company to timely and/or properly file and pay any federal, state and local taxes applicable to any payments made to Author hereunder.

    5.    <u>Waiver of Claims and Indemnification</u>. Author hereby acknowledges that he is independently choosing to go to Afghanistan. Author understands and acknowledges that a state of war exists in Afghanistan and that by going there he subjects himself to risks of harm or death. Author assumes any and all risks arising out of, connected with, or in any way associated with his travel and stay in Afghanistan. Author fully releases and discharges the Company from any and all claims, of any kind, including but not limited to injury, death, kidnapping, or damage or loss of any other kind, which he may have or which may accrue to him arising out of his travel to and stay in Afghanistan. Author acknowledges that he understands that he is releasing future claims, and claims of which he may not presently be aware, and that he understands the effect of doing so. Author further agrees to indemnify and hold harmless and defend the Company from any and all claims, damages, liabilities and/or costs (including attorneys' fees) arising out of, connected with, or in any way associated with his travel and stay in Afghanistan.

    6.    <u>Severable Provisions</u>. The provisions of this Agreement are severable, and if any one or more provisions is determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions or parts hereof shall nevertheless be binding and enforceable. In the event that any provision of this Agreement is deemed unenforceable, the Company and Author agree that a court of competent jurisdiction shall have jurisdiction to reform such provision to the extent necessary to cause it to be enforceable to the maximum extent permitted by law, and they will abide by what said court determines.

    7.    <u>Assignment</u>. Author's duties under this Agreement shall not be assignable or delegable by Author without the prior written consent of the Company.

    8.    <u>Binding Agreement</u>. The rights and obligations of the Company and Author under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company, and to the extent legally permissible, to and upon the heirs, legal representatives and assigns of Author.

2

Publicity Expense Agreement – Richard Miniter

9.    Waiver.  Any party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party thereafter from enforcing any provision of this Agreement.  The rights granted the parties herein are cumulative and the waiver by a party of any single remedy shall not constitute a waiver of such party's right to assert any other legal remedies.

10.    Governing Law.  This Agreement is made in the District of Columbia and shall be governed and construed according to the laws of the District of Columbia.

11.    Interpretation of Agreement.  This Agreement is to be interpreted in conjunction with the Publishing Contract.  The Publishing Contract, in its entirety, remains in full effect.  This Agreement does not modify, supersede or nullify any provision of the Publishing Contract.  This Agreement may not be modified except in writing, signed by all parties.

12.    Termination. This Agreement can be terminated, with or without cause, with or without notice, at any time, at the option of either Author or the Company. Sections 4 -- 6 and 12 shall survive any termination of this Agreement.  Upon termination of this Agreement, Author shall immediately refund all royalties advanced pursuant to this Agreement.

13.    Attorneys' Fees. In the event either party hereto finds it necessary to employ legal counsel or to bring an action at law or other proceeding against the other party to enforce any of the terms, covenants or conditions hereof, the party prevailing in any such action or other proceeding shall be paid all reasonable attorneys' fees by the other party as well as costs.

3

Publicity Expense Agreement – Richard Miniter

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement.  Author acknowledges that he or she has read and understands this Agreement.

Witnessed by:                                    Author:

_Donna Harkins_                                  _Rchd Mtr_
(Signature)                                      (Signature)

_DONNA HARKINS_                                  _Richard Miniter_
(Print Full Name)                                (Print Full Name)

                                                 Regnery Publishing, Inc.

                                                 By _Mgr Rs_
                                                 Marjorie G. Ross
                                                 President, Regnery Publishing, Inc.

WDC/310766.2

4



REGNERY
PUBLISHING, INC.
*An Eagle Publishing Company • Since 1947*

FILE COPY

March 30, 2006

Mr. Mel Berger
William Morris Agency
1325 Avenue of the Americas
15th Floor
New York, NY 10019

Dear Mel,

Thank you for following up on the status of our Rich Miniter two-book deal.

As you know, when we entered into this agreement, we were hoping to publish two mc
best-sellers with Rich, building on the success of the first two best-sellers Rich wrote fc
us. We expected and hoped that Rich would be a willing, cooperative and enthusiastic
partner. We also hoped some of the problems we experienced working with Rich on h
previous books, such as chronically and badly missed deadlines, chronically missed ar
cancelled interviews, and unfortunate remarks about his publisher to others in the
industry, would be avoided.

Your letter of March 22 states we are not interested in either of the two books propose
to us; however that is not quite correct. As you may recall, after Rich came into our
offices on January 24 and met with our Acquisitions Committee to present his Zarqawi
proposal, I called you and told you that we had decided to accept that proposal. I'm
sure you will recall I even remarked that you and Rich might be surprised to hear that
news, since we had really grilled Rich on the idea when he was here.

After Rich called Jeff Carneal, and after hearing more rumors that Rich was complainir
to people inside and outside Regnery that he would have to do another book with us,
Rich and Jeff arranged another meeting to discuss what went right, and what went
wrong, in our previous books with Rich . At that January 31 "clear-the-air" meeting witl
Rich, Jeff and me, we expressed to Rich our concern regarding Rich's commitment to
meet his deadlines, to fulfill on the promises of the proposal, to fulfill on his obligations
vis-à-vis publicity, and to stop bad-mouthing Regnery around town. Jeff and I were
reassured by Rich that he would satisfy on all of the above.

Our desire from that point on was to have Rich deliver the Zarqawi book, on time, as
promised, agreed and stipulated in our contract. However, we repeatedly heard from
Rich and you that he could not deliver the book without a significant additional cash
payment, which we are unwilling to make (having already advanced Rich more than
$230,000 of his $355,000 two-book advance as of November 2005). We also continue
to hear rumors from many people in both the book world and the political world that Ric
was unhappy with Regnery as his publisher and that he "wanted to go to New York."

That is why, on February 13, I called you and said that "perhaps we will have to let Rich go to New York." As I explained, we felt that if Rich would not be able to deliver his Zarqawi book to us, per his contractual agreement, without a significant additional cash advance, and that if Rich, by all reports, wanted to get out of his contract with Regnery and be published somewhere else, then perhaps the best solution would be to have another publisher buy out his contract with us, thereby providing Rich with the cash he needed to produce the book, and provide us with the money due back to us for the second book. I recall your reaction was that all that remained was to figure out "when and how much."

I really am not at all clear why Rich wanted to then propose a different book to us – we had no desire for a different book, and had already accepted his first (far superior) proposal. As we discussed more than once, the second book idea was neither unique, nor particularly compelling. And we certainly are not interested in doing a particular book just because it will cost Rich less to produce it, which seemed to be Rich's argument.

Thus, our position remains the same: if Rich is able to deliver the Zarqawi book to us, as proposed and accepted, on time, and is committed to working with us to make that book a success, we would be happy to publish it. If, however, Rich requires additional cash in order to produce the book, or if he no longer wishes to work with Regnery (both of which seem to be the case), then we would be willing to allow another publisher to buy out the second book in his two-book contract. I believe this approach could yield the money due back to us, and additional cash for Rich to complete his book.

Please let me know how your discussions with other publishers are progressing, and what Rich decides to do.

