## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CORSI, et al.,             )
           Plaintiffs,    )
             )
v.                     )     Case No. 1:07-cv-02004-ESH
             )
EAGLE PUBLISHING, INC.,   )
           Defendant.   )
_____)

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

COME NOW, Plaintiffs Jerome Corsi, William D. Gertz, Robert B. Patterson, Joel Mowbray and Richard Miniter (collectively, the "Authors"), by counsel, and in Opposition to the Motion to Dismiss filed by Defendant Eagle Publishing, Inc. ("Eagle"), state as follows.

## BACKGROUND

Eagle is the parent of Regnery Publishing, Inc. ("Regnery"). Each of the Authors entered into publishing contracts with Regnery. Eagle has developed a business model that integrates the functions of publisher and book distributor within its wholly-owned subsidiary corporations. The Authors' Complaint against Eagle alleges: fraudulent civil conspiracy, inducement to breach of contract, interference with contractual relations, interference with prospective business advantage, unjust enrichment, unfair trade practices (D.C. Code § 28-3901, *et seq*.), and damage to commercial reputation. The Authors seek monetary damages and an accounting. (Exhibit 1 – Complaint).

The Complaint alleges that Eagle orchestrates and participates in a fraudulent scheme to divert the Authors' book sales away from retail outlets and to its subsidiaries within the Eagle conglomerate (Exhibit 1 – Complaint). The Authors books are

transferred to Regnery's affiliated companies in self-dealing transactions within the Eagle conglomerate at no charge, or for a substantially reduced charge, in order to avoid or reduce book royalty payments to the Authors. (Exhibit 1, at 2).

Pursuant to the Authors' publishing contracts with Regnery, the Authors receive between 10 and 15% of the catalog retail price in royalties for sales of hardback books in retail stores.  Lesser amounts are paid in royalties for sales of paperback editions. Royalties paid to the Authors for sales to "additional markets" are treated under a separate clause of the Authors' publishing contracts:

> Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the book trade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to book clubs Publisher shall pay Author ten percent (10%) of the amount received by the Publisher in excess of its manufacturing costs and returns.

The self-dealing transactions engaged in by Eagle and its subsidiaries are treated as sales to "additional markets."  Rather than 10 to 15% of the catalog list price the Authors generally receive only 10% of the amount received over Regnery's cost (Exhibit 1, at 6). The Complaint alleges that Eagle's vertically integrated business model "exploits, manipulates and defrauds" the Authors (Exhibit 1, at 4-5).  Rather than promoting retail sales, Regnery, at Eagle's direction, channels books that would otherwise be available for retail sale to affiliated companies within Eagle under the "additional markets" clause (Exhibit 1, at 5-6).  "The diversion of books away from retail sale is deliberately concealed from the Authors by Eagle and its agents" (Exhibit 1, at 6).  There is no honest negotiation in the sale of books from Regnery to its affiliates (Exhibit 1, at 3).  There is

no arms-length, bidding competition for the sale of books to "additional markets" between Regnery's affiliates and other, non-affiliated book distributors (Exhibit 1, at 3).

An arbitration proceeding is pending between Plaintiff Miniter and Regnery pursuant to a mandatory arbitration clause that is common to the other Authors' publishing contracts. Based on the unlawful acts described in the Authors' Complaint, Miniter is seeking an arbitration award against Regnery for breach of contract, and breach of the covenant of good faith and fair dealing (Motion to Dismiss, Ex. 10). The Authors sought to join the pending arbitration and consolidate claims against Regnery (Motion to Dismiss, Ex. 11). Claims for breach of fiduciary duty were included in the Authors' Motion for Leave to Join Parties and Claims (Motion to Dismiss, Ex. 11). However, the Arbitrator denied the Authors leave to join in the pending arbitration. Eagle's suggestion that filing a Complaint against Eagle is the Authors' attempt to evade mandatory arbitration is nonsensical given their efforts to join the pending proceeding. Nevertheless, the Authors are not barred from re-filing their arbitration claims against Regnery in a separate proceeding and are preparing to do so. Eagle is not a party to the mandatory arbitration provisions.