Thanks very much.

Best regards,

Marjory G. Ross
President and Publisher

cc: Jeff Carneal



**REGNERY PUBLISHING, INC.**

*An Eagle Publishing Company • Since 1947*



April 21, 2006

Via fax 212-903-1418
and USPS

Mr. Mel Berger
William Morris Agency, LLC
1325 Avenue of the Americas
New York, New York 10019

Dear Mel:

First, my apologies for taking so long to get this letter to you. I hope it accurately reflects the spirit of the discussion you had with Marji to craft an acceptable solution to release Rich from the second book in his two-book contract (dated February 14, 2005) with Regnery Publishing.

A. Amount of money owed:

| | | |
|---|---|---|
| $238,333 | First two advances paid per contract |
| (180,000) | Advance attributable toward "Book 1" |
| 58,333 | Subtotal owed Regnery |
| 25,000 | Additional monies paid Rich (unrealized "60 Minutes" trip) |
| $ 83,333 | Grand total owed Regnery |

B. Suggested payment schedule:

1. $10,000 upon the signing of this agreement;

2. $35,000 upon Rich's receipt of the first royalty advance from new publisher for manuscript delivery, or December 1, 2006, whichever comes first; and

3. $38,333 upon Rich's receipt of second royalty advance from new publisher or December 1, 2006, whichever comes first

4. Any royalty payment owed on 9/30/06 from ongoing sales of *Disinformation* will be applied to, and therefore reduce, the amount of the final payment shown in #3 above.

Of course, payments #2 and #3 above should be paid to Regnery directly from the new publisher and would, therefore, need to be included in Rich's contract with them. If there is an adjustment (per #4), we will communicate that to you.

We hope that you are in agreement with these terms. If so, please have Rich sign and return one copy of this letter to us, along with a check for the first installment of $10,000.

If you have any questions, please feel free to call me.

Sincerely,

Agreed: _____  _____

Richard Miniter                    Date

Jeffrey J. Carneal
President
Eagle Publishing, Inc.

JJC/do

## Marji Ross

| | |
|---|---|
| **From:** | Mel Berger [mberger@wma.com] |
| **Sent:** | Monday, May 08, 2006 3:35 PM |
| **To:** | Jeff Carneal |
| **Cc:** | Marji Ross |
| **Subject:** | Miniter letter |



Miniter-Regnery.
doc (28 KB)

Dear Jeff:

Take a look at this letter we put together which reflects the Miniter
repayments to you on the schedule we agreed to.    If this works for you,
send it back to me on your letterhead and I'll be able to get it back to you with the S&S
agreement to pay you directly, when the contracts come in .
Thanks again.

MEL

-------------------------------------------------------------------

This message contains information which may be confidential and privileged.  Unless you
are the addressee (or authorized to receive for the addressee), you may not use, copy, re-
transmit, or disclose to anyone the message or any information contained in the message.
If you have received the message in error, please advise the sender by reply e-mail
@WMA.com, and delete the message. E-mail communication is highly susceptible to spoofing,
spamming, and other tampering, some of which may be harmful to your computer. If you are
concerned about the authenticity of the message or the source, please contact the sender
directly.

This Email has been scanned for all viruses

1

REGNERY PUBLISHING, INC.

May 8, 2006

Mr. Richard Miniter
c/o William Morris Agency
1325 Ave of Americas
New York, NY 10019

Dear Mr. Miniter:

Reference is made to the Agreement dated February 14, 2005, between you (the
"Author") and us, Regnery Publishing, Inc., a division of Eagle Publishing Company for
two books, the first tentatively entitled, Propaganda, which has been published as
DISINFORMATION.

This letter, when signed by both parties, will constitute our mutual agreement with
respect to the termination of the Agreement as it relates to the untitled Book 2 ("Book
2").

You have advised us that you anticipate that you will enter into a 2-book agreement with
Threshold Books, a division of Simon & Schuster, or another publisher as you may
choose (the "New Publisher") to publish Book 2 and an additional work ("Book 3").

In full satisfaction of any and all of our obligations to each other with respect to Book 2,
upon execution of an agreement with the New Publisher, you agree to direct the New
Publisher to pay to us directly $83,333 as follows:

     Twenty seven thousand, seven hundred and seventy seven dollars
     ($27,777) on execution,

     Twenty two thousand dollars ($22,000) on the New Publisher's acceptance of
     the manuscript, if ever, and

     Thirty three thousand, five hundred fifty six dollars ($33,556) on the earlier
     of publication of the Book 2, or the acceptance of an outline for Book 3.

You will provide us with a copy of the relevant language/provisions of any such
agreement.

Upon execution of this amendment, all rights granted to us in Book 2 under the
Agreement shall revert to you for your sole use and disposition and neither party shall
have any further obligation to each other in connection with Book 2 other than as
specified hereunder.

We also acknowledge that we have decline to exercise our option on your next work and that you shall be free to sell such work, or any other work, to another publisher without further obligation to us.

All other terms and conditions of the Agreement remain binding and unchanged.

If the foregoing is in accordance with your understanding, please sign all copies where indicated below and return them for countersignature.

Sincerely,

Regnery Publishing, Inc.
A division of Eagle Publishing Company


BY:_____

Accepted and Agreed:



_____
Richard Miniter

# MOTION TO DISMISS
# EXHIBIT 10

## AMERICAN ARBITRATION ASSOCIATION
### Washington, D.C.

REGNERY PUBLISHING, INC.,    )
    Claimant/Counter-Respondent,  )
                      )
v.                        )    Claim No. 16 143 00290 07
                      )
RICHARD MINITER,        )
    Respondent/Counter-Claimant.  )

## FIRST AMENDED COUNTERCLAIMS AND DEMAND FOR ARBITRATION

Richard Miniter, by counsel, counterclaims against Regnery Publishing, Inc.

("Regnery") and demands arbitration of disputes arising under a Publishing Contract

entered into by the parties as of April, 2003 ("2003 Contract"). (Exhibit 1).

    1.    Regnery submitted a Demand for Arbitration and Statement of Claim on

April 6, 2007. Miniter filed an Answering Statement denying all claims arising under a

Publishing Contract between the parties dated February 14, 2005 ("2005 Contract").[1]

Miniter demands arbitration of claims arising under the 2003 Contract in the District of

Columbia under the arbitration clause contained in paragraph 14 of that contract. (Exhibit

1, ¶ 14).

    2.    Pursuant to the 2005 Contract, Regnery agreed to pay Miniter a royalty of

fifteen percent (15%) of its catalog retail price on the sale of hardback books to the book

trade (seven and one-half percent (7.5%) for paperback books). (Regnery Statement of

Claim – Ex. A, ¶ 2(d)).  Regnery agreed to pay Miniter a reduced royalty for the sale of

books to "additional markets." (Regnery Statement of Claim – Ex. A, ¶ 2(f)).  Regnery's

sale of books to "additional markets" was subject to Miniter's prior consent. *Id.*  Regnery

agreed to pay Miniter a further reduced royalty of five percent (5%) over its cost for sales

---

[1] Miniter objects to the arbitration of disputes arising under a Publicity Expense Agreement dated as of June 21, 2005. (Regnery's Statement of Claim, Ex. B).

of books it deems "remainders" that could not be "sold on usual terms in a reasonable time." (Regnery Statement of Claim – Ex. A, ¶ 11).