## **ARGUMENT**

### **(1)    Regnery is Not an Indispensable Party under Rule 19**

Rule 19 addresses distinct but related questions concerning joinder of parties. Rule 19(a) describes when a court should order the joinder of a person who is not yet a party to the case. If such a person should be joined, the court must then evaluate whether, under principles of jurisdiction and venue, the person can be joined. If joinder is not feasible, Rule 19(b) addresses whether the court should dismiss the case or continue

without that person.  *Keweenaw Bay Indian Community v. State of Michigan*, 11 F.3d

1341, 1347 (6th Cir. 1993).

Eagle argues that Regnery is a necessary party under Rule 19(a)(2)(i) as it claims

an interest relating to the subject matter of the action.  However, the interests of Eagle

and Regnery are identical in this litigation and it cannot be argued that Eagle will not

adequately protect against "[f]indings of fact and legal determinations involving the

Publishing Contracts" (Motion to Dismiss, at 9).  It can easily be concluded here that

Eagle will serve as a proxy for Regnery and protect its interests.  *See, National Union*

*Fire Insurance Co. v. Rite Aid*, 210 F.3d 246, 250-01 (4th Cir. 2000).  Moreover, since

Regnery is not a party to the action, any findings against Eagle will lack *res judicata*

effect against Regnery.  Thus, Eagle fails to demonstrate that Regnery a "necessary

party" under Rule 19(a).

Even were Regnery were "necessary" under Rule 19(a), Eagle cannot demonstrate

that Regnery is indispensable under Rule 19(b).  Rule 19(b) provides that if a party who

meets Rule 19(a) criteria "cannot be made a party, the court shall determine whether in

equity and good conscience the action should proceed among the parties before it, or

should be dismissed, the absent [party] being thus regarded as indispensable." Fed. R.

Civ. P. 19(b).  The Rule 19 analysis is controlled by "pragmatic and equitable

considerations."  *Wolcott v. Ginsburg*, 746 F. Supp. 1113, 1121 (D.D.C. 1990)(citing

*Lone Star Industries, Inc. v. Redwine*, 757 F.2d 1544, 1552 (5th Cir. 1985)).  The inability

to join a party who meets the criteria in Rule 19(a) is not necessarily fatal.  *Id.*; *see*,

*Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 774 (D.C. Cir. 1986).

The four factors provided in Rule 19 are not to be considered as "rigid, technical tests,

but rather 'guides to the overarching equity and good conscience determination'." *Id*.

(citing *Witchita*, 788 F.2d at 774).[1]

The paramount concern in this case is whether the Authors will have an adequate

remedy against Eagle if the action is dismissed for non-joinder of Regnery.  Eagle is not

subject to the mandatory arbitration provisions that bind the Authors and Regnery.

Unlike the cases relied upon by Eagle (all of which were dismissed because an

indispensable party destroyed diversity), no forum exists for the Authors to seek relief

against Eagle if this action is dismissed.[2]  The Authors cannot bring Regnery before this

court due to mandatory arbitration provisions in their publishing contracts.  "A court

should be extra cautious in dismissing a case for nonjoinder where the plaintiff will not

have an adequate remedy elsewhere." *Witchita*, 788 F.2d at 777.

The Supreme Court noted in *Moses H. Cone Mem'l Hosp. v. Mercury Constr.

Corp.*, 460 U.S. 1, 19-20 (1983), that piecemeal litigation is unavoidable when giving

effect to an arbitration agreement.  *Moses* involved a plaintiff, the Hospital, with two

related disputes with two parties, defendant Mercury Construction and an architect.  Only

the Hospital's dispute with Mercury Construction was subject to an arbitration clause.

The *Moses* Court stated:

> The Hospital points out that it has two substantive disputes here – one with
> Mercury, concerning Mercury's claim for delay and impact costs, and the
> other with the Architect, concerning the Hospital's claim for indemnity for
> any liability it may have to Mercury.  *The latter dispute cannot be sent to
> arbitration without the Architect's consent, since there is no arbitration
> agreement between the Hospital and the Architect*.  It is true, therefore, that if

---

[1]  The four factors are: (1) to what extent judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent by which, by protective provisions in the judgment, by shaping the relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.  Fed.R.Civ.P. 19(b).
[2]  Regnery is a citizen of the District of Columbia and would not interfere with diversity jurisdiction were it amenable to suit.