    3.    Pursuant to the 2005 Contract, Regnery agreed to provide Miniter with a semi-annual statement of account detailing the sales of all books, the proceeds therefrom, all returns, and the total number of books in stock. (Regnery Statement of Claim – Ex. A, ¶ 4).  Regnery also agreed to provide Miniter weekly sales reports and monthly returns reports. (Regnery Statement of Claim – Ex. A, ¶ 7(d)).  Further, Regnery agreed to provide Miniter a written marketing plan and cooperate in advancing marketing opportunities. (Regnery Statement of Claim – Ex. A, ¶ 7(c)).

    4.    Pursuant to the 2003 Contract, Regnery agreed to pay Miniter a royalty of fifteen percent (15%) of its catalog retail price on the sale of hardback books to the book trade (seven and one-half percent (7.5%) for paperback books). (Exhibit 1, ¶ 2(d)). Regnery agreed to pay Miniter a reduced royalty for the sale of books to "additional markets." (Exhibit 1, ¶ 2(f)).  Regnery's sale of books to "additional markets" was subject to Miniter's prior consent. *Id.*  Regnery agreed to pay Miniter a further reduced royalty of five percent (5%) over its cost for sales of books it deems "remainders" that could not be "sold on usual terms in a reasonable time." (Exhibit 1, ¶ 11).

    5.    Pursuant to the 2003 Contract, Regnery agreed to provide Miniter with a semi-annual statement of account detailing the sales of all books, the proceeds therefrom, all returns, and the total number of books in stock. (Exhibit 1, ¶ 4).

## COUNT I – 2005 CONTRACT
### (Breach of Contract)

    6.    Miniter realleges the allegations of paragraphs 1 through 5.

    7.    Miniter faithfully performed his obligations under the 2005 Contract.

8.    Regnery has breached the 2005 Contract by its failure to make royalty payments to Miniter, as required; and by its improper diversion of books from retail sales and to affiliate and/or subsidiary organizations for no charge, or for a substantially reduced charge, in order to avoid royalty payments.

9    Regnery has breached the 2005 Contract by failing to produce a written marketing plan in a timely manner, as required; and by failing in its obligation to promote and market the book.

WHEREFORE, Miniter seeks an award for consequential damages in a range of $10,000 to $75,000.

## COUNT II – 2005 CONTRACT
### (Breach of Covenant of Good Faith and Fair Dealing)

10.    Miniter realleges the allegations of paragraphs 1 through 9.

11.    By failing to make royalty payments, and by diverting books from retail sales in order to reduce or eliminate its royalty obligations to Miniter, Regnery has breached the covenant of good faith and fair dealing.

12.    Regnery's breach of the covenant of good faith and fair dealing was undertaken with improper motive and with an intent to injury Miniter.

WHEREFORE, Miniter seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

## COUNT III – 2003 CONTRACT
### (Breach of Contract)

13.    Miniter realleges the allegations of paragraphs 1 through 13.

14.    Miniter faithfully performed his obligations under the 2003 Contract.

15.    Regnery has breached the 2003 Contract by its failure to make royalty payments to Miniter, as required; and by its improper diversion of books from retail sales and to affiliate and/or subsidiary organizations for no charge, or for a substantially reduced charge, in order to avoid royalty payments.

WHEREFORE, Miniter seeks an award for consequential damages in a range of $10,000 to $75,000.

## COUNT IV – 2003 CONTRACT
### (Breach of Covenant of Good Faith and Fair Dealing)

16.    Miniter realleges the allegations of paragraphs 1 through 15.

17.    By failing to make royalty payments, and by diverting books from retail sales in order to reduce or eliminate its royalty obligations to Miniter, Regnery has breached the covenant of good faith and fair dealing.

18.    Regnery's breach of the covenant of good faith and fair dealing was undertaken with improper motive and with an intent to injury Miniter.

WHEREFORE, Miniter seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

Dated:  September 14, 2007        McFADDEN & SHOREMAN, L.L.C.

John M. Shoreman
1420 New York Avenue, N.W.
Seventh Floor
Washington, D.C.  20005
(202) 638-2100
fax (202) 628-0735

*Attorneys for Richard Miniter*

4

MAY 31 '07  04:32PM BARNES,RICHARDSON

# EXHIBIT 1

# 2003 CONTRACT



**REGNERY PUBLISHING, INC.**

*An Eagle Publishing Company • Since 1947*

### PUBLISHING CONTRACT

AGREEMENT made this ___ day of April, 2003, between Richard Miniter, c/o William Morris Agency, 1325 Avenue of the Americas, New York, NY 10019 (hereinafter "Author") and Regnery Publishing, Inc., One Massachusetts Avenue NW, Washington, D.C. 20001, (hereinafter "Publisher").

In consideration of the mutual promises and covenants made herein, Publisher and Author (the "parties") agree as follows:

1.    **Grant of Rights.**

Author hereby grants and assigns to Publisher, its licensees and assigns for the full term of the copyright and any extension thereof, the exclusive right, title and interest in the English language to print, publish and market ("publish") and license subsidiary rights throughout the World, in book form (hardcover and softcover) and electronic form two books, which have been or will be written by Author; the first book is tentatively entitled, *A.W.O.L.* and the second will be a book written about terrorism ("the Works").

2    **Publication and Royalties.**

a.    Publisher hereby agrees to publish each Work within twelve (12) months after the acceptance of the final manuscript of each Work, except that such twelve (12) month period shall be extended for a period of time equal to any delay caused by Author or by any circumstance beyond the Publisher's control.

b.    Publisher shall pay Author an advance against all royalty income in the amount of $150,000; $35,000 of which will be paid upon the signing of this agreement; $35,000 upon Publisher's final acceptance of the manuscript for the first book; $30,000 when the first book is published (but in no event later than 12 months after final acceptance); $25,000 upon Publisher's final acceptance of the manuscript for the second book, and $25,000 when the second book is published (but in no event later than 12 months after final acceptance).

c.    Publisher shall pay Author an additional advance against all royalty income of five thousand dollars ($5,000) for each week that each Work is listed on the printed New York Times Best Seller List (any of the top 15 positions), provided, however, that no more than $25,000 shall be paid for each book in such additional advances pursuant to this paragraph. Such payment to be made no later than thirty (30) days after the relevant list appears in print.

d.    On all books sold to the book trade, Publisher shall pay Author a royalty of fifteen percent (15%) of Publisher's catalog retail price for all books sold and for which Publisher has been paid after returns, for hardback books; and seven and one-half percent (7.5%) of such retail price for all trade paperback books in each case after returns.