> Mercury obtains an arbitration order for its dispute, the Hospital will be forced to resolve these related disputes in different forums. That misfortune, however, is not the result of any choice between the federal and state courts; it occurs because the relevant federal law requires piecemeal resolution when necessary to give effect to an arbitration agreement. Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.

460 U.S. at 19-20(emphasis added). Piecemeal litigation is unavoidable to give effect to the arbitration provisions and to allow redress against Eagle in the only forum available. Thus, in "equity and good conscience" this action must proceed

**(2)    Complaint Satisfies Pleading Requirements of Rule 8**

In considering a motion a dismiss pursuant to Rule 12(b)(6), a guiding principle are the requirements of Rule 8(a)(2), "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 127 S. Ct. 1955 (2007)(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, __ U.S. __, 127 S. Ct. 2197, 2200 (2007). Factual allegations must be presumed true, and plaintiffs must be given every favorable inference that may be drawn from the allegations of fact. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

**Count One - Fraud**

The Authors have effectively pled the elements of civil conspiracy involving fraud against Eagle. Under D.C. law those elements are "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) pursuant to, and in furtherance of, the common scheme." *Weishapl v.*

*Sowers*, 771 A.2d 1014, 1023 (D.C. 2001)(quoting *Griva v. Davison*, 637 A.2d 830, 848

(D.C. 1994). The Complaint details Eagle's participation and concealment of a scheme

to deny the Authors their rightful royalties by diverting book sales away from retail sales

in favor of self-dealing tranactions within the Eagle conglomerate (Exhibit 1, at 3-7).

Contrary to Eagle's arguments, the Authors are not relying on direct misrepresentations

from Eagle as the basis of this cause of action. A conspiracy to defraud the Authors and

Eagle's active participation in that conspiracy is pled with sufficient particularity to give

Eagle fair and adequate notice of the claims against it under Count One.

**Counts Two and Three – Inducement to Breach Contract/Interference with
Contractual Relations**

The Authors have adequately alleged facts to support a finding that a breach of

the Authors publishing contracts was procured by Eagle. *See, Tuxedo Contractors, Inc. v.

Swindell-Dressler Co.*, 613 F.3d 1159, 1162 (D.C. Cir. 1979). The Complaint alleges

that Regnery is in breach of the royalty provisions of the publishing contracts (Exhibit 1,

at 5-7). Eagle is alleged to orchestrate a fraudulent and deceptively-concealed scheme to

avoid or substantially reduce the payment of royalties under the publishing contracts in

derogation of Regnery's obligations to promote sales of the book in retail stores rather

than engage in self-dealing transactions that reduce royalties paid to the Authors (Exhibit

1, at 2- 7).

**Count Four – Interference with Prospective Business Advantage**

Contrary to Eagle's argument, the Authors have specified a prospective business

advantage in the Complaint. Eagle minimizes the retail sales of the Authors books for its

own business advantage, this results in lower reported sales figures, which has a direct

and proximate effect on the prospective business relations between the Authors and other

publishers who rely on retail sales figures in the negotiation of advances and marketing resources (Exhibit 1, at 6-7). The Authors allege prospective injury to advantageous business relations as a result of Eagle's unlawful practices, which satisfies the elements set forth in *Casco Marina Dev. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003).

### Count Seven – Unfair Trade Practices

The Consumer Protection Procedures Act ("CPPA") is a "comprehensive statute" with an extensive framework designed to "remedy *all* improper trade practices." *Atwater v. D.C. Dept. of Consumer & Reg. Affairs*, 566 A.2d 462, 465 (D.C. 1989). The CPPA protects from those "unlawful trade practices" enumerated in D.C. Code § 28-3904, as well as practices prohibited by other statutes and common law. *Atwater*, at 465-66. The CPPA is intended to provide remedies to a "broad spectrum of practices," it is referred to as "ambitious legislation." *Id*. (citing *Howard v. Riggs Nat'l. Bank*, 432 A.2d 701, 708 (D.C. 1981). The Complaint alleges a conspiracy to defraud the Authors by deceptively concealing the diversion of book sales away from retail and to Eagle's own, self-dealing transactions. Violation of the CPPA is established by the Authors proof that Eagle engaged in a fraudulent conspiracy to harm retail sales and thus purposefully eliminate or reduce royalty payments from its wholly-owned subsidiary Regnery. Accordingly, Eagle is on sufficient notice of the facts underlying the Authors' allegations of unfair trade practices.