FP.10

03-05-2001    MAY 31 '07  04:32PM BARNES RICHARDSON 15

12/05/2003  02:26PM

Publishing Contract
Page 2

e.      On all copies of the Works, complete or abridged, published and sold by other than Publisher, such as book club editions, paperback editions, abridged editions, and on the sale of all rights to the Works, including but not limited to paperback, second serial rights, electronic rights now known or to be developed in the future, of the verbatim text, without adaptation, the result of which serves as a substitute for sales of the Works in book form, Publisher and Author shall divide the gross proceeds equally, without deduction of any agent commissions, provided, however, as regards second serialization, the periodical and out shall be subject to the Author's approval, not to be unreasonably withheld or delayed, and further provided, that prior to Publisher's use or disposition of electronic rights granted herein, Author and Publisher shall agree upon the royalties. Author shall retain first serial rights. Author retains foreign language rights to the Works.

f.      Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the booktrade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten percent (10%) of the amount received by the Publisher in excess of its manufacturing costs and returns. Such sales shall be subject to Author approval, such approval not to be unreasonably withheld.

3.      Manuscript.

a.      Author shall deliver to the Publisher no later than June 15, 2003, a complete copy of the first Work, and on June 15, 2004, a complete copy of the second Work; in each case, in hard copy and on computer disk, in content and form satisfactory to the Publisher, together with all permissions necessary for the reproduction of copyrighted material therein secured at Author's expense. Author agrees to supply with the manuscripts and suitable for reproduction all mutually agreed upon photographs, illustrations, drawings, charts and other material necessary to complete the Works and if Author fails to do so, the Publisher shall be entitled to supply them and charge the cost against any royalty sums payable to Author.

b.      Should Author fail to deliver the complete and satisfactory manuscript of the Works to the Publisher on the above dates (unless such date is extended by an agreement signed by an officer of the Publisher) the Publisher, if it so elects, may notify Author in writing that it intends to cancel this contract; in such case Author shall have thirty (30) days in which to supply the manuscript to publisher; if Author fails to deliver the manuscript in said thirty (30) day period, Author shall repay the Publisher all sums previously paid to Author by the Publisher.

c.      The Publisher may make the manuscripts conform to such style of punctuation, spelling, capitalization and usage as it deems appropriate, and may edit the manuscripts in a manner subject to Author's approval.

d.      All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms

03-05-21MAY 31 '07   04:33PM BARNES RICHARDSON15

12/05/2003  02:26PM

Publishing Contract
Page 3.

of sale, distribution, advertising, and promotion of the Works shall be within the Publisher's sole discretion, provided, however, Author shall have approval of flap copy and cover design. The initial publications shall be in hardcover.

4.    Statements of Accounts.

a.    Publisher shall render to Author semi-annual statements of account in the months of March and September covering sales of the Works to the last day of December and June preceding, and shall pay with the statements all monies indicated therein as due to Author, less a reasonable reserve against returns of copies of the Works.

b.    The statement shall include an accounting of all copies of the Works sold by Publisher in the accounting period and the proceeds therefrom, and all returns, and total number of copies that Publisher then has in stock.

c.    Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Works; such examination shall be at the sole expense of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author with respect to the period examined shall be found to Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

d.    If as of any particular accounting rendered under Paragraph 4 hereof the amounts credited to the Author's account under the terms of this Agreement exceed the advances actually paid to the Author as of such accounting the Publisher shall pay with such accounting the amount of such excess. However, the Publisher's obligation to pay advances under Paragraph 2(b) shall be reduced by the amount of payments made in this manner. Such reductions shall be applied in chronological order to the advance installments remaining to be paid as of the date on which any such payment is made.

5.    Author's Warranties.

Author hereby represents and warrants:

a.    That he owns all right, title and interest to the Works.

b.    That the Works are original and do not include, and are not derived from, the work of any other, except as indicated in the bibliography supplied therewith, and that all statements purporting to be facts are true.

c.    That the Works have not previously been published or distributed, except as indicated in the manuscript, and Author has not entered into any other arrangements or agreement with respect to the Works in the United States or elsewhere.

DEC-05-03 14:04 FROM:EAGLE PUBLISHING    ID:2625218601Ø    PAGE 4/10

03-05-2MAY 31 '07   04:33PM BARNES,RICHARDSON15

Publishing Contract
Page 4

d.   That the Works contain no libelous, obscene, or other unlawful matter.

e.   That the Works do not infringe upon any statutory or common law copyright or trademark, and that any recipe, formula, medication or instruction included in the Works is not injurious to the users' health.

f.   The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

6.   Author's Undertakings.

a.   Author shall indemnify and hold Publisher harmless, from any claim that may be asserted on the ground that the Works contain matter that is untrue, libelous, obscene, or otherwise unlawful, or infringes another's copyright or other lawful right or alleges facts contrary to or inconsistent with any of the representations and warranties made by Author in this Agreement. If a lawsuit is instituted against Publisher on any of these grounds, Publisher and Author shall cooperate in the defense and shall share the costs thereof equally; provided, however, that if a final judgment is entered against Publisher therein, Author shall be responsible for payment of any damages, fines or other money owed under that judgment and shall reimburse Publisher for all of its costs in connection therewith or resulting therefrom, including reasonable attorney's fees; and provided further, that if Publisher makes any settlement payment prior to a final judgment in such lawsuit without Author's prior written approval, then Author shall have no further responsibility to Publisher in connection with the lawsuit or the claims that are its subject matter. Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in this agreement, the Publisher shall have the right to withhold any sums payable to Author in reasonable amounts as security for the payment of Author's potential obligations pursuant to the indemnity contained herein, provided, however, in the event no legal proceedings have been instituted within one (1) year from the date of receipt of any claim or demand, Publisher shall promptly pay to the Author all withheld sums.

b.   Author shall promptly upon receipt review, correct, and return to Publisher all proof sheets of the Works. Publisher and Author will agree after each completed manuscript has been submitted whether an index is required; if so, such index shall be charged to Author's royalty account. The costs of any changes (but not corrections) in proof copy requested by Author shall be charged to Author's account to the extent that they exceed five percent (5%) of the costs of the proofs without such changes.

c.   Author shall cooperate with Publisher in promotion of the Works and shall be available for interviews and other promotional activities as requested by Publisher at mutually agreed upon times and places at Publisher's sole cost and expense. It is understood that Author will use his own residence and transportation while in the Washington, DC area, and the Publisher will not incur any housing or local transportation expenses related to such stays.

MAY 31 '07  04:33PM BARNES,RICHARDSON
03-05-2003  16:33

12/05/2003  02:26PM

Publishing Contract
Page 5

d.   The warranties, representations and indemnity of Author herein shall survive termination of this agreement for any reason.

7.   Publisher's Undertakings.

a.   Publisher shall affix to all copies of the Works a copyright notice in the form and place prescribed by law, in Author's name and shall register copyright in the Works with the U.S. Copyright Office; and Publisher shall take all necessary or prudent steps to protect the copyright in the Works when selling or licensing any rights in connection therewith.

b.   Publisher shall give Author fifty (50) copies of each Work without charge and shall sell any additional copies to Author at a discount of fifty percent (50%).  Author shall not be entitled to royalties on account of such books.

8.   Copyright Infringement.

Publisher and Author shall jointly have the right to prosecute any infringement of the copyright in the Works.  If the parties proceed jointly, the expenses and recovery, if any, shall be shared equally.  If either party refuses to join the prosecution, the other party shall have the right to proceed alone and, in that case, shall bear and recoup all expenses of the proceeding and shall share equally all recovery therefrom.  If the suing party shall not hold the record title to the copyright, the other party shall permit the action to be brought in his or its name.