WHEREFORE, the Authors request the Court to dismiss Eagle's motion to dismiss in its entirety.

Dated: 12/13/07                          Respectfully submitted,


                                         /s/ John M. Shoreman
                                         _____
                                         John M. Shoreman (407626)
                                         McFadden & Shoreman
                                         1420 New York Avenue, N.W., Suite 700
                                         Washington, D.C.  20005
                                         (202) 638-2100
                                         fax (202) 628-0735

                                         *Attorneys for Plaintiffs*

**EXHIBIT 1**

**OPPOSITION TO MOTION TO DISMISS**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**JEROME CORSI**
41 Copeland Road,
Denville, NJ 07834,

**WILLIAM D. GERTZ**
811 Overfield Court,
Bowie, MD 20715,

**ROBERT B. PATTERSON**
139 Jamison Court,
Simi Valley, CA 93065,

**JOEL MOWBRAY**
331 W. 57th Street, #104
New York, NY 10019

and,

**RICHARD MINITER,**
2420 South Queen Street,
Arlington, VA 22202,
                    Plaintiffs,

v.

**EAGLE PUBLISHING, INC.**
One Massachusetts Avenue, NW
Washington, D.C. 20001
**Serve:** Corporate Services Co.
          1100 New York Avenue, NW
          West Tower Suite 500
          Washington, D.C. 20005
                    Defendant.

Case No.:

Case: 1:07-cv-02004
Assigned To : Huvelle, Ellen S.
Assign. Date : 11/6/2007
Description: General Civil

**JURY DEMAND**

## COMPLAINT

COME NOW, Plaintiffs JEROME CORSI, WILLIAM D. GERTZ , ROBERT B.

PATTERSON, JOEL MOWBRAY and RICHARD MINITER (collectively, "AUTHORS"), by

counsel, John M. Shoreman and Athan T. Tsimpedes, and in complaint against EAGLE

PUBLISHING, INC. ("EAGLE") states as follows:

## NATURE OF THE CASE

This action is brought by AUTHORS against EAGLE, which is the parent company of their book publisher REGNERY PUBLISHING, INC. ("REGNERY"). AUTHORS allege that EAGLE orchestrates and participates in a fraudulent, deceptively-concealed, and self-dealing scheme to divert book sales away from retail outlets and to wholly owned subsidiary organizations within the EAGLE conglomerate. Under this scheme, books written by AUTHORS and published by REGNERY are sold or transferred to affiliated organizations within the EAGLE conglomerate for no charge, or for a substantially reduced charge, in order to avoid or substantially reduce royalty payments to AUTHORS. The scheme is continuing in nature. As a result of the fraudulent scheme, EAGLE has benefited and been unjustly enriched well in excess of one million dollars ($1 million) to the detriment of the AUTHORS.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332.

2.    The amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

3.    Venue is appropriate in this Court pursuant to 28 U.S.C. §1391, *et seq*.

## THE PARTIES

4.    Plaintiff JEROME CORSI is a citizen of New Jersey.

5.    Plaintiff WILLIAM D. GERTZ is a citizen of Maryland.

6.    Plaintiff ROBERT B. PATTERSON is a citizen of California.

7.    Plaintiff JOEL MOWBRAY is a citizen of New York.

8.    Plaintiff RICHARD MINITER is a citizen of Virginia.

9.    Defendant EAGLE is incorporated under the laws of the District of Columbia. Its

2

principal offices are located within the District of Columbia.

## BACKGROUND FACTS

10.     REGNERY is a wholly owned subsidiary of EAGLE, which calls itself "America's leading conservative publishing company." EAGLE has developed a business model that integrates among its subsidiary organizations the functions of publisher and distributor.