9.   Right to Cancel.

a.   If Author does not review, correct and return proof sheets to Publisher within thirty (30) days of Author's receipt thereof, Publisher may cancel this contract by written notice to Author.

b.   If the Publisher determines that any one of Author's warranties, as set forth in paragraph 5 hereof, is breached, Publisher may terminate this contract by written notice to Author.  If Author has not cured the breach as set forth by Publisher within thirty (30) days of such notice, this contract shall be deemed null and void, and Author shall return all sums previously paid but unearned to Publisher.

c.   If Publisher does not publish the Works on or before the dates provided herein, Author may at any time thereafter serve written notice on Publisher requiring the Publisher to publish the Works.  If the Publisher does not comply within ninety (90) days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such ninety (90) day period.

d.   If the Publisher's stock of either Work falls below two hundred and fifty (250) copies, and Author makes written demand to reprint it, the Publisher shall, within sixty (60) days

03-05-2MAY 31 '07   04:34PM BARNES,RICHARDSON15

Publishing Contract
Page 6

after the receipt of such demand, notify Author in writing if it intends to comply. If Publisher fails to reprint the Work in question within six (6) months of such notification, this agreement shall terminate and all rights granted hereunder shall revert to Author.

It is also understood that if for two (2) consecutive accounting periods neither the Publisher, nor a licensee of the Publisher has in its inventory printed copies of either Work available for sale in the United States but copies of such work are available for sale by means of on-demand printing or electronic transmission or reproduction, and within these two (2) accounting periods, the Publisher or its licensee(s) collectively have sold less than two hundred and fifty (250) copies of such Work, such Work shall be deemed out-of-print. Each of the two Works shall be treated individually for the purpose of out-of-print.

9.    In the event of a termination by either party under this paragraph, all rights conveyed hereunder shall revert to their grantor and the parties shall have no further claims upon each other except for obligations already incurred, and except that Author shall return all monies paid to him by Publisher for advances on royalties in the event of termination before publication due to breach of any of Author's warranties as set forth in this agreement.

10.    Force Majeure.

Neither party shall be in default of any provision of this contract requiring an act to be performed by a certain date or within a specified time period if delay was caused by strikes, fires government restrictions, sickness, or other circumstances beyond the control of that party; and the time for performance shall be extended until the removal of the impediment, except that if the delay persists for more than three (3) months, the party entitled to the performance may terminate this contract by giving written notice to the other party.

11.    Remainders.

If the Publisher at any time has unsold or returned copies of the Works on hand which in its judgment could not be sold on usual terms in a reasonable time, Publisher will first offer Author said copies at forty percent (40%) of U.S. retail price, and Author may purchase as many copies as he desires. If Author fails to respond to Publisher's offer to purchase same within thirty (30) days, Publisher may remainder said copies of the Works to such buyers and upon such terms as the Publisher may decide. If such stock is sold at or below the Publisher's cost, no royalty shall be paid Author on such remainder sales. If such stock is sold above the Publisher's cost, the Publisher shall pay Author as a royalty five (5%) percent of the amount received by it in excess of Publisher's cost. Publisher may destroy or otherwise dispose of all copies not remaindered.

03-05-2000

Publishing Contract
Page 7

12.    Assignment.

a.    Author shall not assign his personal undertakings hereunder without the prior written consent of Publisher, which consent shall not be unreasonably withheld.

b.    Publisher may only assign this contract with the written consent of Author, whose consent shall not be unreasonably withheld, except that this contract may be assigned without permission in the connection of a sale of all or substantially all of the Publisher's assets.

c.    In the event of the insolvency of Publisher, or of an assignment for the benefit of creditors, or the filing of a petition in bankruptcy by or against Publisher, this contract shall be deemed automatically terminated and all rights in the Works shall revert to Author, and any monies owing Author hereunder shall be deemed to be held by Publisher in trust for Author and shall immediately be paid to Author.

13.    Option.

As part of the consideration paid to Author by Publisher hereunder, Publisher shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form, and of acquiring the same rights on mutually agreed upon terms and conditions. If, four (4) weeks after such Work has been submitted to the Publisher, no terms have been agreed upon for its publication, then Author shall be at liberty to enter into an agreement with any other publisher for its publication.

14.    Arbitration.

Any controversy or claim arising out of or relating to this agreement, the interpretation, implementation, breach or subject matter thereof, shall be settled by arbitration in the District of Columbia, in accordance with the laws of the District of Columbia and the rules of the American Arbitration Association. Judgment upon the award made by the arbitrators may be entered in any Court having jurisdiction thereof.

Agency Clause

All payments due hereunder shall be made payable to and in the name of William Morris Agency, 1325 Avenue of the Americas, New York, NY 10019 as agents for Richard Minter.

15.    Competing Work.

each of the Works

Author shall not within one (1) year after publication of the second work authorize the publication of a book on a similar subject or without the written permission of the Publisher, not to be unreasonably withheld.



16.    Entire Agreement

03-05-2MAY 31 '07  04:35PM BARNES,RICHARDSON15

12/05/2003 02:26PM

Publishing Contract
Page 8

This Agreement constitutes the entire agreement between the Publisher and Author, and supersedes any discussions or agreements which may have preceded this Agreement. This Agreement cannot be amended, modified, or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by an authorized agent of the Publisher or by Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Works, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Interactive electronic multimedia rights to the text of the Works with non-textual elements such as sound, musicals, visuals, graphics or other multimedia features are reserved to the Author for the Author's sole use and disposition.

Advertisements may not be inserted or printed in any edition of the Works, whether issued by the Publisher or its license(s) without the Author's prior written consent.

All rights not specifically granted hereunder are reserved to the Author for his own use and disposition. Reserved rights include, but are not limited to, the right to publish or cause to be published in any form, excerpts, summaries, novelizations or dramatizations, of television and/or motion pictures of the Work, thereof not to exceed seventy-five hundred (7,500) words in length to be used for advertising and exploitation of television and/or motion pictures based upon the Works.

Agreed:

_____

_____
Social Security Number

Regnery Publishing, Inc.

by: _____

03-05-2MAY 31 '07  04:35PM BARNES, RICHARDSON 15

FAX NO. 2022180812          P. 08

Publishing Contract
Page 8

effectiveness of any notice of termination. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the President of the Publisher. This agreement shall be binding in the event it is signed in counterparts.

Interactive electronic multimedia rights to the text of the Work with non-textual elements such as sound, musicals, visuals, graphics or other multimedia features are reserved to the Author for the Author's sole use and disposition.

Advertisements may not be inserted or printed in any edition of the Work, whether issued by the Publisher or its license(s) without the Author's prior written consent.

All rights not specifically granted hereunder are reserved to the Author for his own use and disposition. Reserved rights include, but are not limited to, the right to publish or cause to be published in any form, excerpts, summaries, novelizations or dramatizations, of television and/or motion pictures of the Work, thereof not to exceed seventy-five hundred (7,500) words in length to be used for advertising and exploitation of television and/or motion pictures based upon the Work.