11.     REGNERY's publications are marketed and sold by sister companies within the EAGLE conglomerate. Eagle Book Clubs, Inc. (wholly-owned by EAGLE) operates the Conservative Book Club ("CBC"). CBC has a membership of over 80,000 conservative readers. REGNERY sells first edition books to CBC at, below, or only marginally above, its own cost of publication. CBC substantially reduces royalties to AUTHORS. There is no honest negotiation in the sale of books from REGNERY to CBC. CBC purchases books from REGNERY for less than market price and/or is the sole book club selling certain REGNERY books. There is no arms-length, bidding competition for the purchase of REGNERY's books between CBC and other, unaffiliated, book clubs.

12.     In some cases CBC, or another EAGLE-owned entity, has actually offered REGNERY's new books to its membership prior to the official release date.

13.     The EAGLE conglomerate realizes greater profits from the sale of REGNERY's books by CBC than it does from sales in retail bookstores because, in part, little or no royalty is paid to REGNERY's authors and no promotional payments to retail bookstores are necessary. Nor does Regnery have to share revenue with the bookstores on sales made through CBC. This cannibalizes sales for the bookstores, where authors would receive the highest royalty, by steering sales to book clubs owned by Eagle, where the authors would receive almost no royalties.

14.     Conservative readers are the target audience of REGNERY's authors, as well as the target audience for EAGLE's direct marketing; CBC's often-discounted membership sales substantially detract from potential sales at the catalog list price in retail bookstores. EAGLE's interest in maximizing profits through CBC book sales is antithetical to the interest of REGNERY's authors in selling books at the catalog list price and thus maximizing royalties. EAGLE's self-dealing results in a direct financial injury to AUTHORS, and is contrary to the clear intent of the parties to REGNERY's publishing contracts.

15.     EAGLE also distributes REGNERY's books by direct mail and over the Internet. And, again, AUTHORS' expected royalties are substantially reduced or eliminated as a result. Other EAGLE subsidiaries publish periodicals that, like CBC, are geared to a conservative reading audience. These include magazines such as *Human Events* and the *Evans-Novak Political Report.*

16.     REGNERY's first edition books are offered as free gifts to new subscribers of EAGLE's periodicals. REGNERY supplies the new books to its affiliated publisher at or below cost, or for free, and EAGLE gains a new annual subscriber. EAGLE then maximizes the value of that subscription through its List Division, which rents the "highly-responsive political and financial customer lists" developed in its operations.

17.     EAGLE also controls and directs the donation of REGNERY books to non-profit entities such as the Eagle Foundation and CPAC. While Eagle may realize tax and other benefits from such donations, AUTHORS receive de minimus or no royalty compensation from EAGLE's transaction.

18.     While a model of efficiency, EAGLE's vertically integrated business model exploits, manipulates and defrauds the AUTHORS. The web of internecine, self-dealing transactions is

4

purposefully designed to divert sales away from the retail book trade, and is intentionally concealed by EAGLE and its agents. The AUTHOR's reasonable expectation that REGNERY, as a fiduciary, would promote retail sales at the catalog list price in order to maximize royalties, and concurrently enhance the AUTHORS' ability to repay advanced royalties promptly, is frustrated.

19.    Each of the AUTHORS entered into publishing contracts with REGNERY. Pursuant to the contracts REGNERY agreed to pay AUTHORS royalties of ten percent (10%) of its catalog retail price for the first 5,000 hardback books to the book trade, twelve and one-half percent (12½%) for the second 5,000 copies and fifteen percent (15%) thereafter. CORSI earned half the percentage at each threshold. Lesser amounts were paid for sales of paperback editions.

20.    The self-dealing transactions engaged in by EAGLE's subsidiaries are treated as sales to "additional markets." Royalties paid to AUTHORS for sales to "additional markets" are treated under a separate clause in the Publishing Contracts:

> Notwithstanding paragraph 2(b) or 2(c) hereof, on sales to additional markets outside regular bookstores or outside of the book trade, by means of direct mail circulation and coupon advertisements in newspapers or other periodicals and on premium sales and sales to organizations outside the book trade for resale or promotional use, and on the sale of books to book clubs Publisher shall pay Author ten percent (10%) of the amount received by the Publisher in excess of its manufacturing costs and returns.

21.    The "additional markets" clause is CORSI's June 2004 Contract provides for a royalty of five percent (5%) of the amount received by REGNERY.