Agreed:

_____
Social Security Number

Regnery Publishing, Inc.

by: _____

REDACTED

04/21/2003  11:52AM
DEC-05-03 14:08 FROM:EAGLE PUBLISHING
ID:202218012
PAGE 14/18

# MOTION TO DISMISS
# EXHIBIT 11

**AMERICAN ARBITRATION ASSOCIATION**
Washington, D.C.

| | | |
|---|---|---|
| **Regnery Publishing, Inc.,** | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | Claim No. 16 459 00290 07 |
| | ) | |
| **Richard Miniter,** | ) | |
| Respondent. | ) | |
| | ) | |

## RESPONDENT'S MOTION FOR LEAVE TO JOIN PARTIES AND CLAIMS

COMES NOW, Respondent Richard Miniter, by counsel, moves for leave to join the claims of Joel Mowbray, William D. Gertz, Robert B. Patterson, and Jerome Corsi (collectively, "Authors"). A copy of the Authors's Claims and Demand of Arbitration is attached hereto as Exhibit A.

As more fully described in Exhibit A, the Authors' claims against Regnery are identical to the Counterclaims raised by Miniter in this proceeding. Joinder of parties and claims is necessary to avoid a multiplicity of litigation and a possibility of inconsistent rulings. Expediency and economy dictate the litigation of these several claims in the same proceeding and before the same arbitrator. As is the case with Miniter's Counterclaims, the Authors' claims focus on Regnery's self-dealing relationships within the Eagle Publishing Company. Regnery's sweetheart dealings are central to a business strategy that integrates traditionally separate functions of publisher and retail distributor. The scope of discovery needed to disclose the full extent of Regnery's deceptive practice of transferring books to affiliated entities, in self-dealing transactions that substantially reduce the author's royalties, is identical under all claims by all parties.

While joinder of the Authors' claims will undoubtedly require a modification of the procedural schedule in this case, overlapping discovery among Miniter and the Authors means that ultimately the litigation of all claims against Regnery will be expedited. Except for specific transactions relating to a particular book that Regnery must in any case keep in the regular course of business, discovery will be identical for all claims. Therefore, Regnery is not unduly prejudiced at this stage by the joinder of Authors' claims.

WHEREFORE, Miniter requests entry of an Order granting leave to file join the parties and claims set forth in Exhibit A.

Dated: 9/5/07                              Respectfully submitted,

                                           /s/ John M. Shoreman

                                           _____
                                           John M. Shoreman
                                           McFadden & Shoreman
                                           1420 New York Avenue, NW
                                           7th Floor
                                           Washington, D.C. 20005
                                           (202) 638-2100
                                           fax (2020 628-0735
                                           *Attorneys for Claimant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion for Leave to Join Parties and Claims was served via electronic transmission on the following counsel of record this 5th day of September, 2007.

> Mark I. Bailen, Esq.
> Baker & Hostetler LLP
> 1050 Connecticut Avenue, NW
> Suite 1100
> Washington, D.C. 20036

> /s/ John M. Shoreman
>
> _____
>
> John M. Shoreman

3

## AMERICAN ARBITRATION ASSOCIATION
### Washington, D.C.

| | |
|---|---|
| JOEL MOWBRAY, WILLIAM D. GERTZ, ROBERT B. PATTERSON and JEROME CORSI,<br><br>　　　　　　　Claimants,<br><br>v.<br><br>REGNERY PUBLISHING, INC.,<br>　　　　　　　Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Claim No. |

_____

### CLAIMS AND DEMAND FOR ARBITRATION

Joel Mowbray, William D. Gertz, Robert B. Patterson and Jerome Corsi (collectively, "Authors"), by counsel, claim against Regnery Publishing, Inc. ("Regnery") and demand arbitration of disputes arising under the following Publishing Contracts: (1) Mowbray Contract of October 2002 (Exhibit 1); Gertz Contracts of July 1998, January 2000 and November 2001 (Exhibit 2); Patterson Contract of May 2002 (Exhibit 3); and, Corsi Contract of June 2004 (Exhibit 4).

1. Authors demand arbitration of claims arising under the Publishing Contracts in the District of Columbia under arbitration clauses contained therein. (Ex. 1, ¶ 13; Ex. 2, ¶ 15 (July 1998 Contract), ¶ 14 (January 2000 Contract), *and* ¶ 14 (November 2001 Contract); Ex. 3, ¶ 14; *and*, Ex. 4, ¶ 14).

#### Background

2. Respondent Regnery is a wholly owned subsidiary of the Eagle Publishing Company ("Eagle"). Eagle, which calls itself "America's leading conservative publishing company," has developed a business model that integrates the functions of book publisher and retail distributor. Regnery's publications are marketed and sold by

sister companies within the Eagle organization. For instance, Eagle Book Clubs, Inc. (wholly-owned by Eagle) operates the Conservative Book Club ("CDC"). CDC has a membership of over 80,000 conservative readers. Regnery sells first edition books to CDC at, below, or only marginally above its own cost of publication. CDC offers Regnery's books to its membership at prices that are deeply discounted against the catalog retail list price charged in bookstores. In some cases CDC has offered Regnery's new books to its membership prior to the official release date. The Eagle organization realizes a greater profit from sales of Regnery's books by CDC than it does from sales in retail bookstores because, in part, little or no royalty is paid to Regnery's authors and no promotional payments to retail bookstores are necessary.

3.      Conservative readers are the target audience of Regnery's authors; CDC's discounted membership sales substantially detract from potential sales at the catalog list price in retail bookstores. Regnery's interest in maximizing Eagle's profits through CDC book sales is antithetical to the interest of Regnery's authors in selling books at the catalog list price and thus maximizing royalties. Regnery's self-dealing results in a direct financial injury to its own authors, and is contrary to the clear intent of the parties in the publishing contract.

4.      Eagle also distributes Regnery's books by direct mail and over the Internet through its affiliation with the Town Hall Book Service. And, again, the authors' expected royalties are substantially reduced or eliminated as a result. Other Eagle subsidiaries publish periodicals that, like CDC, are geared to a conservative reading audience. These include magazines such as *Human Events* and the *Evans-Novak Political Report*. In many instances Regnery's first edition books are offered as free gifts

2

to new subscribers. Regnery supplies the new books to its affiliated publisher at or below cost, or for free, and Eagle gets a new annual subscriber. Eagle then maximizes the value of that subscription through its List Division, which rents the "highly-responsive political and financial customer lists" developed in its operations.