22.    The "additional markets" clauses in two of the three GERTZ Publishing Contracts, and in one of MINITER's Publishing Contracts, differ in that they provide for prior approval of promotional sales and giveaways(?), though EAGLE chose uniformly to ignore that condition.

23.    Rather than promoting retail sales at the catalog list price in bookstores, REGNERY, at

EAGLE's direction, funnels books that otherwise would be available for retail sale to its EAGLE affiliates under the "additional markets" clause of the AUTHORS' Publishing Contracts. Rather than 10 to 15% of the catalog list price, GERTZ, PATTERSON, MOWBRAY and MINITER receive only 10% of the amount received over REGNERY's cost, which, given the lack of arms-length negotiation in REGNERY's "additional market" sales, is little or nothing at all. CORSI realizes five percent (5%) of what REGNERY receives on paper from EAGLE, less costs. The "price" charged by REGNERY to EAGLE subsidiaries is an arbitrary and capricious number chosen through self-dealing by EAGLE. The diversion of books away from retail sale is deliberately concealed from AUTHORS by EAGLE and its agents.

24.     REGNERY, at EAGLE's direction, undertakes to minimize retail sales through traditional channels in the book trade, while maximizing sales to "additional" markets through the direct marketing techniques of its EAGLE affiliates, which specifically target the conservative readers most likely to purchase books by the AUTHORS. Consequently, in addition to an immediate loss of royalty income, the AUTHORS suffer future economic injury and reputational damages. Non-retail sales are not included in industry-wide sales reports, such as Book Scan.

25.     The amount that another publisher is willing to advance for a book by a former EAGLE author, and the marketing budget it is willing to commit to support the authors' work, is determined by the industry-wide retail sales record generated from sales of the REGNERY books. Those sales figures available to other publishers are artificially depressed due to the number of books channeled by EAGLE to its subsidiaries, in less than arms-length transactions, for purposes of direct marketing. The diversion of book sales away from retail outlets distorts the AUTHORS' sales records since a significant number of books that were actually sold are not reported to the rest of the publishing industry. Higher sales of previous books commonly results

6

in larger marketing budgets for future books. Typically, the higher the marketing budget for a book, the greater the retail sales, and thus the greater the royalties paid to an author. Therefore, future publishers deciding to spend less on marketing because AUTHORS' sales figures for REGNERY-published books are artificially low results in lower sales, and consequently, lower royalties for AUTHORS. Thus, EAGLE's self-dealing and diversion of books away from retail sales has continuing adverse effects on AUTHORS' commercial and professional reputations.

## COUNT ONE
### Fraud

26.    Plaintiffs reallege paragraphs 1 through 25 of the Complaint as set forth in full.

27.    EAGLE participates in a scheme to defraud the AUTHORS by its conduct in diverting REGNERY book sales away from retail outlets and to its own subsidiaries in self-dealing transactions.

28.    As a direct and proximate cause of EAGLE's participation and concealment of the fraudulent scheme to deny AUTHORS their lawful royalty payments, Plaintiffs have been damaged in an amount presently unknown, but in excess of the jurisdictional minimum of this Court.

29.    Upon information and belief, EAGLE engaged in the fraudulent scheme described above willfully and knowingly with the intent to deceive Plaintiffs. EAGLE ratified the false statements and concealments of its subsidiaries. Accordingly, Plaintiffs are entitled to punitive and exemplary damages against EAGLE.

30.    Upon information and belief, EAGLE has acted with oppression, fraud and malice, and has deliberately caused and intended to cause great economic harm to Plaintiffs with full knowledge of the wrongfulness and unjustifiable nature of its conduct. Therefore, Plaintiffs should be awarded punitive and exemplary damages sufficient to punish Defendant for engaging

7

in this conduct and to deter similar conduct on its part in the future.

## COUNT TWO
## Inducement to Breach of Contract

31.    Plaintiffs reallege paragraphs 1 through 30 of this Complaint as set forth in full.

32.    EAGLE induced, forced and required its wholly owned subsidiary REGNERY to violate

the terms of the AUTHORS' Publishing Contracts by diverting books away from retail sales in

concealed, self-dealing transactions with affiliates.

33.    As a direct and proximate cause of EAGLE's inducement, REGNERY breached the

AUTHORS' Publishing Contracts by diverting books away from retail sales in self-dealing

transactions with affiliates.