5.      While a model of efficiency, Eagle's integrated business strategy exploits, manipulates and cheats Regnery's authors. The web of internecine transactions is purposefully designed to divert sales away from the retail book trade. This frustrates the author's reasonable expectancy that Regnery, as a fiduciary, would promote retail sales at the catalog list price in order to maximize royalties. Pursuant to the Publishing Contracts, Regnery agreed to pay royalties of ten percent (10%) of its catalog retail price for the first 5,000 hardback books to the book trade, twelve and one-half percent (12½%) for the second 5,000 copies and fifteen percent (15%) thereafter. (Ex. 1, ¶ 2(d); Ex. 2, ¶ 2(c) (July 1998 Contract), ¶ 2(c) (January 2000 Contract), *and* ¶ 2(c) (November 2001 Contract); Ex. 3, ¶ 2(c); *and*, Ex. 4, ¶ 2(b)). Lesser amounts were paid for sales of paperback editions. *Id*. However, Regnery considers the self-dealing transactions it engages in with its Eagle affiliates as sales to "additional markets." Royalties paid to Authors for sales to Regnery's "additional markets" are treated under a separate clause in the Publishing Contracts:

> Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the book trade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to bookclubs Publisher shall pay Author ten percent (10%) of the amount received by the Publisher in excess of its manufacturing costs and returns.

(Ex. 1, ¶ 2(g); Ex. 2, ¶ 2(f) (July 1998 Contract); *and* Ex. 3, ¶ 2(f)). The "additional markets" clauses in two of the three Gertz Publishing Contracts differ in that they provide for prior approval of promotional sales, though Regnery chose to ignore that condition. (Ex. 2, ¶ 2(i) (January 2000 Contract), *and* ¶ 2(i) (November 2001 Contract)). The "additional markets" clause is Corsi's June 2004 Contract provides for a royalty of five percent (5%) of the amount received by Regnery. (Ex. 4, ¶ 2(e)). Rather than promoting retail sales at the catalog list price in bookstores, Regnery funnels books that otherwise would be available for retail sale to its Eagle affiliates under the "additional markets" clause of the Publishing Contract. Rather than 10 to 15% of the catalog list price, Mowbray, Gertz and Patterson receive only 10% of the amount received over Regnery's cost, which, given the lack of arms-length negotiation in Regnery's "additional market" sales, is little or nothing at all. Corsi realizes five percent (5%) of what Regnery actually receives.

6.     Regnery undertakes to minimize retail sales through traditional channels in the book trade, while maximizing sales to "additional" markets through the direct marketing techniques of its Eagle affiliates. Consequently, in addition to an immediate loss of royalty income, Regnerys' authors suffer future economic injury and reputational damages. Non-retail sales are not included in industry-wide sales reports. The amount that another publisher is willing to advance for a book by a former Regnery author, and the marketing effort it is willing to commit to support the authors' work, is determined by the industry-wide retail sales record generated from sales of the Regnery books. Those sales are artificially depressed due to the number of books channeled by Regnery to its Eagle affiliates, in less than arms-length transactions, for purposes of direct marketing.

4

Accordingly, Regnery authors suffer future financial injury and harm to their professional reputations.

## COUNT I – MOWBRAY CONTRACT
### (Breach of Contract)

7.    Authors reallege the allegations of paragraphs 1 through 6.

8.    Mowbray faithfully performed his obligations under the October 2002 Contract. (Ex. 1).

9.    Regnery has breached the October 2002 Contract by its failure to make royalty payments to Mowbray, as required; and by its improper diversion of books from retail sales and to affiliate and/or subsidiary organizations for no charge, or for a substantially reduced charge, in order to avoid royalty payments, which breach is continuing.

10.    Regnery has breached the October 2002 Contract by failing in its obligation to promote and market the book.

WHEREFORE, Mowbray seeks an award for consequential damages in a range of $10,000 to $75,000.

## COUNT II – MOWBRAY CONTRACT
### (Breach of Covenant of Good Faith and Fair Dealing)

11.    Authors reallege the allegations of paragraphs 1 through 10.

12.    By failing to make royalty payments, and by diverting books from retail sales in order to reduce or eliminate its royalty obligations to Mowbray, Regnery has breached the covenant of good faith and fair dealing, which breach is continuing.

13.    Regnery's breach of the covenant of good faith and fair dealing was undertaken with improper motive and with an intent to injure Mowbray.

WHEREFORE, Mowbray seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

## COUNT III – MOWBRAY CONTRACT
### (Breach of Fiduciary Duty)

14.    Authors reallege the allegations of paragraphs 1 through 13.

15.    Mowbray reposed special trust in Regnery to fulfill its obligations under the October 2002 Contract. (Ex. 1).  A special duty to act in good faith and protect Mowbray's interests against its own selfish interests and self-dealing arose from Regnery's superior position in implementing the terms of the October 2002 Contract.

16.    Regnery's breach of its fiduciary duty, which breach is continuing, caused the loss of Mowbray's reasonable expectancy of royalty income under the October 2002 Contract.

WHEREFORE, Mowbray seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

## COUNT IV – GERTZ CONTRACTS
### (Breach of Contract)

17.    Authors  reallege the allegations of paragraphs 1 through 16.

18.    Gertz faithfully performed his obligations under the Publishing Contracts of July 1998, January 2000, and November 2001. (Ex. 2).

19.    Regnery has breached the Publishing Contracts of July 1998, January 2000, and November 2001 by its failure to make royalty payments to Gertz, as required; and by its improper diversion of books from retail sales and to affiliate and/or subsidiary

organizations for no charge, or for a substantially reduced charge, in order to avoid royalty payments, which breach is continuing.

WHEREFORE, Gertz seeks an award for consequential damages in a range of $10,000 to $75,000.

### COUNT V – GERTZ CONTRACTS
**(Breach of Covenant of Good Faith and Fair Dealing)**

20.    Authors reallege the allegations of paragraphs 1 through 19.

21.    By failing to make royalty payments, and by diverting books from retail sales in order to reduce or eliminate its royalty obligations to Gertz, Regnery has breached the covenant of good faith and fair dealing, which breach is continuing.

22.    Regnery's breach of the covenant of good faith and fair dealing was undertaken with improper motive and with an intent to injure Gertz.

WHEREFORE, Gertz seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

### COUNT VI – GERTZ CONTRACTS
**(Breach of Fiduciary Duty)**

23.    Authors reallege the allegations of paragraphs 1 through 22.

24.    Gertz reposed special trust in Regnery to fulfill its obligations under the Publishing Contracts of July 1998, January 2000, and November 2001.  A special duty to act in good faith and protect Gertz's interests against its own selfish interests and self-dealing arose from Regnery's superior position in implementing the terms of the Publishing Contracts of July 1998, January 2000, and November 2001.

25.     Regnery's breach of its fiduciary duty, which breach is continuing, caused the loss of Gertz's reasonable expectancy of royalty income under the Publishing Contracts of July 1998, January 2000, and November 2001.

WHEREFORE, Gertz seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

## COUNT VII – PATTERSON CONTRACT
### (Breach of Contract)

26.     Authors  reallege the allegations of paragraphs 1 through 25.

27.     Patterson faithfully performed his obligations under the May 2002 Contract. (Ex. 3).

28.     Regnery has breached the May 2002 Contract by its failure to make royalty payments to Patterson, as required; and by its improper diversion of books from retail sales and to affiliate and/or subsidiary organizations for no charge, or for a substantially reduced charge, in order to avoid royalty payments, which breach is continuing.

WHEREFORE, Patterson seeks an award for consequential damages in a range of $10,000 to $75,000.