## COUNT THREE
## Interference with Contractual Relations

34.    Plaintiffs reallege paragraphs 1 through 33 of this Complaint as set forth in full.

35.    EAGLE wrongfully interfered with the contractual relationship between REGNERY and

the AUTHORS by requiring REGNERY to divert books from retail sales in concealed, self-

dealing transactions with affiliates in order to maximize profits to the EAGLE conglomerate.

36.    EAGLE's interference in the contractual relationship between REGNERY and

AUTHORS frustrated the purposes of the Publishing Contracts and denied AUTHORS their

legitimate and expected benefits.

## COUNT FOUR
## Interference with Prospective Business Advantage

37.    Plaintiffs reallege paragraphs 1 through 36 of this Complaint as set forth in full.

38.    EAGLE participates in a concealed scheme to defraud the AUTHORS by its conduct in

diverting REGNERY book sales away from retail outlets and to its own subsidiaries in self-

dealing transactions.

8

39.    As a direct and proximate cause of EAGLE's participation and concealment in such scheme, the AUTHOR's retail book sales are artificially reduced resulting in damage to their professional reputations and interfering in prospective business relationships with other publishers.

## COUNT FIVE
### Unjust Enrichment

40.    Plaintiffs reallege paragraphs 1 through 39 of the Complaint as set forth in full.

41.    A benefit has been conferred upon EAGLE by the AUTHORS.

42.    EAGLE has knowledge of the benefit.

43.    EAGLE retained or accepted the benefit under such circumstances as to make it inequitable for it to retain the benefit without payment of its value to AUTHORS.

## COUNT SIX
### Accounting

44.    Plaintiffs reallege paragraphs 1 through 43 of the Complaint as set forth in full.

45.    The business relationship between the EAGLE conglomerate and AUTHORS and/or the circumstances regarding that business relationship, coupled with the missing and/or unpaid royalties makes this case appropriate for an accounting.

46.    The amount of money due from the EAGLE conglomerate to each Plaintiff is unknown and cannot be ascertained without an accounting of the receipts and disbursements of the aforementioned transactions.

## COUNT SEVEN
### Unfair Trade Practices

47.    Plaintiffs reallege paragraphs 1 through 46 of the Complaint as set forth in full.

48.    EAGLE engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, et seq.

## COUNT EIGHT
## Damage to Commercial Reputation

49.    Plaintiffs reallege paragraphs 1 through 48 of the Complaint as set forth in full.

50.    EAGLE's intentional diversion of book sales away from retail outlets is the direct and proximate cause of injury to the AUTHORS' commercial and professional reputations and to their respective standing in the literary community.

51.    AUTHORS rely on an industry-wide measure of retail book sales to negotiate advantageous terms in subsequent book contracts. As EAGLE is fully aware, AUTHORS' commercial reputations are built upon and maintained by measurable retail book sales.

## PRAYER FOR RELIEF APPLICABLE TO ALL COUNTS

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment against Defendant and grant the following relief:

A.    An accounting to be conducted to determine the profits, sales and royalties between each Plaintiff and Defendant regarding the subject matter herein;

B.    Constructive Trust imposed upon the assets of Defendant for the amounts determined Plaintiffs are entitled;

C.    Judgment for plaintiffs for:

    1.    Compensatory damages according to proof;
    2.    Consequential or Special Damages according to proof;
    3.    Punitive damages;
    4.    Disgorge from Defendant all monies received unjustly from its wrongful conduct;
    5.    Award attorneys' fees and costs; and,
    6.    Grant such other and further relief as the Court may deem just.

## DEMAND FOR JURY

Plaintiffs demand trial by jury on all issues.

Respectfully submitted,

John M. Shoreman (Bar No. 407626)
McFadden & Shoreman
1420 New York Avenue, NW
7th Floor
Washington, D.C. 20005
Tel. 202-638-2100
Fax 202-628-0735
Email: mstlaw@erols.com

*Counsel for the Plaintiffs*

COUNSEL:
Athan T. Tsimpedes
1420 New York Avenue, NW
7th Floor
Washington, DC 20005
Tel. 202-638-2100
Fax. 202-449-3499
Email: atsimpedes@comcast.net