## COUNT VIII – PATTERSON CONTRACT
### (Breach of Covenant of Good Faith and Fair Dealing)

29.     Authors reallege the allegations of paragraphs 1 through 28.

30.     By failing to make royalty payments, and by diverting books from retail sales in order to reduce or eliminate its royalty obligations to Patterson, Regnery has breached the covenant of good faith and fair dealing, which breach is continuing.

8

31.     Regnery's breach of the covenant of good faith and fair dealing was undertaken with improper motive and with an intent to injure Patterson.

WHEREFORE, Patterson seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

### COUNT IX – PATTERSON CONTRACT
### (Breach of Fiduciary Duty)

32.     Authors reallege the allegations of paragraphs 1 through 31.

33.     Patterson reposed special trust in Regnery to fulfill its obligations under the May 2002 Contract. (Ex. 3).  A special duty to act in good faith and protect Patterson's interests against its own selfish interests and self-dealing arose from Regnery's superior position in implementing the terms of the May 2002 Contract.

34.     Regnery's breach of its fiduciary duty, which breach is continuing, caused the loss of Patterson's reasonable expectancy of royalty income under the May 2002 Contract.

WHEREFORE, Patterson seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

### COUNT XI – CORSI CONTRACT
### (Breach of Contract)

35.     Authors  reallege the allegations of paragraphs 1 through 34.

36.     Corsi faithfully performed his obligations under the June 2004 Contract. (Ex. 4).

9

37.    Regnery has breached the June 2004 Contract by its failure to make royalty payments to Corsi, as required; and by its improper diversion of books from retail sales and to affiliate and/or subsidiary organizations for no charge, or for a substantially reduced charge, in order to avoid royalty payments, which breach is continuing.

WHEREFORE, Corsi an award for consequential damages in a range of $10,000 to $75,000.

### COUNT XII – CORSI CONTRACT
**(Breach of Covenant of Good Faith and Fair Dealing)**

38.    Authors reallege the allegations of paragraphs 1 through 37.

39.    By failing to make royalty payments, and by diverting books from retail sales in order to reduce or eliminate its royalty obligations to Corsi, Regnery has breached the covenant of good faith and fair dealing, which breach is continuing.

40.    Regnery's breach of the covenant of good faith and fair dealing was undertaken with improper motive and with an intent to injure Corsi.

WHEREFORE, Corsi seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

### COUNT XIII – CORSI CONTRACT
**(Breach of Fiduciary Duty)**

41.    Authors reallege the allegations of paragraphs 1 through 40.

42.    Corsi reposed special trust in Regnery to fulfill its obligations under the June 2004 Contract. (Ex. 4). A special duty to act in good faith and protect Corsi's interests against its own selfish interests and self-dealing arose from Regnery's superior position in implementing the terms of the June 2004 Contract.

43.    Regnery's breach of its fiduciary duty, which breach is continuing, caused the loss of Corsi's reasonable expectancy of royalty income under the June 2004 Contract.

WHEREFORE, Corsi seeks an award for consequential damages in a range of $10,000 to $75,000, together with an award of punitive damages sufficient to deter Regnery from similar misconduct in the future.

Dated: 9/5/67

McFADDEN & SHOREMAN, L.L.C.

John M. Shoreman
1420 New York Avenue, N.W.
Seventh Floor
Washington, D.C.  20005
(202) 638-2100
fax (202) 628-0735

*Attorneys for Claimants*

11

# MOTION TO DISMISS
# EXHIBIT 12

# AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| REGNERY PUBLISHING, INC., | ) |
| | ) |
| *Claimant,* | ) |
| | ) |
| **and** | ) No. 16 143 00290 07 |
| | ) |
| RICHARD MINITER, | ) |
| | ) |
| *Respondent.* | ) |
| | ) |

## <u>PROCEDURE ORDER No. 4</u>

The Arbitrator has before him Respondent Richard Miniter's Motion for Leave to Join Parties and Claims and also, still pending, a motion for leave to file counterclaims against Claimant Regnery Publishing, Inc. based on the 2003 contract between the parties. Regnery opposes both motions. At this stage of the arbitration proceeding, a party may not file a new claim without the consent of the Arbitrator. Rule 6, Commercial Arbitration Rules of the American Arbitration Association.

On April 10, 2007, Regnery initiated this case by Demand for Arbitration, based on a 2005 publishing contract between it and Mr. Miniter. By order dated July 16, 2007, the matter was set for hearing November 5, 6, and 12, 2007. On July 27, 2007, Respondent filed a motion for leave to file counterclaims based on both the 2005 contract and on an earlier 2003 contract. The Arbitrator granted the motion as to the 2005 counterclaims (it was unopposed) but deferred ruling on the 2003 counterclaims because he felt there was insufficient information presented and because Respondent was representing that he intended to file additional claims on behalf of additional parties. On September 5, 2007, Miniter filed a motion to join claims by Joel Mowbray, Wiliam D. Gertz, Robert B. Patterson, and Jerome Corsi, based on six separate contracts with Regnery dating back as early as 1998.

The matters having been briefed and argued by counsel at a preliminary hearing by conference call on September 21, 2007, it is now ORDERED as follows:

With respect to Respondent's motion to join parties and claims, that motion is DENIED, without prejudice. None of the proposed new parties has anything to do with the contract between Regnery and Miniter that is the subject of the original case brought by Regnery against Miniter, and none of the new parties

has any rights or interests that might be prejudiced by the disposition of the case between Regnery and Miniter.

In addition, we are not persuaded that there are such commonalties between and among the contracts, the books and the marketing of the various books, that there are obvious efficiencies to be realized by consolidating the four new, essentially distinct, cases with the existing case, especially at this stage of the proceedings. In fact, it is fairly conceded that joinder of the new parties and consolidation of their claims would serve to delay hearing and disposition of the present case for a considerable time. The four new parties are, of course, free to initiate and pursue their claims against Regnery as they see fit.

With respect to Respondent's motion to file counterclaims relating to the 2003 contract between him and Regnery, that motion is also DENIED, without prejudice. The Arbitrator is persuaded that the discovery requirements of these additional claims, unrelated to the 2005 contract, would serve to delay resolution of the original case and would do little to promote a more efficient, less costly resolution of that case. At this point, given Respondent's and others' apparent intent to file a series of claims against Regnery based on multiple contracts and book transactions, the proposed 2003 counterclaims appear that they might be more efficiently handled in conjunction with those other claims, rather than in the present case. We see no prejudice to Respondent in disallowing the 2003 counterclaims into the present case. Mr. Miniter is still free to initiate and pursue those claims in a separate proceeding which would be handled in due course on a schedule designed to fit that case.


DATED: October 1, 2007.                    /John R. Keys, Jr./

                                           _____
                                           John R. Keys, Jr.
                                           Arbitrator

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CORSI, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-02004-ESH |
| | ) | |
| EAGLE PUBLISHING, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>ORDER</u>

AND NOW, on this ___ day of _____, 20___, upon consideration of the

Motion to Dismiss by Defendant Eagle Publishing, Inc., and any opposition and reply thereto, it

is hereby

ORDERED that the Motion to Dismiss is GRANTED, and it is further

ORDERED that the case is DISMISSED.


_____
United States District Judge